UNITED STATES BANKRUPTCY COURT       **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                            Chapter 11

THE 1031 TAX GROUP, LLC, et al.,          Case No. 07-11448 (MG)

                                                 Jointly Administered

-----------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER DENYING MOTION FOR
APPOINTMENT OF CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE,
CONVERSION OF THE CASE TO A CASE UNDER CHAPTER 7**

**A P P E A R A N C E S :**

DREIER LLP
*Attorneys for the Debtors*
499 Park Avenue
New York, New York 10022
By:     Norman N. Kinel, Esq.
        Paul Traub, Esq.

DIANA G. ADAMS
*United States Trustee*
33 Whitehall Street, 21st Floor
New York, New York 10004
By:     Andrew Velez-Rivera, Esq.
        Linda Riffkin, Esq.
        Greg M. Zipes, Esq.

GREENBERG TRAURIG, LLP
*Attorneys for the Official Committee of Unsecured Creditors*
200 Park Avenue
New York, New York 10166
By:     Thomas J. Weber, Esq.
        Melanie L. Cyganowski, Esq.

TEITELBAUM & BASKIN, LLP
*Attorneys for the Certain Exchange Parties*
3 Barker Avenue, Third Floor
White Plains, New York 10601
By:     Jay Teitelbaum, Esq.

OLSHAN GRUNDMAN FROME
ROZENZWEIG &WOLOSKY LLP
*Attorneys for Certain Exchange Parties*
Park Avenue Tower
65 East 55th Street
New York, New York 10022
By:    Michael S. Fox, Esq.
        Andrea Fischer, Esq.

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
*Attorneys for Certain Exchange Parties*
437 Madison Avenue
New York, New York 10022
By:    Jonathan L. Flaxer, Esq.


**MARTIN GLENN**
**United States Bankruptcy Judge**

This matter is before the Court on motions filed by the U.S. Trustee and several

parties in interest, seeking the appointment of a chapter 11 trustee pursuant to § 1104 of

the Bankruptcy Code and Bankruptcy Rule 2007.1, or in the alternative, a conversion of

the case to a case under chapter 7 pursuant to § 1112 of the Bankruptcy Code (the

"Trustee Motions"). The Debtors filed an objection to the Trustee Motions on June 8,

2007, and thereafter the U.S. Trustee, several creditors, and the Debtors filed

supplemental briefs.[1] The Creditors Committee also opposes the appointment of a

trustee. The Court held an initial hearing on the Trustee Motions on July 2, 2007,

followed by an evidentiary hearing on July 11, 2007. Further supplemental submissions

---

[1]    The Debtors are: The 1031 Tax Group, LLC; 1031 Advance 132 LLC; 1031 Advance, Inc.; 1031
TG Oak Harbor LLC; Atlantic Exchange Company, Inc.; Atlantic Exchange Company LLC; Exchange
Management, LLC; Investment Exchange Group, LLC; National Exchange Accommodators, LLC;
National Exchange Services QI, Ltd.; National Intermediary, Ltd.; NRC 1031, LLC; Real Estate Exchange
Services, Inc.; Rutherford Investment LLC; Security 1031 Services, LLC; and Shamrock Holdings Group,
LLC. The Debtors moved to dismiss the bankruptcy proceedings of Exchange Management, LLC, Case
No. 07-11454, and National Intermediary, Ltd., Case No. 07-11458. An order dismissing these cases was
entered on June 11, 2007. The Debtor AEC Exchange Company, LLC filed its voluntary petition for relief
under chapter 11 of the Bankruptcy Code on June 11, 2007. The Debtors' cases are being jointly
administered.

were filed after July 11, 2007, but the parties agree that no further evidentiary hearing is required to address any issues of fact arising from the supplemental submissions. Upon considering all of the evidence and arguments, the Court finds that the moving parties have failed to establish that "cause" exists requiring appointment of a chapter 11 trustee pursuant to § 1104(a)(1), or that the appointment of a chapter 11 trustee is in the best interests of creditors pursuant to § 1104(a)(2). The moving parties have also failed to establish, in the alternative, that "cause" exists to convert this case to a case under chapter 7 pursuant to § 1112(b).

## I. BACKGROUND

### A. The Parties

On May 14, 2007 (the "Petition Date"), The 1031 Tax Group, LLC and the other debtors (collectively, the "Debtors") filed for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The Debtors continue to operate their businesses (primarily in a wind-down or liquidation mode) as debtors in possession under §§ 1107 and 1108. The 1031 Tax Group, LLC is the direct or indirect parent of the other Debtors. *See Debtors Rule 1007 Affidavit* ¶ 11, at Exhibit A (Debtor's Organization Chart) ("*1007 Affidavit*") (ECF No. 2). The Debtors are "qualified intermediaries," or "QIs," and are engaged in the business of providing custodial services to individuals and entities conducting property exchanges under § 1031 of the Internal Revenue Code, 26 U.S.C. § 1031. *See 1007 Affidavit* ¶ 7-8. The main purpose of a § 1031 like-kind exchange is to defer capital gains tax resulting from the sale of investment property. *U.S. Trustee's Motion Directing the Appointment of a Chapter 11 Trustee,* ¶ 2 *("U.S. Trustee's Motion")* (ECF No. 106). As of the Petition

Date, there were over 300 open exchange contracts with the Debtors representing an estimated liability of $151 million.  *1007 Affidavit* ¶ 13.

Edward H. Okun ("Okun") is the sole member of the main Debtor, The 1031 Tax Group, LLC, and was the sole manager or sole director of each of the Debtors.  *Voluntary Petition for each Debtor, Written Consent in Lieu of Meeting of the Sole Member* (ECF No. 1); *1007 Affidavit* ¶ 10.  Okun acquired all of the Debtor entities between August 2005 and December 2006 with a business strategy of "rolling up" regional qualified intermediaries into a national firm.  *1007 Affidavit* ¶ 11.  Okun is also the sole shareholder of Okun Holdings, Inc. ("Okun Holdings"), an entity that was intended to act as a holding company for all of Okun's business ventures.  *1007 Affidavit* ¶ 10. However, as of the Petition Date, the actions that needed to be taken to enable the Debtors to become part of Okun Holdings had not been effected.  *Id.*  Okun is also the sole member of Investment Properties of America, LLC ("IPofA"), a non-debtor entity owning property with substantial value, acquired with funds borrowed from the Debtors prepetition.

**B.  The Debtors' Liquidity Crisis Leads to Bankruptcy Filing**

The allegedly unauthorized borrowing of funds by IPofA from the Debtors, and IPofA's failure to repay such funds are the primary reasons for the Debtors' bankruptcy filings on May 14, 2007.  *1007 Affidavit* ¶¶ 22-23.  Specifically, IPofA and Okun Holdings engaged in intercompany transactions with the Debtors, in the form of a series of unsecured promissory notes (the "Affiliate Notes").  The Affiliate Notes are in writing, generally provide for market rates of interest, maturity dates and, in the event of non-payment, penalty interest provisions.  The maturity of each Affiliate Note generally was

4

one hundred and eighty (180) days, although certain Affiliate Notes contained different maturity timetables, or were payable on demand. *Id.; Declaration of Andrew Velez-Rivera* ¶ 14 (ECF No. 106). The funds represented by the Affiliate Notes were "borrowed" from the Debtors, and in turn used by Okun to invest in the business and investment activities of non-debtor entities owned or controlled by Okun, principally IPofA.[2] *Joint Disclosure Statement*, at 11.

While the Debtors contend that some cash payments were made in respect of the Affiliate Notes, the Affiliate Note balance grew from approximately $55 million at December 31, 2005, to approximately $113 million at December 31, 2006, and approximately $132 million (without accrued non-default interest) at May 11, 2007. *Id.* at 12. As of the Petition Date, the net balance due to the Debtors on the outstanding Affiliate Notes was approximately $137 million in principal and accrued interest at non-default contractual rates. *Id.* These Affiliate Notes represent the single most significant asset of the Debtors' estates; however, the value of the Affiliate Notes is, according to the Debtors, "speculative." *Id.* Various parties to Exchange Agreements, the U.S. Trustee, and others have made allegations that the funds in question were not borrowed, but instead were improperly diverted by Okun from the Debtors.[3]

---

[2]    The U.S. Trustee and other parties in interest contend that the loans from the Debtors to IPofA were funded with proceeds of the sales of exchange participants' properties, without the exchange participants' authorization or knowledge. *Velez-Rivera Declaration* ¶ 15.

[3]    The Debtors have advised that the United States Postal Inspector, in conjunction with the United States Attorney for the Eastern District of Virginia (Richmond Division) ("U.S. Attorney"), has been conducting an investigation into the Debtors and certain of Okun's non-debtor affiliates. Although specific details concerning the precise nature and focus of the investigation are confidential, the Debtors advise that the investigation in part concerns the circumstances surrounding the transfer of funds by certain of the Debtors to non-debtor affiliates of Okun in the period prior to the commencement of the chapter 11 cases. The Debtors have stated that since the Petition Date, they have been cooperating with authorities, including the U.S. Attorney in connection with its investigatory efforts. *Joint Disclosure Statement,* at 12.

In addition to the issues relating to the Affiliate Notes, according to Okun, the Debtors' liquidity crisis was further exacerbated by Debtors' employees in Denver and in San Jose who allegedly opened local bank accounts without the knowledge of Okun or his treasury management group. *Joint Disclosure Statement*, at 12. Funds were deposited into Colorado Capital Bank and Countrywide Bank and were later frozen by those institutions. *Id.* As a result of these actions, the payments to close certain exchange contracts expected to be funded from local accounts maintained by the various QIs were instead made from the main operating account, quickly depleting available funds and worsening the liquidity crunch. *Id.*

Faced with an impending financial crisis, the Debtors retained Dreier LLP ("Dreier") as it counsel and Huron Consulting Service LLC ("Huron") as its restructuring professionals. On May 8, 2007, Huron and Dreier, on behalf of the Debtors, and Okun and outside counsel to Okun Holdings, began negotiations in an attempt to stabilize the Debtors' businesses and possibly avoid bankruptcy filings. *1007 Affidavit* ¶ 20. As a result of the negotiations Okun executed a personal guarantee of the Affiliate Notes (ECF No. 211, Exhibit A), and he agreed "in principal" to collateralize the guarantee with a collateral package of assets of IPofA and/or other non-debtor entities controlled by Okun, in an effort to facilitate repayment of creditors' claims. *Id.* Since the chapter 11 filings, the Debtors, the Creditors Committee, Okun's counsel and JPS Capital Partners, LLC ("JPS"), a prospective lender, have been working to collateralize and monetize Okun's non-debtor assets to obtain financing to fund a reorganization plan. On July 19, 2007, the Debtors and the Creditors Committee filed a Joint Plan of Reorganization (the "Plan") that contemplates funding through a Plan Funding Agreement, secured by Okun's non-

debtor assets.[4]  (ECF No. 409).  On July 29, 2007, the Debtors and the Creditors

Committee filed the proposed Joint Disclosure Statement.  (ECF No. 457).

## C.  Prepetition Changes in the Debtors' Management

Presumably, at least in part, to avoid the appointment of a chapter 11 trustee, on

May 11, 2007, James R. Lukenda ("Lukenda"), the Managing Director of Huron, was

formally engaged as the Chief Restructuring Officer for the Debtors.  *See Written*

*Consent in Lieu of Meeting of the Sole Member of the 1031 Tax Group, LLC*

("Resolutions") (ECF No. 1).  Okun executed the resolutions effectuating the

appointment on May 12, 2007.[5]  *Resolutions* (ECF No. 1).  In its first day declarations,

the Debtors indicated that they anticipated hiring "an independent sole Manager," to

assume Okun's duties as sole member to act as the Debtors' board of directors.  *1007*

*Affidavit*, Schedule 12.  Pursuant to a letter dated May 25, 2007 (the "Irrevocable

Delegation Letter"), Okun delegated the authority to appoint the Manager to Lukenda.

*See Debtors' Motion Approving the Consulting and Services Agreement Between the*

*Debtors and Moran* ("Debtors Moran Motion"), Exhibit A (ECF No. 276).  Lukenda

selected Edward G. Moran ("Moran") as the Manager, and the motion to approve a

---

[4]     Okun also agreed not to transfer or otherwise encumber non-debtor property pending further order
of the Court. (ECF No. 277).

[5]     The U.S. Trustee previously filed objections to the retention of Huron and Dreier LLP, claiming
that neither was disinterested and, therefore, should not be retained.  *The United States Trustee's
Objections to Debtors' Application to Retain Dreier LLP as Counsel ("Dreier Objection")* ¶¶ 13-23 (ECF
No. 24, 145).  On May 17, 2007, the Court entered an interim order approving retention of Huron and
Dreier.  (ECF No. 57, 59).  A final hearing on the retention applications was held on July 2, 2007.  The
Court overruled objections by the U.S. Trustee and other parties in interest and approved the Huron and
Dreier final retention applications. (ECF No. 333, 334).  In entering the final retention orders, the Court
necessarily overruled the objections that Dreier, Lukenda and Huron are conflicted because they were
initially selected by Okun, with their retainers paid by IPofA.  The evidence at the July 11, 2007
evidentiary hearing further supports and confirms that Lukenda and Huron are independent and
unconflicted.

consulting agreement with Moran was also heard on July 11, 2007. *Debtors' Moran Motion*. On July 17, 2007, the Court in a written opinion conditionally granted the Debtors' motion to approve the selection of Moran as the Debtors' sole manager or sole director or sole general partner subject to the Debtors and Okun taking all required actions, consistent with applicable state laws, to implement the governance changes to reflect the roles that Moran will have for each of the Debtors. (ECF No. 400). All of these changes were completed by the July 27, 2007 deadline.[6] The amended organizational documents make clear that Okun cannot without Court approval terminate the manager or exercise management authority while the Debtors' chapter 11 cases are pending.

## II. DISCUSSION

Section 1104(a) of the Bankruptcy Code governs appointment of a chapter 11 trustee. It provides:

> a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
>
> > (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
> > (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> > (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

---

[6]   The Debtors reported to the Court on the completion of these governance changes in a report dated July 27, 2007, attaching copies of each of the documents by which the changes were effected. (ECF No. 447).

11 U.S.C. § 1104(a).

The appointment of a chapter 11 trustee is an extraordinary remedy. *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) (noting "the appointment of a §1104 trustee is an extraordinary remedy"); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) ("It is settled that appointment of a trustee should be the exception, rather than the rule.") (collecting cases). There is a strong presumption that a debtor should remain in possession absent a showing of need for the appointment of a trustee. *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990); 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][b] (15th ed. 2006). The party seeking appointment of a chapter 11 trustee has the burden of showing, by clear and convincing evidence, "cause" under § 1104(a)(1), or the need for a trustee under § 1104(a)(2). *Euro-American Lodging Corp.*, 365 B.R. at 426; *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006) (citing *In re Marvel Entertm't Group, Inc.,* 140 F.3d 463, 471 (3d Cir. 1998)). Although § 1104 requires a bankruptcy court to appoint a trustee if the requirements of the statute are met, a court has wide discretion in considering the relevant facts. *In re Sharon Steel Corp.*, 871 F.2d at 1226; *Adelphia*, 336 B.R. at 656 ("The decision to appoint a chapter 11 trustee is a factual determination entrusted to the discretion of the bankruptcy judge.").

## A.  Section 1104(a)(1) – Appointment of a Chapter 11 Trustee for "Cause"

The U.S. Trustee's principal argument has been that a chapter 11 trustee must be appointed because there is "cause" within the meaning of § 1104(a)(1). The appointment of a chapter 11 trustee is authorized upon the showing of cause – inclusive of fraud, dishonesty, incompetence or gross mismanagement of the debtor's affairs by *current*

9

*management*.  11 U.S.C. § 1104(a)(1).   Once the court makes a finding that cause exists

under § 1104(a)(1), "there is no discretion; an independent trustee must be appointed."  *In*

*re V. Savino Oil & Heating Co., Inc.,* 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).

Although the court's finding is limited to a factual determination whether "cause" exists,

a court is given wide latitude in determining whether the challenged conduct rises to the

level of "cause."  *Comm. of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d

239, 241-42 (4th Cir. 1987) (noting that the construction of § 1104 "requires that the

courts be given discretionary authority to determine whether the conduct rises to the level

of 'cause'").  When considering whether to appoint a trustee for cause, a court's focus is

on the debtor's current management, not the misdeeds of past management.  *See In re*

*Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("[O]n a motion for the

appointment of a trustee, the focus is on the debtor's current activities, not past

misconduct.") (citing 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][c][i] (15th ed.)).  In other

words, the fact that the debtor's prior management might have been guilty of fraud,

dishonesty, incompetence, or gross mismanagement does not necessarily provide grounds

for the appointment of a trustee under § 1104(a)(1), as long as a court is satisfied that the

current management is free from the taint of prior management.  *In re Microwave*

*Products of America,* 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989).  A court may

consider both the pre- and postpetition misconduct of the current management when

making the determination that "cause" exists for the appointment of a trustee.

*Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.),*

4 B.R. 635, 644-45 (Bankr. E.D.N.Y. 1980).

### 1. The Applicability of § 1104(e)

Section 1104(e) was added to the Bankruptcy Code and became effective in October 2005. *See* 11 U.S.C. § 1104(e) ("The United States trustee *shall* move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief financial officer, participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting.") (emphasis added); *see generally* 7 COLLIER ON BANKRUPTCY ¶ 1104.02 (15th ed. rev. 2007). The section was introduced into the Senate version of the bill late in the legislative process and there is little legislative history surrounding it.[7] The subsection gave the U.S. Trustee an important but ill-defined role requiring vigilance and action where fraud, dishonesty, or criminal conduct by "current members" of management is suspected. The U.S. Trustee must seek an order requiring appointment of a chapter 11 trustee whenever the "reasonable grounds to suspect" standard is met.[8] The standard in § 1104(e) – "reasonable grounds to suspect that current members of the governing body of

---

[7]      "This provision was added to the Bankruptcy Abuse Prevention and Consumer Protection Act during Senate Judiciary Committee mark-up of the bill, late in the bill's eight-year journey through Congress. As a result, there is very little legislative history or analysis to shed light on its meaning or probable operation." 7 COLLIER ON BANKRUPTCY ¶ 1104.02.

[8]      Commentators have raised questions about the standard that applies in determining reasonable suspicion. *See* NORTON ANNUAL SURVEY OF BANKRUPTCY LAW Part III § 34 (Sept. 2006) ("While at first blush newly added § 1104(e) appears straightforward, there is very little legislative history or analysis underlying its enactment to help explain how the subsection should operate in practice, and consequently several significant questions remain unanswered. For example: (1) under what standard (objective or subjective) should a trustee determine that 'reasonable' grounds exist to suspect that fraudulent, dishonest or criminal conduct has occurred? . . . ."); 7 COLLIER ON BANKRUPTCY ¶ 1104.02 ("The second question is what constitutes 'reasonable grounds to suspect.' Although the placement of the word 'reasonable' raises a possible question, the phrase as a whole suggests that the provision should apply only where it is reasonable, as an objective matter, for the United States trustee to suspect that one of the triggering grounds applies. Because of the risk of disruption that a contested trustee motion can create, the United States trustee should use appropriate discretion in evaluating whether there are 'reasonable grounds to suspect.'"

the debtor . . . participated in actual fraud, dishonesty, or criminal conduct in the

management of the debtor" – was unquestionably satisfied in this case in light of the so-

far uncontested facts surrounding Okun's borrowing of more than $150 million from the

Debtors.

Where an allegedly tainted "current member of the governing body of the debtor,"

11 U.S.C. § 1104(e), has selected or appointed new management, as is the case with

Okun, particularly if it is done immediately prepetition or postpetition, as occurred in this

case, the U.S. Trustee acts prudently when she challenges whether new management is

tainted by an association with, or selection or appointment by, the governing body.  But

the statutory requirement that the U.S. Trustee bring such a motion does not alter the

standard for deciding whether to grant the motion.  Rather, § 1104(a)(1)&(2), and the

cases interpreting these subsections, continue to control whether a trustee should be

appointed.  *See* NORTON BANKRUPTCY LAW AND PRACTICE 2d § 79.3 (database updated

June 2007) ("The addition of Code § 1104(e) in 2005, providing that the U.S. trustee

must move for the appointment of a trustee when there is evidence of managerial

participation in fraud, dishonesty, or criminal conduct in management of the debtor . . .

underscores congressional concern that untrustworthy management be removed in favor

of a trustee.  But while the 2005 Amendment mandates that a motion be made in the face

of such evidence, it did not change the standards for mandatory or discretionary

appointment of a trustee under Code § 1104(a) and (b).").

The Court has not found any cases that have interpreted or applied § 1104(e).

While prior case law establishes that the U.S. Trustee as the moving party bears the

burden of proving "cause" by clear and convincing evidence, the Court believes that where the U.S. Trustee establishes a *prima facie* case that a tainted current member of the governing body has selected or appointed new management shortly before or after a chapter 11 filing, a court should apply heightened scrutiny in reviewing whether new management is also tainted, thereby requiring appointment of a chapter 11 trustee for "cause." Once a *prima facie* showing is made by the U.S. Trustee, the burden then shifts to the debtors, or other parties opposing the appointment of a chapter 11 trustee, to demonstrate that the new management is unconflicted by any association with the tainted members of the governing body that made the selection or appointment.[9] If the parties opposing appointment meet this burden, the ultimate burden of establishing cause shifts back to the moving parties.[10] *Cf.* FED. R. EVID. 301 ("In all civil actions . . . a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.").

2. *The Debtors Have Met Their Shifting Burden*

Whether Okun retained or exercised management authority, whether the Debtors' appointments of Lukenda and Moran were made in accordance with applicable state

---

[9] It is important to note that "reasonable grounds" to suspect fraud is not the same as establishing a *prima facie* case of fraud.

[10] Difficult questions could be presented if a new chief executive officer or chief financial officer reported to an allegedly tainted officer or board, or if some but not all board members are allegedly tainted. In this case, even though Okun remains the sole member of The 1031 Tax Group, LLC, the changes in the Debtors' organizational documents pursuant to applicable state laws, and the Irrevocable Delegation Letter signed by Okun, have stripped Okun of his power to exercise management authority or control. Moran and Lukenda may not take instructions from Okun, and the evidence shows that Okun has not attempted to exercise any management authority and can no longer do so in any event. The Court has expressly found, based on the evidence in the record, that Moran and Okun are independent and unconflicted.

laws, and whether Lukenda and Moran are independent and unconflicted, were disputed

issues of fact that necessitated scheduling the July 11, 2007 evidentiary hearing.  Both

prepetition and since the U.S. Trustee and several creditors filed the Trustee Motions, the

Debtors and Okun have taken steps to put to rest the U.S. Trustee's concern that Okun

retains management authority and control of the Debtors.  First, Huron's consulting

agreement, approved on an interim basis by the Court on May 22, 2007, and approved

finally on July 3, 2007, provides that Huron and Lukenda would manage the Debtors'

operations (ECF No. 11), and the Irrevocable Delegation Letter expressly provides that

Lukenda and Moran will not report to or receive instructions from Okun (ECF No. 276).

Second, in response to continuing questions by the U.S. Trustee and the Court

whether Okun has irrevocably transferred management authority, Okun's counsel agreed

on the record in open court that Okun has irrevocably transferred management authority

during the pendency of the chapter 11 cases, a representation which the Debtors contend

and the Court concludes is enforceable by judicial estoppel.  *See June 11, 2007 Hearing*

*Transcript* at 122-23 (ECF No. 269); *Maharaj v. Bankamerica Corp.* 128 F.3d 94, 98 (2d

Cir. 1997) ("[J]udicial estoppel may be applied to bar a party from asserting a factual

position in a given proceeding only when that party advanced a clearly inconsistent

position in a prior proceeding and that inconsistent position was adopted by the court in

some manner . . . .").  This is further supported by Lukenda's testimony that since his

selection as Chief Restructuring Officer for the Debtors, Okun has taken no actions to

exercise any management control or authority over the Debtors. *July 11, 2007 Hearing Transcript* at 59, 113 (ECF No. 426).[11]

Third, in response to the U.S. Trustee's contention that Lukenda, as Chief Restructuring Officer, did not have the authority to appoint Moran as sole manager, sole director or partner – in effect, to appoint Moran as Lukenda's boss – Okun signed the Ratification Letter, ratifying and confirming Lukenda's selection of Moran to fill each of the designated roles. (ECF No. 360). Okun's signing of the Ratification Letter at Lukenda's request was a ministerial act rather than the exercise of management authority. While the U.S. Trustee disputes Lukenda's authority to make the selection, the Ratification Letter and subsequent changes in the Debtors' organizational documents have assured that Moran is properly authorized to fill his designated roles.

Finally, in response to the Court's opinion conditionally approving Moran's consulting agreement, the Debtors and Okun have taken additional steps, in accordance with applicable state laws, to change the governance structure of each of the Debtors, removing Okun and replacing him with Moran as sole manager, sole director or partner of the Debtors. *Cf. In re Bayou Group, LLC,* 363 B.R. 674 (S.D.N.Y. 2007) (holding prepetition appointment by the court of a new managing member of the debtor pursuant

---

[11]     The U.S. Trustee also appears to challenge the Debtors' authority to replace the management of a debtor in possession, even though the change was made prior to the bankruptcy filing, and asserts that the Debtors have asked the court to approve Lukenda to act as a "quasi-trustee." The U.S. Trustee asserts that "Congress has only provided one way to replace the management of a debtor in possession, *i.e.*, the appointment of a trustee pursuant to § 1104(a)." The Court rejects this argument outright because nothing in the Bankruptcy Code precludes a debtor in possession from making necessary changes to its management while in bankruptcy. In fact, the Code requires the debtor to continue to run the debtor's day-to-day operations and make the necessary changes to the business to provide for a successful reorganization. However, § 1104(a)(1) requires the Court, if a motion to appointment a trustee is made, to examine the integrity of the new management.

to its authority under federal securities law remains in effect after bankruptcy filing; the managing member may continue to manage the debtor's operations as debtor-in-possession and this selection does not warrant the appointment of a trustee under § 1104(a)(1)). The Court concludes that the organizational changes have confirmed what has been true since the outset of these cases, namely that Okun has effectively insulated current management from his management authority and control.[12]

The Court need not decide whether any one of these individual steps was sufficient to assure that Okun was effectively removed from management authority or control (or ability to control) the Debtors. The Court expressly finds that taken together these steps have resulted in the Debtors installing new current management, free from any taint associated with Okun or prior management.

Based on the evidentiary record, and applying the suggested burden shifting standards here, the Court concludes that the motion for appointment of a chapter 11 trustee for "cause" under § 1104(a)(1) must be denied. The U.S. Trustee established a *prima facie* case of fraud by Okun. However, establishing fraud by a member of the Debtors' governing body that appoints new management is by itself insufficient to

---

[12]     John Benitez, the Co-Chairman of the Creditors Committee, also testified at the July 11 hearing. Benitez has been deeply involved on behalf of the Creditors Committee in the ongoing negotiations of the Plan and the Plan Funding Agreement. He testified that he has not seen any evidence that the Debtors are taking instruction or assistance from Okun. *Id.* at 160. He further testified that in negotiations, the Debtors have taken positions concerning Okun that may have been harsher than the Committee's position. *Id.* at 160-61.

Moran also testified at the July 11 hearing, explaining that he understood that he would primarily be acting as a manager, or a sole director of the Debtors, and the Debtors' management would report to him. *July 11, 2007 Hearing Transcript* at 139. Moran further testified that he understood that he had a fiduciary duty to the Debtors' constituents, and that he would exercise his independent judgment as to any proposed settlement that could be reached. *Id.* at 142. In approving the Moran consulting agreement, the Court found that Moran is an independent fiduciary.

require the appointment of a trustee.  The issue is whether current management is tainted.

Okun is the sole member of The 1031 Tax Group, LLC, and he made the appointment of

Lukenda as Chief Restructuring Officer.  While Lukenda's position is not one of those

specifically identified in § 1104(e), *i.e.*, chief executive officer and chief financial officer,

Okun "irrevocably delegated" all management authority to Lukenda, at least until a new

sole manager was selected, functionally making Lukenda the chief executive officer.[13]

Moran, the new sole manager, director or partner of the Debtors, was not selected or

appointed by Okun, other than for the ministerial acts required to confirm the

appointment or election of Moran in accordance with applicable state laws, but the U.S.

Trustee challenged Moran's selection by Lukenda.  Even assuming that the U.S. Trustee

made the necessary initial showing challenging the selections of Lukenda and Moran, the

Debtors and Creditors Committee in opposing the appointment of a chapter 11 trustee

easily met the shifted burden, establishing that Lukenda and Moran – Debtors' current

management – are independent, unconflicted, and in no way beholden to Okun or prior

management.  Furthermore, the evidence established that since the filing of the chapter

11 cases, Okun has taken no actions to interfere with the management authority or

decisions by Lukenda and Moran.  The evidentiary record also clearly establishes that

Lukenda and Moran had no prior association with Okun or the Debtors.  They are

experienced professionals clearly qualified for the important roles they have been

appointed or elected by the Debtors to fill.  With the ultimate burden then shifted back to

---

[13]      *See* 7 COLLIER ON BANKRUPTCY § 1104.02 ("Another question is which of the debtor's directors
and officers are covered by the provision [of §1104(e)].  Clearly, the chief executive officer and the chief
financial officer are covered.  That should be the case whether or not they actually hold those titles.  For
example, if the most senior executive office has the title of 'president,' the provision should apply;
similarly if the most senior finance executive is the controller or vice president-finance.").

the U.S. Trustee, she failed to establish "cause" for the appointment of a chapter 11

trustee under § 1104(a)(1).

## B.  Section 1104(a)(2)- Appointment of a Chapter 11 Trustee When In The Creditors' Best Interests

Even if the Court does not find that "cause" exists to appoint a chapter 11 trustee

under § 1104(a)(1), the Court may still appoint a trustee if it is in the "interest of the

creditors . . . and other interests of the estate."  11 U.S.C. § 1104(a)(2).  Section §

1104(a)(2) "envisions a flexible standard" and "gives the district court discretion to

appoint a trustee when doing so would serve the parties' and estate's interests."  *In re*

*Marvel Entertm't,* 140 F.3d at 474 (quoting *In re Sharon Steel Corp.,* 871 F.2d at 1226)

(internal quotations omitted); *In re Ionosphere,* 113 B.R. at 168 (noting that "courts look

to the practical realities and necessities" in considering whether to appoint a chapter 11

trustee under § 1104(a)(2)).  "The twin goals of the standard for appointment of a trustee

should be protection of the *public interest* and the interests of creditors . . . and

facilitation of a reorganization that will benefit both the creditors and the debtors. . . ."

*Id.*  (quoting House Report, 124 Cong.Rec. H11, 11 (daily ed. Sept. 28, 1978)).  Although

the standard is amorphous and necessarily involves a great deal of judicial discretion,

courts have considered several factors including: "(i) the trustworthiness of the debtor;

(ii) the debtor in possession's past and present performance and prospects of the debtor's

rehabilitation; (iii) the confidence – or lack thereof – of the business community and of

the creditors in present management; and (iv) the benefits derived by the appointment of

a trustee, balanced against the cost of appointment."  *Euro-American Lodging Corp.* 365

B.R. at 427 (quoting *In re Ionosphere,* 113 B.R. at 168) (citations omitted); *In re V.*

*Savino Oil & Heating Co,* 99 B.R. at 527 n. 11 ("[T]he factors constituting a basis for

appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a

great deal of judicial discretion").  In essence, § 1104(a)(2) reflects "the practical reality

that a trustee is needed."  *In re V. Savino Oil & Heating Co ,* 99 B.R. at 527 n. 11.

        While the Court has concluded that the U.S. Trustee failed to establish "cause" for

the appointment of a chapter 11 trustee based on the contention that current management

remains tainted by the timing and manner of their appointment or election, those same

circumstances surrounding the selection of new management are relevant considerations

applying factors (i) and (iii) of the *Euro-American* and *Ionosphere Clubs* factors quoted

above, s*ee Euro-American*, 365 B.R. at 427; *Ionosphere Clubs*, 113 B.R. at 168,

specifically the trustworthiness of the debtor and the confidence – or lack thereof – of the

creditors in the present management.  While the U.S. Trustee failed to show that current

management is tainted by the alleged sins of prior management, some of the creditors

have expressed a well-founded distrust and a lack of confidence in the Debtors, even with

their new management.  These factors, standing alone, would point to the appointment of

a chapter 11 trustee.

        But there are additional factors to consider.  Where a case has an active creditors

committee functioning effectively and working well with the debtors, as it does here,

there is little benefit in appointing a trustee.  Particularly as these cases have unfolded,

real progress has been made through the joint efforts of the Debtors' new management

and the Creditors Committee.  As already stated, the Creditors Committee strongly

opposes the motion, including through the testimony of the Co-Chairman of the

Committee. The Debtors and the Creditors Committee have now presented for hearing a

proposed Joint Disclosure Statement (ECF No. 457) and Plan (ECF No. 409). Court

hearings on both have already been set, and while no assurance can be given that

approval of the Court and the creditor body (if submitted to a vote) will be given, these

steps so early in this difficult case are important. The evidence demonstrated that

ordering the appointment of a chapter 11 trustee now would threaten these positive

developments. *See Testimony of John Benitez, July 11, 2007 Hearing Transcript* at 161-

63.[14]

A major factor in these cases affecting the Creditors best interests is the issue of

time.[15] Because of the 180 day time limit to complete a § 1031 like-kind exchange −

which the court does not have the authority to extend − all of the constituents have a

strong interest in confirming a viable Plan as expeditiously as possible. Exchange

---

[14]      At the July 11, 2007 evidentiary hearing, John Benitez, the Co-Chairman of the Creditors
Committee, testified persuasively against the appointment of a trustee. Benitez gave several
reasons, including: the time delay; the additional cost to the estate; the effect that the negotiations
with JPS; and the concern that JPS would not look favorably on the appointment of a trustee
because the negotiations have largely been completed. *July 11, 2007 Hearing Transcript* at 161-
63. For example, with respect to the issue of timing, Benitez stated:

> [W]e're in a very delicate timeframe that things have to happen very quickly. We have to
> get the plan, we have to get the disclosure statement, we have to get that before the Court,
> we absolutely have to get information out to the creditors. And the timing is very, very
> critical. So to the extent there's and advent of another person in the process it may well,
> and my sense is it may slow down the process.

*Id.* Further, Benitez indicated that an important intangible factor was the effect a trustee would have on the
negotiations with Okun and JPS. At this stage all of the "pieces of the puzzle" have at least been identified.
*Id.* at 162. A trustee who would rightly want to become involved in the process and would need time to
educate himself, and would likely not add value to the process. *Id.*

[15]      The U.S. Trustee challenges the assertion that the appointment of a trustee will create a time delay.
The Trustee has stated that it has interviewed several candidates for the trustee position (including Moran),
the candidates are aware of the general events surrounding the case, and are ready and prepared to assume
the role of trustee. The Court believes that the appointment of a chapter 11 trustee at this stage will delay
the proceedings and perhaps threaten the sensitive negotiations that have been conducted leading to the
proposed Plan.

participants will avoid loss of their funds, adverse tax consequences and, possibly, additional potentially unrecoverable damages, if they can close their open exchange transactions within the applicable time limits; the Debtors will avoid additional consequential damages claims to the extent that open exchange transactions can be salvaged; and exchange participants who can no longer avoid the adverse tax consequences and possibly other damages from missed deadlines will be benefited to the extent that total claims against the Debtors are reduced in the event there is not enough money available for a full recovery by everyone.  Therefore, the Court concludes based upon consideration of all of the evidence, and the exercise of the Court's discretion, that the appointment of a trustee is not in the creditors' best interests.  For that reason, the motion for appointment of a chapter 11 trustee under § 1104(a)(2) should be denied.

## C.  Conversion Pursuant to § 1112(b) To A Case Under Chapter 7

The Trustee Motions[16] argued in the alternative that the case should be converted to a case under chapter 7 because "cause" exists under § 1112(b) of the Bankruptcy Code. Section 1112(b)(1) provides:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

---

[16]    Although the U.S. Trustee makes this alternative argument, the U.S. Trustee's brief stated that she prefers the appointment of a chapter 11 trustee at this time.  The U.S. trustee notes that where some moving creditors favor conversion due largely to the desire to curb administrative expenses, most notably the expenses of a committee, this monetary concern is insufficient to override the statutory framework of § 1104(a)(3).  Further, the U.S. Trustee notes that due to the inherently personal nature of the debtors' customers, an official committee could well serve its constituents.

11 U.S.C. § 1112(b)(1).  The bankruptcy court has wide discretion to determine if cause

exists and how to ultimately adjudicate the case.  *In re State St. Assoc.*, 348 B.R. 627, 638

(Bankr. N.D.N.Y. 2006).  Section 1112(b)(4) provides a list of non-exclusive factors that

constitute "cause" and includes the following factors which the moving parties assert are

relevant here: substantial and continuing loss to the estate in conjunction with the absence

of a reasonable likelihood for rehabilitation, and gross mismanagement of the estate.  11

U.S.C. § 1112(b)(4); *see In re State St. Assoc.*, 348 B.R. at, 639 n.24 ("While the

enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in

§ 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, not

exhaustive has not.").  However, even if there is a finding of cause – a court is not

obligated to convert the case – the decision remains within the court's discretion.  11

U.S.C. § 1112; H. Rep. 595, 95th Cong., 1st Sess. 405 (1977) ("Subsection (b) gives wide

discretion to the court to make an appropriate disposition of the case when a party in

interest requests.").  The statute explicitly provides for this discretion where a court is

able to identify "unusual circumstances . . . that establish that the requested conversion is

not or dismissal is not in the best interests of creditors and the estate . . . ."  11 U.S.C. §

1112(b)(1).[17]

     The moving parties have failed to establish that "cause" exists for the appointment

of a trustee.  Even if such "cause" does exist the Court finds that conversion is not in the

estates' or the creditors' best interest.  The fact that there is a continuing loss to the estate,

due to the mounting administrative costs and the lack of any new business entering the

---

[17]     The exception to conversion under § 1112(b)(2) is inapplicable here because the creditors seek
conversion based on the loss and diminution of estate assets and absence of a reasonable likelihood of
rehabilitation.

estate, is insufficient to establish "cause" within the meaning of § 1112(b).  *In re Photo Promotion Assocs., Inc.,* 47 B.R. 454, 458 (S.D.N.Y. 1985) (stating that a party moving under § 1112(b)(1) must establish both the "continuing loss to or diminution of the estate *and* absence of a reasonable likelihood of rehabilitation").  To the extent that the movants challenged the Debtors' ability to rehabilitate, the Debtors have worked diligently with the Creditors Committee to file a proposed Joint Disclosure Statement and Plan that could provide creditors with close to full recovery of their claims.  This belies the assertion that the debtors cannot reorganize.  Finally, as discussed in Section II.A.2, *supra*, at 14-18, the movants have not established that current management has grossly mismanaged the estate.  Therefore, cause has not been established and conversion is inappropriate.

### III.  CONCLUSION

For the foregoing reasons, the Trustee Motions to appoint a chapter 11 trustee, or in the alternative to convert the case to a case under chapter 7 are denied.

**IT IS SO ORDERED.**

DATED:  New York, New York
             August 13, 2007

            **/s/ Martin Glenn**
            **THE HON. MARTIN GLENN**
            **United States Bankruptcy Judge**

23