UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

In re:                                            :
                                                  :     Chapter 11
The 1031 Tax Group, LLC, *et al.*,                :     Case No. 07-B-11448(MG)
                                                  :     Jointly Administered
                        Debtors.                  :
                                                  :
--------------------------------------------------------------X
In re:                                            :
                                                  :
IPofA Shreveport Industrial Park, LLC             :     Chapter 11
                                                  :     Case No. 07-13624(MG)
                        Debtor.                   :
                                                  :
--------------------------------------------------------------X

## SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF
## GERARD A. McHALE, JR., AS CHAPTER 11 TRUSTEE
## FOR EACH OF THE 1031 DEBTORS[1], AND
## IPofA SHREVEPORT INDUSTRIAL PARK, LLC

Dated: August 11, 2009

## THE SECOND AMENDED PLAN OF REORGANIZATION IS BEING FILED, BUT HAS NOT YET BEEN APPROVED FOR DISSEMINATION BY THE COURT; NO VOTES ARE BEING SOLICITED AT THIS TIME; VOTES WILL ONLY BE SOLICITED WHEN THE DISCLOSURE STATEMENT IS APPROVED

## PLAN INTRODUCTION AND SUMMARY

Gerard A. McHale, Jr., the court appointed Chapter 11 Trustee of the 1031 Debtors, and IPofA Shreveport Industrial Park, LLC jointly propose the Plan. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, the Chapter 11 Cases, risk factors, summary and analysis of the Plan, and certain other related matters. All parties entitled to vote on the Plan should review the Disclosure Statement (when it is approved by the Court) and the terms of the Plan before voting to accept or reject the Plan. In addition, there are other agreements and documents that will be filed as part of the Plan Supplement, that are referenced in the Plan and/or Disclosure Statement, and that will be available for review.

---

[1] The 1031 Debtors are The 1031 Tax Group, LLC, 1031 Advance 132 LLC, 1031 Advance, Inc., 1031 TG Oak Harbor LLC; Atlantic Exchange Company, Inc., Atlantic Exchange Company LLC, Investment Exchange Group, LLC, National Exchange Accommodators LLC, National Exchange Services QI, Ltd., NRC 1031 LLC, Real Estate Exchange Services, Inc., Rutherford Investment, LLC, Security 1031 Services, LLC, Shamrock Holdings Group, LLC, and AEC Exchange Company, LLC.

REFERENCE IS MADE TO THE DISCLOSURE STATEMENT ACCOMPANYING THE PLAN FOR A DISCUSSION OF THE DEBTORS' HISTORY, A DESCRIPTION OF KEY EVENTS IN THE CHAPTER 11 CASES, AND A SUMMARY AND ANALYSIS OF THE PLAN. ALL CLAIM HOLDERS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO CONSULT THE DISCLOSURE STATEMENT AND TO READ THE PLAN CAREFULLY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

NOTHING IN THE PLAN SHALL BE CONSTRUED AS CONSTITUTING A SOLICITATION OF ACCEPTANCES OF THE PLAN UNLESS AND UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED AND DISTRIBUTED TO ALL HOLDERS OF CLAIMS AND INTERESTS TO THE EXTENT REQUIRED BY BANKRUPTCY CODE SECTION 1125.

NO SOLICITATION MATERIALS OTHER THAN THE DISCLOSURE STATEMENT (WHEN IT IS APPROVED BY THE COURT) AND RELATED MATERIALS TRANSMITTED THEREWITH MAY BE USED IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN.

## ARTICLE I

### DEFINITIONS; RULES OF INTERPRETATION; AND COMPUTATION OF TIME

**Section 1.1** **Definitions.** Capitalized terms used herein shall have the following meanings:

**"1031 Chapter 11 Cases"** means the jointly administered Chapter 11 cases of the 1031 Debtors (as defined below) pending before the Bankruptcy Court and bearing case number 07-11448 (MG).

**"1031 Debtors"** means, collectively, The 1031 Tax Group, LLC, 1031 Advance 132 LLC, 1031 Advance, Inc., 1031 TG Oak Harbor LLC; Atlantic Exchange Company, Inc., Atlantic Exchange Company LLC, Investment Exchange Group, LLC, National Exchange Accommodators LLC, National Exchange Services QI, Ltd., NRC 1031 LLC, Real Estate Exchange Services, Inc., Rutherford Investment, LLC, Security 1031 Services, LLC, Shamrock Holdings Group, LLC, and AEC Exchange Company, LLC, each of which is a subject of the 1031 Chapter 11 Cases.

**"AEC Parties"** means Atlantic Exchange Company, LLC, a Massachusetts limited liability company now known as Ocean Holdings, LLC ("AEC"), William A. Hazel, J. Patrick Dowdall, James F. Livesey, Charles D. Subrt, and any other officers, employees, attorneys, managers, members, partners and/or owners of AEC that are entitled to the benefit of the release and discharge provided in the AEC Settlement Agreement, and their respective, heirs, successors and assigns.

**"AEC Parties Settlement Agreement"** means that certain agreement between the 1031 Debtors and AEC, William A. Hazel, J. Patrick Dowdall, James F. Livesey, Charles D. Subrt and dated February 17, 2009, a copy of which is annexed hereto as **Exhibit 1**, as the same may be amended and in effect from time to time.

**"Acceptance"** or **"Accept"** means acceptance of the Plan by a Class of holders of Claims or Interests pursuant to Bankruptcy Code Section 1126(c) or (d).

**"Administrative Claims Bar Date"** means: (i) with respect to creditors who assert a Claim arising between the Petition Date and July 30, 2007 against the 1031 Debtors, the General Claims Bar Date; (ii) with respect to creditors who assert a Claim arising after November 15, 2007 but prior to February 18, 2009 against IPofA Shreveport, April 3, 2009; (iii) with respect to creditors who assert a Claim arising between July 30, 2007 and the Effective Date against the 1031 Debtors, 4:00 p.m. (Eastern) on the date that is the first Business Day after the date that is thirty (30) days after the Effective Date; and (iv) with respect to creditors who assert a Claim arising between February 18, 2009 and the Effective Date against IPofA Shreveport, 4:00 p.m. (Eastern) on the date that is the first Business Day after the date that is thirty (30) days after the Effective Date.

**"Administrative Claim"** means a Claim against a Debtor for costs and expenses of administration under Bankruptcy Code Section 503(b) entitled to priority in payment under Bankruptcy Code Section 507(a), including but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date for preserving the Estates and/or operating the Debtors' businesses; (b) cure costs associated with the assumption or assumption and assignment of executory contracts and unexpired leases pursuant to Bankruptcy Code Section 365; and (c) all fees and charges assessed against an Estate under Section 1930 of title 28 of the United States Code. The term "Administrative Claim" as used herein shall exclude all Fee Claims.

**"Allowed"** or **"Allowed Claim"** means a Claim that is Allowed under the Plan and, therefore, is not subject to disallowance, defense, reduction, avoidance, setoff, or subordination of any kind. The term "Allowed" or "Allowed Claim" also means any Claim to the extent: (a) such Claim is scheduled by a Debtor pursuant to the Bankruptcy Code and Bankruptcy Rules in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined or disputed; or (b) a proof of such Claim was timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules and/or any applicable Final Order, or late filed, but with leave of the Bankruptcy Court, deemed timely, and, in either case, (i) is not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules and/or applicable orders of the Bankruptcy Court or (ii) has otherwise been allowed by a Final Order. An "Allowed" Claim includes a previously Disputed Claim to the extent such Disputed Claim becomes Allowed when the context so requires. Except as otherwise expressly provided herein (including with respect to Excess Exchanger Claims) or in a Final Order of the Bankruptcy Court allowing such Claim, the term "Allowed" Claim shall not include (i) interest on account of such Claim from and after the Petition Date, (ii) any non-compensatory penalties, fines, punitive damages, exemplary damages, multiple damages, treble damages or any other claims or obligations that do not compensate for actual losses incurred, and (iii) any other amounts not allowable under the Bankruptcy Code or applicable law.

**"Allred Parties"** means Steven Allred, his heirs, successors and assigns.

**"Allred Settlement Agreement"** means that certain agreement between the 1031 Debtors and Steven Allred made as of January 21, 2009, a copy of which is annexed hereto as **Exhibit 2**, as the same may be amended and in effect from time to time.

**"Assets"** means (a) all assets, properties and rights of every kind, nature, character and description (whether real, personal, or mixed, whether tangible or intangible, contract rights, including rights under the Class Action Agreement, wherever situated and by whomever possessed, including the goodwill related thereto), of or owned by any of the Debtors or the Estates, including all property that constitutes property of the Estates within the meaning of Bankruptcy Code Section 541, including without limitation and any all Estate Causes of Action or rights of the Debtors under federal, state, or foreign law; and (b) the proceeds, products, rents and profits of any of the foregoing. The term "Assets" shall include all Okun Assets, except to the extent previously sold, transferred, conveyed or abandoned.

**"Asset Transfer Agreement"** means that certain agreement dated October 11, 2007 and approved by the Bankruptcy Court on October 26, 2007 under which Okun and Simone Bolani transferred the Okun Assets to the 1031 Debtors.

**"Available Cash"** means Cash held by the Liquidation Trust, available from time to time, for payment of Liquidation Trust Expenses and/or for distribution to holders of Allowed Claims after payment of Liquidation Trust Expenses, and net of Reserves for Disputed Claims and for anticipated Liquidation Trust Expenses, all as determined by the Liquidation Trustee in accordance with the Plan and the Liquidation Trust Agreement.

**"Avoidance Actions"** means any claims, rights, defenses, or other causes of action arising under Chapter 5 of the Bankruptcy Code, including without limitation, Bankruptcy Code Sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553, or under similar state or federal statutes and common law, including state fraudulent transfer or preference laws, whether or not prosecution of such actions has commenced as of the Confirmation Date or the Effective Date.

**"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York, or such other court having jurisdiction over these Chapter 11 Cases or any proceeding within, or appeal of an order entered in, the Chapter 11 Cases.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms and the local rules and general orders of the Bankruptcy Court, and as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**"Basic Exchanger Claims"** shall have the meaning ascribed to such term in Section 5.3(c) of the Plan.

**"Beneficiary"** and **"Beneficiaries"** mean the holders of Allowed Claims in Class 3.

**"Bennett Parties"** means William D. Bennett, National Intermediary, Ltd., a Texas limited partnership ("NIL"; the general partner of which is Exchange Management, L.L.C., a Manager of which is William D. Bennett), NIL's general and limited partners, their respective officers, employees, managers, members, owners, representatives and attorneys, and heirs, successors and assigns.

**"Bennett Settlement Agreement"** means that certain agreement between the 1031 Debtors, William D. Bennett and NIL, dated February 11, 2009, a copy of which is annexed hereto as **Exhibit 3**, as the same may be amended and in effect from time to time.

**"Business Day"** means any day, other than a Saturday, Sunday or a "legal holiday" (as such term is defined by Bankruptcy Rule 9006(a)).

**"Cash"** means money that is legal tender of the United States of America or the indubitable equivalent thereof.

**"Causes of Action"** means any and all claims, rights, defenses, offsets, recoupments, actions in law or equity or otherwise, causes of action, choses in action, suits, damages, rights to legal or equitable remedies, judgments, third-party claims, counterclaims and cross-claims against any Entity or Person, whether arising under the Bankruptcy Code or federal, state, common, or other law, regardless of whether the subject of pending litigation or proceedings on the Confirmation Date, the Effective Date, or thereafter, including but not limited to: (a) all Avoidance Actions; (b) all other claims in avoidance, recovery, or subordination; and (c) all other actions described in the Disclosure Statement, any of the Schedules, or the Plan.

**"CCB"** means Colorado Capital Bank.

**"CCB Covered Fees and Expenses"** means any fees and expenses reasonably incurred by CCB (i) in respect of defending any action actually commenced by an Exchanger arising out of or in connection with an Exchange Agreement and/or (ii) to satisfy any judgment entered against CCB in any such action.

**"CCB Parties"** means CCB and its shareholders, directors, officers, parents, successors, assigns, affiliates, heirs, executors, administrators, attorneys and any individuals or entities or professional persons engaged by CCB (including without limitation, Jones Day, Hatch Jacobs LLC and Sandberg, Phoenix & von Gontard, P.C.).

**"CCB Release"** means the release and injunction enjoining the Debtors, their Estates, any Creditors, Exchangers and all other Persons from asserting any and all claims that can or could be asserted against CCB, including without limitation, any claims in respect of (i) funds in accounts formerly maintained by Investment Exchange Group, LLC, National Exchange Services QI, Ltd., Rutherford Investment, LLC, and Shamrock Holdings Group, LLC at CCB; (ii)

accounts formerly maintained by Investment Exchange Group, LLC, National Exchange Services QI, Ltd., Rutherford Investment, LLC, and Shamrock Holdings Group, LLC at CCB; (iii) the 1031 Debtors' qualified intermediary services to any Exchangers; (iv) the declaratory action commenced by CCB on May 1, 2007 against, among others, Investment Exchange Group, LLC in the District Court, City and County of Denver, Colorado, which action was later amended to one in interpleader; (v) the 1031 Debtors' chapter 11 cases; (vi) the adversary proceeding number 07-01710 commenced by Investment Exchange Group, LLC, National Exchange Services QI, Ltd., Rutherford Investment, LLC, and Shamrock Holdings Group, LLC against CCB, et al.; and (vii) any and all acts or conduct of CCB with respect to any of the foregoing through October 15, 2007.

**"CCB Settlement Agreement"** means the Stipulation and Order Approving Settlement between the 1031 Debtors and CCB approved by the Bankruptcy Court on October 23, 2007 as part of the adversary proceeding commenced by Investment Exchange Group, LLC, National Exchange Services QI, Ltd., Rutherford Investment, LLC and Shamrock Holdings Group, LLC against Colorado Capital Bank, et al., Adv. Proc. No. 07-01710 (MG), as the same may be amended and in effect from time to time.

**"Chapter 11 Cases"** means the 1031 Chapter 11 Cases (as defined below) and the IPofA Shreveport Chapter 11 Case (as defined below), collectively.

**"Chapter 11 Trustee"** means Gerard A. McHale, Jr., or any successor thereto.

**"Chapter 11 Trustee Appointment Date"** means October 24, 2007, the date the Bankruptcy Court appointed the Chapter 11 Trustee.

**"Claim"** has the meaning ascribed to such term in Bankruptcy Code Section 101(5).

**"Claims Objection Deadline"** means the last day for filing objections to Claims as provided in Article X of the Plan.

**"Class"** means a category of holders of Claims or Interests, as described in Article III of the Plan.

**"Class Action"** means the class action lawsuit which is the subject of the Class Action Claims, or any other pending class action filed on behalf of Exchangers.

**"Class Action Agreement"** means the agreement dated January 20, 2009, as amended, and approved by the Bankruptcy Court by Order dated May 18, 2009 among the Trustee, the Class Representatives with respect to the Class Action Claims, and their respective counsel.

**"Class Action Claims"** means claims currently being asserted in the Class Action styled 409 Sherman Ave., LLC, et al vs. Edward Okun et al., Case No. 5:07-CV-02795-JW, pending in the United States District Court, Northern District of California, in any amendment thereto, or in any other class action lawsuit filed by or on behalf of any Exchangers.

**"Class Representatives"** means the representatives of the putative class as designated in the Class Action Agreement.

**"CNA"** means, singly or jointly, as the case may be, Continental Casualty Company and/or Continental Insurance Company.

**"CNA Parties"** means Continental Casualty Company and Continental Insurance Company and their respective parents, subsidiaries, their past, present and future predecessors, successors, subsidiaries, parents, affiliates, divisions, partnerships, joint ventures and assigns, solely in their capacities as such.

**"CNA Settlement Agreement"** means that certain agreement between the 1031 Debtors and CNA dated February 23, 2009, a copy of which is annexed hereto as **Exhibit 4**, as the same may be amended and in effect from time to time.

**"Confirmation"** means confirmation of the Plan pursuant to the Bankruptcy Code Section 1129.

**"Confirmation Date"** means the date upon which the Confirmation Order is entered on the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rule 5003.

**"Confirmation Hearing"** means the hearing before the Bankruptcy Court at which the Plan is confirmed.

**"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code Section 1129.

**"Cordell Entities"** means, collectively, Cordell Funding, LLLP and Cordell Consultants, Inc. Money Purchase Plan, a Qualified Retirement Plan Trust.

**"Cordell Parties"** means the Cordell Entities and such other Persons or Entities related to either of the Cordell Entities which are entitled to the benefit of the waiver and release provided by the Cordell Settlement Agreement.

**"Cordell Settlement Agreement"** means the settlement among the Chapter 11 Trustee, and the IPofA Debtors on the one hand, and the Cordell Entities, on the other hand, as so ordered by the Bankruptcy Court (docket no. 1348).

**"Creditor"** has the meaning ascribed to such term in Bankruptcy Code Section 101(10).

**"Dashiell Parties"** means Janet Dashiell, her heirs, successors and assigns.

**"Dashiell Settlement Agreement"** means that certain agreement between the 1031 Debtors and Janet Dashiell dated February 17, 2009, a copy of which is annexed hereto as **Exhibit 5**, as the same may be amended and in effect from time to time.

**"Debtor(s)"** means, collectively, the 1031 Debtors and IPofA Shreveport (as defined below), which is the subject of the IPofA Shreveport Chapter 11 Case.

**"Disallowed"** means a Claim or any portion thereof that: (a) has been disallowed or expunged by a Final Order; (b) has been withdrawn, in whole or in part, by the holder thereof or by agreement with the Debtors, the Chapter 11 Trustee, or the Liquidation Trust; (c) is scheduled at zero or as contingent, disputed or unliquidated and as to which no proof of Claim has been filed by the applicable bar date or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order; or (d) is not scheduled in the Schedules and as to which no proof of Claim has been timely filed by the applicable bar date or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order.

**"Disclosure Statement"** means the disclosure statement with respect to the Plan, including all exhibits, appendices, schedules and annexes attached thereto, approved by the Bankruptcy Court on _____ __, 2009 pursuant to Bankruptcy Code Section 1125, as it may be altered, amended, supplemented or modified from time to time, and distributed in accordance with Bankruptcy Code Sections 1125 and 1126 and Bankruptcy Rule 3018.

**"Disputed Amount"** means an amount equal to the total of that portion (including, when appropriate, the whole) of a Claim that is a Disputed Claim.

**"Disputed"** or **"Disputed Claim"** means any Claim that: (a) is objected to in whole or in part on or before any applicable deadline or for which a request for estimation has been timely filed in accordance with the Plan or the Bankruptcy Code and as to which no Final Order Allowing such Claim has been entered; or (b) is held by an Entity or Person that, as of the Effective Date, is adverse to the Estates in any litigation or contested matter pending or which the Liquidation Trustee believes at the time of a distribution in good faith is reasonably likely to be asserted at the time of a distribution and as to which no Final Order resolving such litigation or contested matter, or potential litigation or contested matter, has been entered. To the extent an objection relates to the Allowance of a portion of a Claim, such Claim shall be a Disputed Claim only to the extent of the portion which is subject to the objection.

**"Disputed Claims Reserve"** shall have the meaning ascribed to such term in Section 8.2(a) of the Plan.

**"Disputed Excess Exchanger Claims"** shall have the meaning ascribed to such term in Section 8.2(a) of the Plan.

**"Distribution Address"** means: (a) the address indicated on any notice of appearance filed by an Entity or Person, or the authorized agent therefor prior to the Effective Date; or (b) if no notice of appearance has been filed, the address indicated on a properly filed proof of Claim, or (c) absent such notice of appearance or proof of Claim, the address set forth in the Schedules; provided, however, that any Entity or Person may, after the Effective Date, select an alternative Distribution Address by filing a notice with the Bankruptcy Court (copy served on the Liquidation Trustee and counsel thereto in accordance with Section 13.13) identifying such alternative Distribution Address.

**"Distribution Date(s)"** means the date or dates on which the Liquidation Trust makes a Distribution pursuant to the Plan.

**"Effective Date"** means: (a) if no stay of the Confirmation Order is in effect, the first Business Day after the date all of the conditions set forth in Section 6.2 of the Plan have been satisfied or waived in accordance with that Section; or (b) if a stay of the Confirmation Order is in effect, on the first Business Day (or such later day as may be reasonably determined by the Proponents) after the later of: (i) the date such stay is vacated; and (ii) the date each condition set forth in the Plan has been satisfied or waived as set forth in the Plan.

**"Effective Date Administrative and Priority Claims Cash"** means Cash used to pay, on the Effective Date (or as soon as reasonably practicable thereafter), pursuant to the Plan, Allowed Claims of holders of (x) unclassified Claims and (y) Class 2 Priority Non-Tax Claims.

**"Entity"** has the meaning ascribed to such term in Bankruptcy Code Section 101(15) of the Bankruptcy Code.

**"Estate(s)"** means, in the singular, the Chapter 11 estate of each Debtor created by Bankruptcy Code Section 541 and, in the plural, the Chapter 11 estates of all the Debtors.

**"Estate Causes of Action"** means Causes of Action of or owned by or assigned to any of the Estates.

**"Estimation Order"** means a Final Order pursuant to Section 502(c) of the Bankruptcy Code estimating the amount of a Claim.

**"Excess Exchanger Claims"** shall have the meaning ascribed to such term in Section 5.3(c) of the Plan.

**"Exchange Agreement"** means the written agreement between the applicable Exchanger and the applicable 1031 Debtor pursuant to which the Exchanger deposited the applicable Exchange Amount in respect of a pending or potential transaction or series of transactions intended to qualify for favorable treatment under Section 1031 of the Tax Code.

**"Exchange Agreement Contractual Interest"** means, with respect to an Exchange Agreement, such stated interest, if any, as shall have accrued pursuant to the terms of such Exchange Agreement up to the Petition Date on the applicable Exchange Amount deposited thereunder.

**"Exchange Amount"** means the principal amount deposited by the applicable Exchanger with the applicable 1031 Debtor under the applicable Exchange Agreement.

**"Exchanger"** means the party to an Exchange Agreement that deposited the Exchange Amount pursuant thereto.

**"Exchanger Claims"** means General Unsecured Claims of any of the Exchangers with respect to their respective Exchange Agreements or any of the transactions contemplated thereby.

**"Face Amount"** means, at any time, with respect to a particular Claim: (a) if the holder of such Claim has not filed a proof of claim within the applicable period of limitation fixed by the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules or other applicable law, the amount of such Claim that is listed in the Schedules as noncontingent, undisputed and liquidated; (b) if the holder of such Claim has filed a proof of claim within the applicable period of limitation fixed by the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules or other applicable law, and such Claim has not become an Allowed Claim or been estimated by Final Order of the Bankruptcy Court, the amount stated in such proof of claim; or (c) in all other cases, zero ($0) or such amount as shall be fixed or estimated by a Final Order of the Bankruptcy Court.

**"Federal Parties"** means Federal Insurance Company, and its parents, holding company(s), subsidiaries, officers, employees, predecessors, successors, and assigns, and its affiliated insurance underwriting companies and reinsurers solely in their capacities as such.

**"Federal Settlement Agreement"** means that certain agreement between the 1031 Debtors and Federal dated February 23, 2009, a copy of which is annexed hereto as **Exhibit 6**, as the same may be amended and in effect from time to time.

**"Fee Claim"** means a Claim: (a) of the Chapter 11 Trustee for compensation and/or reimbursement of expenses pursuant to Bankruptcy Code Sections 326 and 330; (b) of any Professional Person retained by order of the Bankruptcy Court for compensation and/or reimbursement of expenses pursuant to Bankruptcy Code Sections 327, 328, 330, 331 or 1103(b); and (c) of any professional or other party-in-interest seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code Section 503(b).

**"Fee Claims Bar Date"** means 4:00 p.m. (Eastern) on the date that is the first Business Day after the date that is thirty (30) days after the Effective Date.

**"Final Order"** means an order or judgment of the Bankruptcy Court (or other court with jurisdiction), as entered on the docket of the Bankruptcy Court (or other court with jurisdiction), that has not been reversed, stayed, modified or amended, and as to which: (a) the time to appeal or seek review has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for review, rehearing, remand or certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the possibility that a motion under Bankruptcy Code Section 502(j), Rules 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules or law governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

**"First Tranche Beneficial Interests"** shall have the meaning ascribed to such term in Section 5.3(c) of the Plan.

**"General Claims Bar Date"** means August 24, 2007, the date set by the Bankruptcy Court as the last day for filing proofs of Claim in the Chapter 11 Cases, except for Administrative Claims and Fee Claims.

**"General Unsecured Claim"** means a Claim that is not an Administrative Claim, a Fee Claim, a Priority Claim or a Secured Claim.

**"Governmental Unit"** has the meaning ascribed to such term in Bankruptcy Code Section 101(27).

**"Greenberg"** means Greenberg Traurig, LLP in its capacity as counsel to the Official Creditors' Committee.

**"Huron"** means Huron Consulting Services LLC in the capacity in which it provided interim management services to the 1031 Debtors, including the services of James M. Lukenda as Chief Restructuring Officer, the services of Richard R. VanderBeek, Jr. as Treasurer, and the services of other personnel as temporary staff.

**"Impaired"** has the meaning ascribed to such term in Bankruptcy Code Section 1124.

**"Initial Distribution Date"** means, (i) with respect to each Claim or Class of Claims, the date as soon as reasonably practicable after the Effective Date, but in no event later than sixty (60) days after the Effective Date unless extended by agreement of the Liquidating Trustee and the Liquidation Trust Oversight Board, for making the initial distribution under the Plan; or (ii) with respect to any Disputed Claim, the next Quarterly Distribution Date after the date such Claim becomes an Allowed Claim.

**"Insider"** has the meaning ascribed to such term in Bankruptcy Code Section 101(31).

**"Insider Claim"** means a Claim asserted by any Insider of a Debtor.

**"Interest"** means any equity security, within the meaning of Bankruptcy Code Section 101(16), issued by a Debtor.

**"IPofA Debtors"** means, collectively, and except to the extent that any of the cases of an IPofA Debtor is hereafter dismissed, Investment Properties of America, LLC, Crossroads Miami Logistics, Center LeaseCo, LLC, Crossroads Miami Logistics Center, LLC, IPofA 5201 Lender, LLC, IPofA Columbus Works LeaseCo, IPofA Shreveport Industrial Park, LLC, IPofA West 86th Street Lease Co, LLC, Simone Condo I, LC, Simone Condo II, LLC, Columbus Works Virginia Trust, and Parkway Virginia Trust. For avoidance of doubt, none of the IPofA Debtors is the subject of 1031 Chapter 11 Cases, although IPofA Shreveport is the subject of the IPofA Shreveport Chapter 11 Case, which is substantively consolidated with the 1031 Chapter 11 Cases through the Plan.

**"IPofA Shreveport"** means IPofA Shreveport Industrial Park LLC, a Delaware limited liability company, which is the subject of the IPofA Shreveport Chapter 11 Case.

**"IPofA Shreveport Chapter 11 Case"** means the case of IPofA Shreveport, pending before the Bankruptcy Court, and bearing case number 07-13624(MG).

**"KPKB"** means Kluger, Peretz, Kaplan & Berlin, P.L., a Florida professional business entity.

**"KPKB Parties"** means KPKB, and such its members and employees of members, employees, officers, managers, directors, and agents, and insurors, including without limitation, its attorneys, accountants and professionals that are entitled to the benefit of the release and waiver provided by the KPKB Settlement Agreement.

**"KPKB Settlement Agreement"** means that certain agreement among the 1031 Debtors, certain other Entities and KPKB dated February 13, 2009, a copy of which is annexed hereto as **Exhibit 7**, as the same may be amended and in effect from time to time.

**"Lien"** shall have the meaning ascribed to such term in Bankruptcy Code Section 101(37).

**"Liquidation Trust"** means the trust established pursuant to the Plan and in accordance with the Liquidation Trust Agreement.

**"Liquidation Trust Agreement"** means that certain trust agreement that establishes and governs the Liquidation Trust, substantially in the form attached hereto as **Exhibit A**.

**"Liquidation Trust Expenses"** means all expenses, costs, fees, debts, charges, taxes, liabilities and obligations related to the formation, management, activities and/or administration of the Liquidation Trust and/or the implementation of the Plan, including without limitation, the fees and expenses of the Liquidation Trust Oversight Board to the extent such fees and expenses are provided for in Section 7.18 of the Plan, the compensation, and professional fees and expenses, payable to the Liquidation Trustee and/or to those Professional Persons retained or engaged by or for the Liquidation Trust, the Liquidation Trustee or Reorganized IPofA Shreveport to assist in the implementation and/or consummation of the terms of, and/or the activities and/or transactions contemplated by, the Plan, the Liquidation Trust Agreement and/or the Reorganized IPofA Shreveport LLC Agreement, and/or any and all professional fees, costs, expenses of or related to (a) taking possession of, holding, maintaining, liquidating or distributing assets, properties or rights that have been or shall be transferred to or vested in the Liquidation Trust and/or Reorganized IPofA Shreveport, and/or (b) prosecuting, defending, settling or otherwise resolving any disputes regarding any such assets, properties or rights, any Claim(s) or any of the Estate Causes of Action and/or the making of distributions from the Liquidation Trust.

**"Liquidation Trustee"** means Gerard A. McHale, Jr., P.A., a Florida professional association, and any successor thereto, which shall be appointed as the trustee of the Liquidation Trust (or any successor trust) in accordance with the Plan and the Liquidation Trust Agreement.

**"Liquidation Trust Oversight Board"** has the meaning set forth in Section 7.18 of the Plan.

**"Lloyd's"** means certain underwriters at Lloyd's of London set forth in Exhibit 1 to the Lloyd's Settlement Agreement.

**"Lloyd's Parties"** means Lloyd's, and the successors and assigns of each of the underwriters constituting Lloyd's.

**"Lloyd's Settlement Agreement"** means that certain agreement between the 1031 Debtors and Lloyd's, signed on behalf of the Debtors and Lloyd's on October 22, 2008 and October 23, 2008, respectively, a copy of which is annexed hereto as **Exhibit 8**, as the same may be amended and in effect from time to time.

**"Manager"** means the Liquidation Trustee, who shall be appointed as the sole manager of Reorganized IPofA Shreveport in accordance with the Plan.

**"McCabe Group"** means Daniel E. McCabe, Shirley L. McCabe, Andrew C. McCabe, Chad J. Greenberg and J. Peter McCann.

**"McCabe Group Parties"** means each person included in the McCabe Group, Reverse Lending Group, LLC, McCabe Family, LLLP and any other entity now or ever owned by the McCabe Group, and their parents, subsidiaries, affiliates, successors and assigns, that are entitled to the benefit of the release and discharge provided by the McCabe Group Settlement Agreement.

**"McCabe Group Settlement Agreement"** means that certain agreement between the 1031 Debtors and each of the persons included in the McCabe Group signed on or about September 24, 2008, as amended on or about November 25, 2008, a copy of which is annexed hereto as **Exhibit 9**, as the same may be amended and in effect from time to time.

**"Mesirow"** means Mesirow Financial Consulting in its capacity as financial advisor to the Official Creditors' Committee.

**"Mineral Servitude"** means the Mineral Servitude and Mineral Rights (as such terms are defined in the Cordell Settlement Agreement) reserved by the Chapter 11 Trustee/IPofA Shreveport pursuant to the Cordell Settlement Agreement.

**"Mineral Servitude Revenues"** means all revenues derived directly or indirectly from any Mineral Lease and/or any Subsequent Mineral Lease (as such terms are defined in the Cordell Settlement Agreement), or otherwise generated from or arising out of or in connection with the Mineral Servitude, which are received and entitled to be retained by Reorganized IPofA Shreveport.

**"Official Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed in the 1031 Chapter 11 Cases, as such committee may be reconfigured from time to time until the Effective Date.

**"Okun"** means Edward H. Okun.

**"Okun Assets"** means the assets transferred to the 1031 Debtors pursuant to the Asset Transfer Agreement.

**"Pajonas Parties"** means Todd Pajonas, his heirs, successors and assigns.

**"Pajonas Settlement Agreement"** means that certain agreement between the 1031 Debtors and Todd Pajonas dated June 10, 2009, a copy of which is annexed hereto as **Exhibit 10**, as the same may be amended and in effect from time to time.

**"Person"** has the meaning ascribed to such term in Bankruptcy Code Section 101(41).

**"Petition Date"** means May 14, 2007 for the 1031 Debtors.

**"Plan"** means this First Amended Chapter 11 Plan of Liquidation, dated as of the date set forth on the first page hereof, together with any amendments or modifications hereto as the Proponents may file hereafter in accordance with the terms of the Plan.

**"Plan Funding Parties"** means the parties (other than any of the Estates or the Chapter 11 Trustee) to any of the Plan Funding Party Settlement Agreements, and each individually, a **"Plan Funding Party."**

**"Plan Funding Party Settlement Agreements"** means collectively: the AEC Parties Settlement Agreement; the Allred Settlement Agreement; the Bennett Settlement Agreement; the CNA Settlement Agreement; the Cordell Settlement Agreement; the Dashiell Settlement Agreement; the Federal Settlement Agreement; the KPKB Settlement Agreement; the Lloyd's Settlement Agreement; the McCabe Settlement Agreement; the Shefman Settlement Agreement; the Twin City Settlement Agreement; the Pajonas Settlement Agreement; and the Wachovia Settlement Agreement.

**"Plan Supplement"** means the Bankruptcy Court filings specified in Section 13.2 of the Plan, the contents of which are incorporated herein by reference.

**"Priority Claims"** means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

**"Priority Non-Tax Claim"** means a Claim or a portion of a Claim for which priority is asserted under Bankruptcy Code Sections 507(a)(3), (4), (5), (6) or (7).

**"Priority Tax Claim"** means a Claim or a portion of a Claim for which priority is asserted under Bankruptcy Code Section 507(a)(8).

**"Professional Persons"** means attorneys, accountants, consultants, experts, and other professionals retained by the Chapter 11 Trustee, the Liquidation Trust, the Liquidation Trust Oversight Board, or Reorganized IPofA Shreveport.

**"Proponents"** means Gerard A. McHale, Jr., as Chapter 11 trustee of the Debtors, and IPofA Shreveport.

**"Quarterly Distribution Date"** means the first Business Day after the end of each quarterly calendar period (*i.e.*, March 31, June 30, September 30, and December 31 of each calendar year), or as soon thereafter as practicable, following the Initial Distribution Date.

**"Ratable, Ratably or Pro Rata"** means, as of the date of determination, the proportion that the Allowed Claim in a particular Class bears to the aggregate amount of (a) Allowed Claims in such Class as of the date of determination, plus (b) Disputed Claims (in their aggregate face amounts or such other amounts as may be established under an Estimation Order) in such Class as of the date of determination.

**"Rejection Claim"** means any Claim for amounts payable as a result of the rejection of an executory contract or unexpired lease in accordance with Bankruptcy Code Section 365.

**"Released Parties"** means each of the following that is the subject of a Plan Funding Party Settlement Agreement approved by a Final Order: the AEC Parties, the Allred Parties; the Bennett Parties; the CNA Parties; the Cordell Entities; the Dashiell Parties; the Federal Parties; the KPKB Parties; the Lloyd's Parties; the McCabe Group Parties; the Shefman Parties; the Twin City Parties; the Pajonas Parties; and the Wachovia Parties.

**"Reorganized IPofA Shreveport"** means the post-confirmation IPofA Shreveport.

**"Reorganized IPofA Shreveport LLC Agreement"** means that certain limited liability company agreement of Reorganized IPofA Shreveport, dated and effective as of the Effective Date, substantially in the form set forth in the Plan Supplement.

**"Reserves"** shall mean any reserve established by the Liquidation Trust in accordance with the Plan or the Confirmation Order to provide for anticipated or contingent expenses or liabilities, including, without limitation, any Disputed Claims Reserve and any reserve established by the Liquidation Trustee for anticipated Liquidation Trust Expenses.

**"Rosen Parties"** means Michael Rosen, his heirs, successors and assigns.

**"Rosen Settlement Agreement"** means that certain agreement between the 1031 Debtors and Michael Rosen made as of March 18, 2009, a copy of which is annexed hereto as **Exhibit 11**, as the same may be amended and in effect from time to time.

**"Schedules"** means, collectively, the (a) schedules of assets, liabilities and executory contracts and (b) statements of financial affairs, as each has been or may be amended and supplemented from time to time, filed by the Debtors pursuant to Bankruptcy Code Section 521.

**"Second Tranche Beneficial Interests"** shall have the meaning ascribed to such term in Section 5.3(c) of the Plan.

**"Secured Claim"** means: (a) that portion of a Claim that is secured by a valid, perfected and enforceable security interest, Lien, mortgage or other encumbrance, that is not subject to an Avoidance Action, in or upon any right, title or interest of any of the Debtors in and to property of the Estates, to the extent of the value of the holder's interest in such property as of the relevant determination date or (b) any Claim that is subject to an offset right pursuant to Bankruptcy Code Section 553, to the extent of the amount subject to a valid setoff, in the case of each of (a) and (b) as determined by the Bankruptcy Court pursuant to Bankruptcy Code Section 506(a).

**"Settling Exchangers"** means, collectively, 100 Garfield, LLC, Hain Capital Holdings, LLC, as transferee of interest of Carl and Stephanie Linkins, Adkisson Family Associates, LLC15 Trust, Daniel Oredson, Donald L. Barnes, Alvarez Family Trust, James E. and Joyce E. Bradley Trust, Estate of Susan Dugan and As Trustee of the Dugan Family Trust, Samuel Guirguis, Khan (WKC), Lawrence D. Beck and Wanda G. Beck, C5 Properties, Ltd, Patrick Edwards, Rose R. Elizondo, Larry and Kay Prather, Robert Skidmore, Texas Ranch Developers, Ltd., Raymond J. Welder, James & Ruth A. Person, The Willie Limited Partnership, Mark Camacho, Sharon Dale Snider, Capitol Reef Development LLC, Sadi Suhweil, Loulourgas Properties Ltd., James H. Collins, Philip Eddings and Susan Eddings, Talon Land Company, LLC, Chand Springfield Corp., Terry and Sylvia Adams, Nancy Kaufman, Nancy Kaufman Family, LLC, MSN Properties, LLC, Marc Naiman Family, LLC, Robert L. Naiman, Robert Naiman Family, LLC, Vista Enclave, Ltd, Stephen J. Stretz, Daniel Kasprzyk, Loren D. Schuler, Hendrik Falk, Thomas Ramsey, Chris and Mary Porter, Audrey Jo Whitlock, Mohammad Kashani and Fran Cuva, Grande Investment, LLC, Myles Enterprises, Inc., Linaka Limited Partnership, Darci Oberly, Dan & Joyce Souza Family Trust, P.J. Ravenna, LLC/Hines, Jesse G. Tolan, a/k/a Jess Tolan, Jesko Family Trust, Brenda Ramsey, Jack Wall, Mark Plonowski, Andrew and Julie Allen, William Hudson, and Arturo Cavazos.

**"Settling Exchangers Settlement Agreement"** means the Second Amended Stipulation and Order Approving Settlement among the 1031 Debtors and the Settling Exchangers approved by the Bankruptcy Court on October 23, 2007 as part of the adversary proceeding commenced by Investment Exchange Group, LLC, National Exchange Services QI, Ltd., Rutherford Investment, LLC and Shamrock Holdings Group, LLC against Colorado Capital Bank, et al., Adv. Proc. No. 07-01710 (MG), as the same may be amended.

**"Shefman Parties"** means David B. Shefman, Marga R. Shefman, and their respective heirs, successors and assigns.

**"Shefman Settlement Agreement"** means that certain agreement between the 1031 Debtors and David B. Shefman and Marga R. Shefman dated March 16, 2009, a copy of which is annexed hereto as **Exhibit 12**, as the same may be amended and in effect from time to time.

**"Solicitation Procedures Order"** means the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

**"Subordinated Fee Claims"** means the fees and expenses incurred by Greenberg, Huron and Mesirow prior to October 25, 2007.

**"Tax"** or **"Taxes"** means all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise or other similar taxes, estimated import duties, fees, stamp taxes and duties, value added taxes, assessments or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

**"Tax Code"** means the United States Internal Revenue Code of 1986, as amended, modified or supplemented from time to time, and the rules and regulations promulgated thereunder.

**"Trust Assets"** shall have the meaning set forth in Section 7.6 of the Plan.

**"Trust Beneficial Interests"** means, as set forth in the Liquidation Trust Agreement, beneficial interests in the Liquidation Trust entitling holders of Allowed Claims in Class 3 to distributions of Available Cash held by the Liquidation Trust after full satisfaction of Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Claims and Allowed Secured Claims, and after funding of any and all Reserves.

**"Twin City"** means Twin City Fire Insurance Company.

**"Twin City Parties"** means Twin City, and its parents, subsidiaries, affiliates, predecessors, successors and assigns, solely in their capacity as such.

**"Twin City Settlement Agreement"** means that certain agreement between the 1031 Debtors and Twin City dated February 23, 2009, a copy of which is annexed hereto as **Exhibit 13**, as the same may be amended and in effect from time to time.

**"Unclaimed Property"** means any Cash or other distributable property unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto in respect of such holder's Allowed Claim. Unclaimed Property shall, without limitation, include: (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address; (b) funds for uncashed checks; and (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, notwithstanding efforts by the Liquidation Trust to locate such address which were commercially reasonable under the circumstances. Distributions of cash that otherwise would be payable under the Plan to a holder that never, collectively, exceed fifty dollars ($50.00) as described in Section 8.9 and for which a request is not made within one (1) year after the Effective Date, as set forth in Section 8.9, shall thereupon become Unclaimed Property.

**"Unimpaired"** has the meaning ascribed to such term in Bankruptcy Code Section 1124.

**"Unsecured Claims"** means any Claim, arising prior to the Petition Date, that is not: (a) an Administrative Claim; (b) a Fee Claim; (c) a Priority Claim; or (d) a Secured Claim.

"**Wachovia**" means, collectively, Wachovia Bank, National Association, Wachovia Capital Markets LLC, Wachovia Exchange Services, Inc., Wachovia Financial Services, Inc., Wachovia Mortgage Corporation, and such Entities and Persons as are affiliated with or successors to any of the foregoing and may be parties to or the subject (as a defendant) of any Estate Cause of Action.

"**Wachovia Parties**" means, each of and collectively, Wachovia Bank, National Association, Wachovia Capital Markets LLC, Wachovia Exchange Services, Inc., Wachovia Financial Services, Inc. and Wachovia Mortgage Corporation.

"**Wachovia Settlement Agreement**" means that certain agreement among the 1031 Debtors, each of the Wachovia Parties, the Class Representatives party thereto and Quirk Infinity, Inc., on behalf of the Quirk Representative, dated May 28, 2009, a copy of which is annexed hereto as **Exhibit 14**, as the same may be amended and in effect from time to time.

**Section 1.2    Rules of Interpretation.** For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter genders; (c) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (d) any reference in the Plan to an existing document or an exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented; (e) if the Plan's description of the terms of an exhibit directly conflicts with the terms of such exhibit, the terms of the Plan shall control; (f) unless otherwise specified, all references in the Plan to articles, sections, clauses and exhibits are references to articles, sections, clauses and exhibits of or to the Plan; (g) the words "herein" and "hereto," and other words of similar import, refer to the Plan in its entirety rather than to a particular portion of the Plan; (h) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (i) any reference to an Entity or Person as a holder of a Claim or Interest includes that Entity or Person's successors, assigns and affiliates; (j) the rules of construction set forth in Bankruptcy Code Section 102 shall apply to the extent such rules are not inconsistent with any other provision in this Section; and (k) any term used herein that is not defined herein shall have the meaning ascribed thereto in the Bankruptcy Code and/or the Bankruptcy Rules, if used therein.

**Section 1.3    Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

# ARTICLE II

## METHOD OF CLASSIFICATION OF
## CLAIMS AND INTERESTS; GENERAL PROVISIONS

**Section 2.1     General Rules of Classification.**  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim is in a particular Class only to the extent that such Claim is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

**Section 2.2     Holder of Claims Entitled to Vote.**  Each holder of an Allowed Claim and each holder of a Claim that has been temporarily allowed for voting purposes by order of the Bankruptcy Court under Bankruptcy Rule 3018(a), which Claim is in an Impaired Class of Claims, shall be entitled to vote separately to accept or reject the Plan as provided by the Solicitation Procedures Order.  Any Unimpaired Class of Claims shall be deemed to have accepted the Plan.

**Section 2.3     Acceptances by Impaired Classes.**  An Impaired Class of Claims shall have Accepted the Plan if all of the necessary conditions of the Bankruptcy Code and the Bankruptcy Rules have been satisfied.

**Section 2.4     Non-Consensual Confirmation.**  To the extent necessary, the Proponents hereby request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code Section 1129(b).  Subject to Bankruptcy Code Section 1127, the Proponents reserve the right to modify the Plan to the extent that confirmation pursuant to Bankruptcy Code Section 1129(b) requires modification, provided such modifications are consistent with Section 13.1 of the Plan.

**Section 2.5     Administrative Claims, Priority Tax Claims, and Fee Claims.**
Administrative Claims, Priority Tax Claims, and Fee Claims have not been classified and are excluded from the Classes set forth in Article IV in accordance with Bankruptcy Code Section 1123(a)(1).

## ARTICLE III

## TREATMENT OF UNCLASSIFIED CLAIMS

**Section 3.1     Administrative Claims.**

(a)     **Administrative Claims Bar Date.**  To be eligible to receive distributions under the Plan on account of an Administrative Claim that is not otherwise Allowed by the Plan, a proof of Administrative Claim must be filed with the Bankruptcy Court so as to be received (i) with respect to the 1031 Debtors, on or before the Administrative Claims Bar Date, and (ii) with respect to IPofA Shreveport, on or before the IPofA Shreveport Administrative Claims Bar Date or such other date as may be agreed to by the Liquidation Trust.  Any holder of an Administrative

Claim that does not assert such Allowed Administrative Claim in accordance with this Section 3.1 shall have its Claim be deemed Disallowed under the Plan and be forever barred from asserting such Claim against any of the Estates, the Liquidation Trust, Reorganized IPofA Shreveport, or any of their Assets or property. Any such Claim shall be Disallowed and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

(b)     **Treatment.** Subject to the terms herein, and unless the holder of an Allowed Administrative Claim agrees to receive other less favorable treatment, each holder of an Allowed Administrative Claim shall be paid, by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Administrative Claim in Cash on the date that is the later of (i) the Effective Date, (ii) the date such Claims become Allowed Claims or otherwise become payable under the Plan, and (iii) as soon thereafter as is reasonably practicable.

**Section 3.2     Priority Tax Claims.**

(a)     **Treatment.** Subject to the terms herein, and unless the holder of an Allowed Priority Tax Claim agrees to receive other less favorable treatment, each holder of an Allowed Priority Tax Claim shall be paid, by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Priority Tax Claim in Cash on the date that is the later of (i) the Effective Date, (ii) the date such Claims become Allowed Claims or otherwise become payable under the Plan, and (iii) as soon thereafter as is reasonably practicable. Any Claim or demand for penalty relating to any Priority Tax Claim (other than a penalty of the type specified in Bankruptcy Code Section 507(a)(8)(G)) shall be Disallowed, and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Estates, the Liquidation Trust, Reorganized IPofA Shreveport or any of their respective Assets or property.

**Section 3.3     Fee Claims.**

(a)     **Fee Claims Bar Date.** All final applications for payment of Fee Claims shall be filed with the Bankruptcy Court and served on or before the Fee Claims Bar Date, or such later date as may be agreed to by the Liquidation Trust. Any holder of a Fee Claim that does not assert such Claim in accordance with this Section 3.3 shall have its Claim be deemed Disallowed under the Plan and be forever barred from asserting such Claim against any of the Estates, the Liquidation Trust, Reorganized IPofA Shreveport, or any of their Assets or property. Any such Claim shall be Disallowed and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

(b)     **Treatment.** Subject to the terms herein, and unless the holder of an Allowed Fee Claim agrees to receive other less favorable treatment, each holder of an Allowed Fee Claim shall be paid, by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Fee Claim in Cash on the date, or as soon thereafter as is

reasonably practicable, that such Claim (i) is Allowed by Final Order or (ii) becomes Allowed after the Effective Date.

### Section 3.4     Subordinated Fee Claims.

(a)     **Treatment**. Subordinated Fee Claims shall be paid only after all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims, Allowed Secured Claims, Allowed Priority Non-Tax Claims, and Allowed General Unsecured Claims are paid in full. Allowed General Unsecured Claims shall be paid in full when all Allowed General Unsecured Claims, including Allowed Excess Exchanger Claims, have been paid in full, including the payment of postpetition interest. The Subordinated Fee Claims are not subordinated to Class 4 Interests.

## ARTICLE IV

## DESIGNATION OF CLASSES OF
## CLAIMS AND EQUITY INTERESTS

**Section 4.1**     **Summary**. The classification of Claims and Interests for purposes of the Plan are as follows:

| Class | Claim | Status | Entitled to Vote |
|-------|-------|--------|------------------|
| Class 1 | Secured Claims | Impaired | Yes |
| Class 2 | Priority Non-Tax Claims | Unimpaired | No |
| Class 3 | General Unsecured Claims | Impaired | Yes |
| Class 4 | Interests | Impaired | No (deemed to reject) |

## ARTICLE V

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### Section 5.1     Class 1: Secured Claims.

(a)     **Classification**. Class 1 shall consist of all Secured Claims. CCB is the only member of Class 1.

(b)     **Impairment and Voting**. The Class 1 Claim is Impaired by the Plan and CCB shall be entitled to vote to accept or reject the Plan.

(c)     **Treatment**. Pursuant to the CCB Settlement Agreement, CCB holds an Allowed contingent unliquidated Secured Claim (the "CCB Secured Claim") for the CCB Covered Fees and Expenses, if any, secured by (and capped at) the balance of the funds, in the original deposit amount of $400,000, held in a segregated bank account at J.P. Morgan Chase

Bank (the "CCB Reserve"). The CCB Secured Claim shall be deemed satisfied by either (i) entry of a final, non-appealable Confirmation Order granting the CCB Release; or (ii) maintenance of the CCB Reserve until October 23, 2009 in accordance with the CCB Settlement Agreement.

### Section 5.2     Class 2: Priority Non-Tax Claims.

(a)     **Classification.** Class 2 shall consist of Allowed Claims entitled to priority under Bankruptcy Code Sections 507(a)(3), (4), (5), (6) or (7).

(b)     **Impairment and Voting**. Class 2 Claims are Unimpaired by the Plan and the holders of Allowed Class 2 Claims are deemed to accept the Plan and therefore are not entitled to vote.

(c)     **Treatment.** Subject to the terms herein and unless the holder of an Allowed Priority Non-Tax Claim agrees to receive other less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall be paid, by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Priority Non-Tax Claim in Cash on the date that is the later of (i) the Effective Date, (ii) the date such Claim becomes an Allowed Claim or otherwise becomes payable under the Plan, and (iii) as soon thereafter as is reasonably practicable.

### Section 5.3     Class 3: General Unsecured Claims.

(a)     **Classification.** Class 3 shall consist of all General Unsecured Claims.

(b)     **Impairment and Voting**. Holders of Class 3 Claims shall be Impaired and shall be entitled to vote to accept or reject the Plan.

(c)     **Treatment.** Subject to the terms herein, and unless the holder of an Allowed General Unsecured Claim agrees to receive other less favorable treatment, each holder of an Allowed General Unsecured Claim shall be entitled to receive: (A) Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 3, other than those Excess Exchanger Claims covered by clause (B) immediately below (which percentage shall be adjusted upon the allowance of any Disputed Claim in Class 3, other than Disputed Excess Exchanger Claims, as defined below), and with the further understanding that, in the case of any Exchanger Claim, such Allowed Claim in respect thereof covered by this clause (A) shall be limited to the sum of the Exchange Amount thereof plus such Exchange Agreement Contractual Interest, if any, that shall have accrued on such Exchange Amount up to the Petition Date (the "Basic Exchanger Claims", and such Trust Beneficial Interests being herein called the "First Tranche Beneficial Interests"); (B) additional Trust Beneficial Interests in respect of Allowed Claims in Class 3 which are Exchanger Claims corresponding in each case only to the portion thereof that is in excess of the Basic Exchanger Claim of the applicable Exchanger (for example, damage claims of Exchangers for consequential, compensatory, punitive, treble, exemplary, multiple or other damages other than Basic Exchanger Claims) (the "Excess Exchanger Claims"), in a percentage Ratable to other holders of Excess Exchanger Claims (which percentage shall be adjusted upon the allowance of any Disputed Excess Exchanger Claims) (such additional Trust

Beneficial Interests being herein called the "Second Tranche Beneficial Interests"); and (C) all proceeds attributable thereto distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement. Holders of Allowed General Unsecured Claims shall be paid postpetition interest on all Allowed General Unsecured Claims, after payment of Allowed Excess Exchanger Claims but prior to any distribution to or payment of Subordinated Fee Claims or Class 4 Interests. A schedule of all Basic Exchanger Claims showing the amount of each Basic Exchanger Claim is attached hereto as **Schedule 1**.

In calculating distributions and Ratable percentages for distribution to Settling Exchangers in respect of their respective Trust Beneficial Interests, the Liquidation Trust shall take into account the applicable provisions of the Settling Exchangers Settlement Agreement, including, without limitation, Section 8 thereof.

In calculating distributions and Ratable percentages for distribution in respect of their Trust Beneficial Interests to holders of Allowed Exchanger Claims, unless the holder of such Claim agrees to receive other less favorable treatment, the Liquidation Trust shall apply the following payment scheme, wherein payments in respect of such Allowed Exchanger Claims shall be made as follows:

(i)     first, on account of Allowed Basic Exchanger Claims (subject to and after the allocation to the Disputed Claims Reserve for all Disputed Claims which if Allowed would constitute Basic Exchanger Claims), Ratably among the holders thereof until payment in full of the aggregate amount of all Allowed Basic Exchanger Claims; and

(ii)     second, subject to and only after the payment in full of all Allowed Basic Exchanger Claims and the allocation to the Disputed Claims Reserve for all Disputed Claims, on account of all Allowed Excess Exchanger Claims, Ratably among the holders thereof.

**Section 5.4     Class 4:  Interests.**

(a)     **Classification.** Class 4 shall consist of all Interests in the Debtors.  Class 4 is impaired by the Plan.

(b)     **Impairment and Voting.** Holders of Interests in Class 4 are deemed to have rejected the Plan and thus, solicitation of acceptances of the Plan with respect to holders of Interests in this Class is not required.

(c)     **Treatment.**  Holders of Interests shall neither receive nor retain any property under the Plan.

**ARTICLE VI**

**CONDITIONS PRECEDENT**

**Section 6.1     Conditions to Confirmation.**  The following conditions are conditions precedent to Confirmation of the Plan, except to the extent waived in whole or in part by the Proponents:

(a)     The Confirmation Order shall be substantially in the form as proposed by the Proponents;

(b)     The Confirmation Date of the Plan shall have occurred on or before February 1, 2010; and

(c)     Such of the Plan Funding Party Settlement Agreements as the Proponents deem necessary to the Plan shall have been approved by Final Order(s) in accordance with the respective terms thereof.

**Section 6.2     <u>Conditions to the Effective Date</u>.**  The Proponents reserve the right to request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry and shall be a Final Order.  Notwithstanding the foregoing, the Plan may not be consummated, and the Effective Date shall not occur, unless and until each of the conditions set forth below is satisfied, to the extent not waived in whole or in part by the Proponents:

(a)     The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Proponents and such Confirmation Order shall not be the subject of any stay;

(b)     The Liquidation Trust Agreement shall have been approved and executed in form and substance satisfactory to the Proponents;

(c)     The Assets (other than the Effective Date Administrative and Priority Claims Cash) and Estate Causes of Action shall have been transferred to the Liquidation Trust;

(d)     The Mineral Servitude shall have vested in Reorganized IPofA Shreveport;

(e)     The Liquidation Trustee shall have been appointed in accordance with the Plan and the Liquidation Trust Agreement;

(f)     Such of the Plan Funding Party Settlement Agreements as the Proponents deem necessary to the Plan shall have been approved by Final Order(s) in accordance with the respective terms thereof;

(g)     All statutory fees and amounts then due and payable to the United States Trustee shall have been paid in full;

(h)     Such documents as the Proponents shall deem necessary to the consummation of the Plan shall be executed, delivered, or filed pursuant to the Plan, as the case may be; and

(i)     Such actions, authorizations, filings, consents and regulatory approvals (if any) as the Proponents shall deem necessary to the consummation of the Plan shall have been

obtained, effected or executed in a manner acceptable to the Proponents, and shall then remain in full force and effect.

**Section 6.3**  **Waiver of Conditions.**  The waiver, in whole or in part, of any condition set forth in this Article VI may be made by the Proponents, in their sole and absolute discretion, without further notice or order of the Bankruptcy Court.

# ARTICLE VII

# MEANS FOR IMPLEMENTATION

**Section 7.1**  **Substantive Consolidation.**  On the Effective Date, the Estates shall be substantively consolidated for all purposes related to the Plan.  For the avoidance of any doubt, IPofA Shreveport shall be substantively consolidated with all of the 1031 Debtors.

(a)  The substantive consolidation of the Estates shall have the following effects: (i) all assets and liabilities of the Estates shall be treated as though they were merged for purposes of distribution; (ii) all pre-petition and post-petition Claims held by a Debtor against any other Debtor, including cross-corporate guarantees of the Debtors shall be eliminated; (iii) all Claims based upon guarantees of collection, payment or performance made by one or more Debtors as to the obligations of another Debtor or of any other Entity or Person shall be discharged, released and of no further force or effect; (iv) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be one obligation of the Estates; (v) any Claims filed or to be filed in connection with any such obligation and such guarantees shall be deemed one Claim against the Estates; and (vi) each and every Claim filed in the individual Chapter 11 Case of any of the Debtors shall be deemed filed against the consolidated Estates in the consolidated Chapter 11 Cases and shall be deemed a single obligation of the consolidated Estates under the Plan on and after the Effective Date.

(b)  The substantive consolidation provided for herein shall not, other than for purposes related to the Plan and distributions to be made hereunder, affect the legal and corporate existence or structure of the Debtors or the rights and defenses of the Liquidation Trust and/or Reorganized IPofA Shreveport pertaining to any Estate Causes of Action.

(c)  Without limiting the foregoing, and without any requirement of any corporate or limited liability company action or approval as to any dissolution, termination or merger of any of the Debtors, the Liquidation Trustee shall be entitled to declare the dissolution and termination of any and all of the Debtors and/or to effect a merger of any one or more of the Debtors, and no such dissolution, termination or merger nor the assignment or transfer of, or the vesting in the Liquidation Trust of rights with respect to, the Estate Causes of Action shall adversely affect in any manner the continuing right and entitlement of the Liquidation Trust to pursue, administer, enforce, settle, compromise and otherwise deal in and with any and all Estate Causes of Action, in each case as fully as any of the Debtors or any of the Estates would be or would have been entitled to do so had no such dissolution, termination or merger, nor any such assignment or transfer, taken place, and as if the Plan had provided that each of the Debtors were to be reorganized and to continue in existence pursuant to the Plan.

**Section 7.2      Creation and Purpose of the Liquidation Trust**.

(a)      As of the Effective Date, the Liquidation Trust shall be established in accordance with the Liquidation Trust Agreement.

(b)      The Liquidation Trust shall be created for the primary purpose of liquidating and distributing the Trust Assets to the Beneficiaries (and other holders of Allowed Claims) in accordance with the Plan and the Confirmation Order, and in an expeditious but orderly manner, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Liquidation Trust and the Plan.

**Section 7.3      Liquidation Trust Agreement.**  As of the Effective Date, the Liquidation Trust Agreement shall be executed and shall become effective without further action by any party.

**Section 7.4      Liquidation Trust and Liquidation Trustee.**

(a)      As of the Effective Date, and without further action, the Chapter 11 Trustee shall be deemed discharged and Gerard A. McHale, Jr., P.A. shall become the Liquidation Trustee, which shall become, and thereupon shall be, the representative of the Estates in accordance with Section 1123(b)(3) of the Bankruptcy Code.  The Liquidation Trustee shall post a bond in an amount to be agreed upon by the Liquidation Trustee and the Office of the United States Trustee.

(b)      The Liquidation Trustee shall be deemed to be the successor to the Chapter 11 Trustee under the Class Action Agreement.

(c)      The Liquidation Trust may retain such counsel and other Professional Persons (and all on such terms) as the Liquidation Trustee deems appropriate to assist the Liquidation Trustee in performing its duties and obligations and exercising its rights, powers and authority under the Plan and/or the Liquidation Trust Agreement, and shall be entitled to cause the Liquidation Trust to pay from time to time all reasonable fees and expenses of such Professional Persons, with prior notice to the Liquidation Trust Oversight Board, and without approval or order of the Bankruptcy Court.

(d)      The Liquidation Trust shall hold and disburse the Trust Assets in accordance with the Plan and the Liquidation Trust Agreement, and, in this regard, shall maintain a Disputed Claims Reserve in accordance with Section 8.2 of the Plan, and shall be entitled to pay ongoing Liquidation Trust Expenses, all without any order or approval of the Bankruptcy Court.

**Section 7.5      Manager**.  As of the Effective Date, and without further action, the Liquidation Trustee shall become the sole Manager of Reorganized IPofA Shreveport, the Liquidation Trust shall become the sole member of Reorganized IPofA Shreveport and Reorganized IPofA Shreveport shall be operated in accordance with the Reorganized IPofA Shreveport LLC Agreement.

**Section 7.6**     **Transfer of Property to Liquidation Trust.**

(a)     As of the Effective Date, and without further action by any party, all of the property of any one or more of the Estates (with the exception of the Mineral Servitude), as defined by Section 541 of the Bankruptcy Code, including but not limited to: (i) the Assets (with the exception of the Mineral Servitude (but including Mineral Servitude Revenues) and Effective Date Administrative and Priority Claims Cash), free and clear of all Liens, Claims, and encumbrances (which, pursuant to the Confirmation Order, shall be fully and completely released and discharged, except as otherwise specifically provided herein); (ii) all of the rights and defenses of the Estates or any of them, including, without limitation, setoff rights, arising out of or directly related to any executory contract or unexpired lease rejected by the Chapter 11 Trustee or by the terms of the Plan, against the other party to such contract or lease; (iii) all sums in the future received by or recovered by or for the Liquidation Trust from any source; and (iv) any defenses and counterclaims of any of the Estates to any Claim filed or asserted against any of the Estates (collectively, the "Trust Assets"), shall be deemed transferred to the Liquidation Trust. The Trust Assets shall vest in the Liquidation Trust in accordance with Section 1141(b) of the Bankruptcy Code.

(b)     Notwithstanding anything to the contrary in Section 7.6(a), the Liquidation Trust may, in the sole and absolute discretion of the Liquidation Trustee, after consultation with the Liquidation Trust Oversight Board, abandon or otherwise not accept any Trust Assets that the Liquidation Trustee believes, in good faith, have no value to the Liquidation Trust or that in the interests of the Liquidation Trust should otherwise be abandoned or rejected.

(c)     As of the Effective Date, the entire membership interest in Reorganized IPofA Shreveport shall vest in the Liquidation Trust, and become a Trust Asset, and the Liquidation Trust shall become the sole member of Reorganized IPofA Shreveport.

(d)     The Mineral Servitude shall not be transferred to the Liquidation Trust, although Mineral Servitude Revenues are to be transferred from time to time to the Liquidation Trust by Reorganized IPofA Shreveport (after the funding of and subject to any reserves as the Manager may establish and maintain in its discretion and the payment by Reorganized IPofA Shreveport of Liquidation Trust Expenses attributable to Reorganized IPofA Shreveport), and will thereupon become Trust Assets.

(e)     All Claims and Causes of Action of or owned by the Official Creditors' Committee are, without the need for any act or document, assigned to and vested in the Liquidation Trust as of the Effective Date.

**Section 7.7**     **Vesting of Mineral Servitude in Reorganized IPofA Shreveport**. As of the Effective Date, and without further action by any party, the Mineral Servitude shall be and remain vested in Reorganized IPofA Shreveport in accordance with Section 1141(b) of the Bankruptcy Code, free of all Liens, Claims, and encumbrances (except as otherwise specifically provided herein, and subject to the terms of the Cordell Settlement Agreement).

**Section 7.8    Powers of the Liquidation Trustee.** Except as otherwise provided in the Liquidating Trust Agreement, the Plan, or the Confirmation Order, the Liquidation Trustee shall have all authority to take all steps deemed by the Liquidation Trustee to be necessary or appropriate to administer and/or otherwise control or exercise authority over the Trust Assets, including without limitation, over the acquisition, management and disposition thereof, and over the management and conduct of the administration of the Liquidation Trust, including, without limitation, to cause or authorize distributions to the Beneficiaries (and other holders of Allowed Claims), to review and maintain objections to or compromise Claims, and to pursue and/or compromise Estate Causes of Action after consultation with the Liquidation Trust Oversight Board. The Liquidation Trustee shall have all authority, power, responsibilities and rights set forth in or contemplated by the Plan or the Liquidation Trust Agreement.

(a)    Without limiting the foregoing, but subject to the Plan, the Confirmation Order, and other provisions of the Liquidation Trust Agreement, and without the necessity of Bankruptcy Court approval (except as otherwise specified herein), and in every case subject to the restrictions imposed herein, the Liquidation Trustee shall have the following powers and authority with respect to the Liquidation Trust and the Trust Assets:

(i)    the power and authority to deposit and invest funds in, and withdraw funds from the Reserves, provided that such funds are maintained in Cash;

(ii)    the power and authority to open and maintain bank, investment or other accounts with one or more banks and/or other financial institutions;

(iii)    the power and authority to pay Liquidation Trust Expenses, make distributions, pay taxes and pay other obligations owed by the Debtors, the Estate, or the Liquidation Trust from the Trust Assets;

(iv)    the power and authority to engage the Liquidation Trust's employees and Professional Persons;

(v)    the power and authority to take all actions, including the power to initiate, commence, prosecute, litigate, defend, compromise, collect, settle and/or otherwise administer Claims and Estate Causes of Action, where appropriate, and in consultation with the Liquidation Trust Oversight Board as set forth in Section 7.18 hereof and in the Liquidation Trust Agreement, and in connection therewith to participate in or initiate any proceeding before the Bankruptcy Court or any other court of competent jurisdiction and voluntarily participate as a party in any administrative proceeding, arbitration, mediate or other nonjudicial proceeding;

(vi)    the power and authority to liquidate any and all of the Trust Assets and provide for distribution of the proceeds, and any other funds as provided for by the Plan and the Liquidation Trust Agreement;

(vii)    the power and authority to sell, assign, transfer, convey, mortgage, lien, hypothecate, pledge, abandon and otherwise dispose of all or any part of the membership interests in Reorganized IPofA Shreveport;

(viii)   the power, and authority, in the discretion thereof, to take any and all action for or on behalf of the Liquidation Trust or as a member of Reorganized IPofA Shreveport required or permitted by, or otherwise in accordance with, the Reorganized IPofA Shreveport LLC Agreement or the Delaware Limited Liability Company Act (as amended and in effect from time to time, the "DLLCA");

(ix)   the power and authority to seek ruling(s) or other guidance from the Internal Revenue Service, state tax authorities or other governmental entities as to the status of the Liquidating Trust for tax purposes and the correct tax treatment of any income, payment or asset or the correct tax filing requirements relating to the same, all as the Liquidating trustee shall deem necessary and appropriate; and

(x)   such other powers and authority as may be vested in or assumed by the Liquidation Trustee pursuant to the Plan, the Liquidation Trust Agreement or a Bankruptcy Court order or as may be necessary or appropriate to carry out the provisions of the Plan.

### Section 7.9   Purposes of Reorganized IPofA Shreveport; Powers of the Manager.

(a)   The purposes of Reorganized IPofA Shreveport are:

(i)   to negotiate, execute, deliver, perform, administer, enforce and exercise any and all rights and remedies under or with respect to one or more leases (including without limitation any Mineral Lease and/or any Subsequent Mineral Lease, as such terms are defined in the Cordell Settlement Agreement), royalty arrangements and/or other contracts relating to or in connection with the exploitation of the Mineral Servitude (collectively "MS Contracts"), and to cause Mineral Servitude Revenues to be paid and/or transferred to the Liquidation Trust (after funding of and subject to any reserves as the Manager may establish and maintain in its discretion and the payment by Reorganized IPofA Shreveport of any Liquidation Trust Expenses incurred thereby or allocable thereto), as the sole Member, in all cases to provide funds for and/or facilitate and/or in furtherance of the purposes and intent of the Liquidation Trust;

(ii)   to manage, administer, exploit, sell, assign, transfer, convey, mortgage, lien, hypothecate, pledge, abandon and otherwise dispose of all or any part of the Mineral Servitude and/or any MS Contract;

(iii)   to engage in any other lawful act or activity in connection with or in furtherance of any of the foregoing for which limited liability companies may be formed under the Act; and

(iv)   to do any and all other acts and things which may be necessary, appropriate or incidental to the carrying out any or all of such purposes.

(b)   Reorganized IPofA Shreveport, and the Manager, in the name or on behalf of Reorganized IPofA Shreveport, without the necessity of any order or approval of or by the Bankruptcy Court, have the power and authority to take any and all actions deemed by the Manager to be necessary, appropriate, proper, advisable, convenient or incidental to or for or in

furtherance of any of the purposes of Reorganized IPofA Shreveport, including, but not limited to the powers and authority set forth in the Reorganized IPofA Shreveport LLC Agreement or otherwise provided or permitted under the DLLCA. The Manager shall consult with the Liquidation Trust Oversight Board regarding any proposed transaction in excess of $500,000.

**Section 7.10    Investments.**    All Cash held by or for the Liquidation Trust in any accounts or otherwise shall be invested in accordance with Section 345 of the Bankruptcy Code or as otherwise permitted by an order of the Bankruptcy Court, and subject to the limitations set forth in Section 2.9 of the Liquidation Trust Agreement.

**Section 7.11    Tax Treatment of Liquidation Trust.**    It is intended that the Liquidation Trust will be treated as a "liquidating trust" within the meaning of Treasury Regulation § 301.7701-4(d) and as a grantor trust pursuant to IRC Sections 671-677. The primary purpose of the Liquidation Trust is the liquidation and distribution of the Trust Assets, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, for federal income tax purposes, the transfer of Trust Assets, subject to the assumption of liabilities, to the Liquidation Trust on the Effective Date shall be treated by the Estates and the Liquidation Trustee as a deemed transfer of such Trust Assets, subject to the assumption of liabilities, by the Debtors and the Estates to holders of Allowed Claims in Class 3, and a deemed further transfer by such holders, subject to the assumption of liabilities, to the Liquidation Trust in exchange for beneficial interests therein. The Liquidation Trustee shall, in consultation with the Liquidation Trust Oversight Board, make a good faith determination of the fair market value of the Trust Assets transferred to the Liquidation Trust as of the Effective Date. The Liquidation Trustee and all holders of Allowed Claims shall use these values for the Transferred Assets consistently for all federal income tax purposes. For federal income tax purposes, the holders of Allowed Claims in Class 3 shall be treated by the Estates and the Liquidation Trustee as the grantors of the Liquidation Trust and as the deemed owners of the assets of the Liquidation Trust, and the Liquidation Trust shall not be treated as a successor of the Debtors. Notwithstanding anything to the contrary contained in the Plan or the Liquidation Trust Agreement, the failure of the Liquidation Trust to be treated for tax purposes in the manner and/or with the effects contemplated by this Section 7.11 shall not limit or affect the validity or formation of the Liquidation Trust or the effectiveness of the Plan or the power or authority of the Liquidation Trustee, and the Liquidation Trustee shall be entitled to take such steps or actions, including without limitation adopting such amendments to the Liquidation Trust Agreement, as the Liquidation Trustee deems appropriate or advisable, in order to further or support the tax treatment and effects contemplated by this Section 7.11.

**Section 7.12    Withholding and Reporting Requirements.**    In connection with the administration of the Plan and the Liquidation Trust Agreement, and the making of distributions under the Plan and the Liquidation Trust Agreement, the Liquidation Trust will endeavor to comply in all material respects with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority.

**Section 7.13    Debtors' Books and Records.**    Upon the occurrence of the Effective Date, the Chapter 11 Trustee and IPofA Shreveport, as the case may be, shall transmit to the

Liquidation Trust all possession, custody, and control of all books and records of the Debtors (with the exception of books and records transferred to the Cordell Entities pursuant to the Cordell Settlement), including, without limitation, all books and records necessary to the making of distributions, prosecution of objections to Claims, prosecution of Causes of Action, and the analysis, recovery and disposition of the Trust Assets. All such books and records shall be preserved for so long as may be necessary for the prosecution or defense of any Causes of Action, or any Claim objection filed by the Liquidation Trust, after which the Liquidation Trust shall be authorized and empowered to abandon and/or destroy said books and records, in the Liquidation Trustee's discretion.

**Section 7.14    Resignation, Death, or Removal of Liquidation Trustee.**  A party in interest, upon application, and upon a showing of willful misconduct or gross negligence and upon prior notice to the Liquidation Trustee and the Liquidation Trust Oversight Board, may move the Bankruptcy Court to remove the Liquidation Trustee from its role as Liquidation Trustee. The movant shall have the burden of establishing such cause as aforesaid for such requested removal. In the event of the resignation or removal, death, or incapacity of the Liquidation Trustee, the Liquidation Trust Oversight Board shall designate another Person to become Liquidation Trustee and such successor Liquidation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor, under terms to be agreed by the successor Liquidation Trustee and the Liquidation Trust Oversight Board. In the event of the resignation of the Liquidation Trustee, the Liquidation Trustee shall remain as the Liquidation Trustee until such time as the Liquidation Trust Oversight Board, or the Bankruptcy Court if the Liquidation Trust Oversight Board fails to act within thirty (30) days of resignation, designates a successor.

**Section 7.15    Resignation, Death, or Removal of Manager.**  A party in interest, upon application and upon a showing of willful misconduct or gross negligence and upon prior notice to the Liquidation Trust Oversight Board, may move the Bankruptcy Court to remove the Manager from its role as Manager. In the event of the resignation or removal, death, or incapacity of the Manager, the Liquidation Trust Oversight Board shall designate another Person to become Manager and such successor Manager, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor under terms to be agreed by the Liquidation Trust Oversight Board. In the event of the resignation of the Manager, the Manager shall remain as the Manager until such time as the Liquidation Trust Oversight Board, or the Bankruptcy Court if the Liquidation Trust Oversight Board fails to act within thirty (30) days of resignation, designates a successor.

**Section 7.16    Ratification.**  On the Effective Date, each holder of a Claim in Class 3 shall be deemed to have ratified and become bound by the terms of the Liquidation Trust Agreement.

**Section 7.17    Termination of Liquidation Trust.**  The Liquidation Trustee shall be discharged and the Liquidation Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidation Trustee hereunder have been fulfilled, (iv) all distributions required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust

Agreement have been made, and (v) the Chapter 11 Case has been closed; provided, that in no event shall the Liquidation Trust be terminated later than the term of the Liquidation Trust under the Liquidation Trust Agreement, as such term may be extended pursuant thereto. As soon as practicable after the final Distribution Date, if any, or such other time as the Liquidation Trustee deems appropriate, the Liquidation Trustee may seek entry of a Final Order closing the Chapter 11 Cases pursuant to Bankruptcy Code Section 350.

### Section 7.18  **Liquidation Trust Oversight Board**.

(a)     The Liquidation Trust Oversight Board shall be formed and constituted on the Effective Date. The Liquidation Trust Oversight Board shall consist of seven (7) members, to be named in a Plan Supplement. A member shall resign if he sells, transfers or assigns all of his (or its) right to or interest in his (or its) Class 3 Claim or Trust Beneficial Interests, as applicable. The Liquidation Trust Oversight Board shall have the right, but shall not be required, to fill any vacancy that arises for any reason with another holder of an allowed Class 3 claim. The Liquidation Trust Oversight Board may, in its discretion, retain legal counsel, provided that the costs of any such legal counsel shall not exceed $7,500 per month. Members of the Liquidation Trust Oversight Board shall be entitled to reimbursement of their actual and reasonable out of pocket expenses as a Liquidation Trust Oversight Board Member.

(b)     The Liquidation Trustee shall regularly consult with members of the Liquidation Trust Oversight Board regarding the prosecution and/or settlement of Estate Causes of Action. The Liquidation Trustee shall report to the Liquidation Trust Oversight Board on a regular basis. The Liquidation Trustee shall seek approval from the Liquidation Trust Oversight Board regarding the prosecution and/or settlement of each Estate Cause of Action if the amount claimed by the Liquidation Trustee against the defendant(s) in such Estate Cause of Action is more than $500,000. In the event that the Liquidation Trust Oversight Board declines to approve a settlement proposed by the Liquidation Trustee, then the dispute shall promptly be brought before the Bankruptcy Court for resolution. Should the Liquidation Trust Oversight Board obtain an order of the Bankruptcy Court sustaining its challenge, then the reasonable legal fees incurred by the Liquidation Trust Oversight Board in connection with such successful challenge shall be paid from the funds held by the Liquidation Trust, subject to Bankruptcy Court approval, and shall not be subject to the monthly limit set forth above. Other duties and provisions regarding the Liquidation Trust Oversight Board are set forth in the Liquidation Trust Agreement.

(c)     A Liquidation Trust Oversight Board member shall recuse him/herself from participation in decision-making by the Liquidation Trust Oversight Board on matters in which such member has a conflict of interest.

### Section 7.19  **Liability, Indemnification**.

(a)     Neither the Liquidation Trustee, nor the Manager, nor the Liquidation Trust Oversight Board, nor any of their respective present or former shareholders, directors, officers, partners, members, managers, designees, Professional Persons and employees, nor any of the respective present or former shareholders, directors, officers, partners, members, managers or employees of any of the foregoing, shall be liable for any act

or omission taken or omitted to be taken in their respective capacities as such, other than acts or omissions found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to constitute willful misconduct or gross negligence by such person or entity.

(b)     Neither the Liquidation Trustee, nor the Liquidation Trust Oversight Board, shall be liable for the act or omission of the other, nor shall any member of the Liquidation Trust Oversight Board be liable for any act or omission of any other member thereof.

(c)     The Liquidation Trust shall indemnify and hold harmless the Liquidation Trustee, the Manager, the Liquidation Trust Oversight Board, and the respective present or former shareholders, directors, officers, partners, members, managers, designees, attorneys, accountants, or other professionals and employees, of any of them, and the respective present or former shareholders, directors, officers, partners, members, managers, attorneys, accountants, or other professionals and employees of any of the foregoing (in their capacity as such) (each, an "Indemnified Party"), from and against and in response to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to reasonable attorneys' fees and expenses, arising out of or due to any of the actions or omissions of any of them, or consequences of any of such actions or omissions, or the status or capacity of any of the foregoing as contemplated by or in connection with the Plan, the Liquidation Trust, Reorganized IPofA Shreveport, or any Causes of Action, or the implementation, administration, pursuit or prosecution of any thereof, and including without limitation all costs and expenses (including without limitation reasonable attorneys' fees and expenses) in connection with the enforcement of the right to indemnification set forth herein, except in the case of any such Indemnified Party or entity for such liabilities, losses, damages, costs and expenses that are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have directly resulted from such Indemnified Party's or entity's willful misconduct or gross negligence.

(d)     The Liquidation Trust and Reorganized IPofA Shreveport, respectively, shall, as provided in the Liquidation Trust Agreement and the Reorganized IPofA Shreveport LLC Agreement, promptly pay expenses reasonably incurred by any Indemnified Party in defending, participating in, or settling any action, proceeding or investigation in which such indemnified party is a party or is threatened to be made a party or otherwise is participating, in connection with the Liquidation Trust, Reorganized IPofA Shreveport, the Liquidation Trustee, the Liquidation Trust Oversight Board, the Manager (in the capacity thereof as such), and the Liquidation Trust (in its capacity as member of Reorganized IPofA Shreveport), upon submission of invoices therefore, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise; provided such Indemnified Party undertakes to the Liquidation Trust to repay any and all such amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor under this Plan, the Liquidation Trust Agreement or the Reorganized IPofA Shreveport LLC Agreement, as applicable.

(e)     The right to indemnification conferred in the Plan shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, agreement, vote, determination of the Liquidation Trustee, the Manager or otherwise (including without limitation the Liquidation Trust Agreement or the Reorganized IPofA Shreveport LLC Agreement).

(f)     With respect to any Person or Entity entitled to indemnification and/or advancement of expenses by the Liquidation Trust and Reorganized IPofA Shreveport, (i) the Liquidation Trust shall be the indemnitor of first resort (i.e., its obligations to such indemnitee shall be primary and any obligation of Reorganized IPofA Shreveport to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such indemnitee shall be secondary), (ii) if the Liquidation Trust determines to make advances to such indemnitee to cover the costs of defending any claim or action against such indemnitee, the Liquidation Trust shall be primarily liable for such costs, without regard to any rights such indemnitee may have against Reorganized IPofA Shreveport, and (iii) the Liquidation Trust irrevocably waives, relinquishes and releases Reorganized IPofA Shreveport from any and all claims against Reorganized IPofA Shreveport for contribution, subrogation or any other recovery of any kind in respect thereof. It is further agreed that no advancement or payment by Reorganized IPofA Shreveport on behalf of an indemnitee with respect to any claim for which such indemnitee shall have sought indemnification from the Liquidation Trust shall affect the foregoing and Reorganized IPofA Shreveport shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such indemnitee against the Liquidation Trust.

(g)     The Liquidation Trustee, the Liquidation Trust Oversight Board, and the Manager in connection with the performance of their respective functions, and in their sole and absolute discretion, may consult with counsel. Neither the Liquidation Trustee, the Liquidation Trust Oversight Board, nor any Member thereof, nor the Manager shall be liable for any action taken or omitted to be taken by the Liquidation Trustee, the Liquidation Trust Oversight Board, or the Manager, as applicable, in reliance upon the advice or opinion of counsel engaged by the Liquidation Trustee, the Liquidation Trust Oversight Board, or the Manager, as applicable.

(h)     Notwithstanding the authority to do so, neither the Liquidation Trustee, the Liquidation Trust Oversight Board nor the Manager shall be under any obligation to consult with any attorneys, accountants, or other professionals or agents, and the determination to not do so shall not result in the imposition of liability on the Liquidation Trustee, the Liquidation Trust Oversight Board, the Manager or any of their respective present or former shareholders, directors, officers, partners, members, managers designees, attorneys, accountants, or other professionals or employees, or any of the respective shareholders, directors, officers, partners, members, managers or employees of any of the foregoing, unless such determination constitutes willful misconduct or gross negligence.

**Section 7.20  Insurance.** The Liquidation Trustee may purchase, using Trust Assets, and carry all insurance policies and pay all insurance premiums and costs the Liquidation Trustee deems reasonably necessary or advisable, including, without limitation, purchasing any errors and omissions insurance with regard to any liabilities, losses, damages, claims, costs, and expenses the Liquidation Trustee  or the Manager may incur, including but not limited to reasonable attorneys' fees, arising out of or due to any actions or omissions, or consequences of such actions or omissions, with respect to the management, conduct, implementation and/or administration of the Liquidation Trust, Reorganized IPofA Shreveport, the Plan, the Liquidation Trust Agreement or the Reorganized IPofA Shreveport LLC Agreement.

**Section 7.21 <u>Compensation and Expenses of the Liquidation Trustee</u>.** The Liquidation Trustee shall be compensated in accordance with <u>Schedule A</u> to the Liquidation Trust Agreement for its reasonable fees and expenses by the Liquidation Trust with prior notice to the Liquidation Trust Oversight Board, but without any requirement of approval by the Bankruptcy Court.

## ARTICLE VIII

## PROVISIONS GOVERNING DISTRIBUTIONS

**Section 8.1 <u>Distributions of Available Cash; Liquidation Trust Accounts</u>.**

(a)     All payments to be made by the Liquidation Trust to any Beneficiary, and/or any other holder of any Allowed Claim, shall be made only in accordance with the Plan, the Confirmation Order, and the Liquidation Trust Agreement and from the Trust Assets (or from the income and proceeds realized from the Trust Assets) net of any Reserves established pursuant to the Plan, the Confirmation Order, or the Liquidation Trust Agreement and only to the extent that the Liquidation Trust has sufficient Trust Assets (or income and proceeds realized from the Trust Assets) to make such payments in accordance with and to the extent provided for in the Plan, the Confirmation Order, and the Liquidation Trust Agreement.

(b)     Available Cash shall be distributed to holders of Allowed Claims on the Initial Distribution Date and each Quarterly Distribution Date, or as soon thereafter as reasonably practicable, in accordance with the provisions of the Plan governing the Class of Claims in which the Claim is classified.

(c)     Cash shall be maintained by or for the Liquidation Trust in such bank and other financial institution accounts as the Liquidation Trustee shall establish from time to time in its discretion.

(d)     The Liquidation Trustee shall have no responsibility or liability for or by reason of or in connection with the financial performance of, or any diminution in value or losses suffered or incurred in connection with, any of such accounts, or the solvency of any bank or other financial institution.

**Section 8.2 <u>Provisions Concerning Disputed Claims Reserves</u>.**

(a)     <u>**Establishment of Disputed Claims Reserve**</u>.  In connection with the Initial Distribution Date (or any other date on which distributions for any particular Class of Claims are made pursuant to the Plan by the Liquidation Trust), and in connection with making all distributions required to be made on any such date under the Plan, the Liquidation Trustee shall establish, for record keeping purposes only (and not as a separate or distinct fund or account and without interest), a Disputed Claims Reserve for holders of Disputed Claims as necessary pursuant to the Plan; provided however that no amounts shall be allocated to the Disputed Claims Reserve in respect of Disputed Claims which if Allowed would constitute Excess Exchanger Claims ("<u>Disputed Excess Exchanger Claims</u>"), unless and until all Allowed Basic Exchanger

Claims shall have been paid in full and there shall have been allocated to the Disputed Claims Reserve the entire Face Amount of all Disputed Claims other than Disputed Excess Exchanger Claims, and, after giving effect to the all of the foregoing, the Liquidation Trust shall have Available Cash remaining to further fund the Disputed Claims Reserve for such Disputed Excess Exchanger Claims.

(b) **Amounts to Be Reserved.** Except as otherwise provided in paragraph (a) above with respect to Disputed Excess Exchanger Claims, the Liquidation Trust shall reserve the Ratable proportion of all Cash allocated for distribution on account of each Disputed Claim based upon the Face Amount of each such Disputed Claim, or such lesser amount as may be agreed to by the holder of the Claim on one hand and the Liquidation Trustee on the other hand, as applicable, or as may otherwise be determined by order of the Bankruptcy Court. All Cash or other property allocable to the relevant Class hereunder with respect to Disputed Claims shall be allocated for record keeping purposes only (and not as a separate or distinct fund or account and without interest), to the Disputed Claims Reserve with respect to the Initial Distribution Date (or such other date on which distributions for any particular Class of Claims are made pursuant to the Plan).

(c) **Distributions.** Payments on any Disputed Claim that becomes an Allowed Claim shall be distributed on the first Quarterly Distribution Date after the Claim is Allowed, but only to the extent consistent with Section 5.3(c) of the Plan. Distributions shall be made only to the extent of the aggregate distributions that the holder of any such Allowed Claim would have received had such Claim been Allowed as of the Effective Date (less any taxes paid with respect to amounts held in the Disputed Claims Reserve), and without interest. Distributions to each holder of a Disputed Claim that has become an Allowed Claim (and to the extent that the holder of the Disputed Claim has not received prior distributions on account of that Claim) shall be made in accordance with the provisions of the Plan governing the Class of Claims in which the Claim is classified.

(d) **Termination of Disputed Claims Reserve.** The Disputed Claims Reserve shall no longer be necessary at the earlier of (i) when all Disputed Claims have been resolved, or (ii) when all distributions and other dispositions of Cash or other property required to be made therefrom under the Plan and the Liquidation Trust Agreement have been made. Thereafter, all Cash and other property deemed allocated to the Disputed Claims Reserve shall remain held for the Liquidation Trust and shall be distributed to the holders of Allowed Claims in accordance with the Plan.

(e) **No Liability for Funding the Disputed Claims Reserve.** The Liquidation Trustee shall have no duty to fund, or to set aside any separate account for, the Disputed Claims Reserve.

**Section 8.3 Transmittal of Distributions and Notices.** Any property or notice that an Entity or Person is or becomes entitled to receive pursuant to the Plan may be delivered by regular mail, postage prepaid, in an envelope addressed to that Entity or Person's Distribution Address. Property distributed in accordance with this Section shall be deemed delivered to such Entity or Person regardless of whether such property is actually received by that Entity or Person.

The Distribution Address shall be binding on all holders of Claims and other parties-in-interest, and the Liquidation Trustee shall be entitled to rely upon the Distribution Address, and shall have no duty or responsibility to independently seek or verify any address. A holder of a Claim may designate a different Distribution Address by notifying, after the Effective Date, the Liquidation Trust of that address in writing. Any change of Distribution Address must be provided to the Liquidation Trust by registered mail, return receipt requested, in order to be effective. Such notification shall be effective only upon receipt.

Section 8.4    **Setoffs.**  The Liquidation Trust may, but shall not be required to, setoff against any Claim (for purposes of determining the allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that any of the Estates or the Liquidation Trust may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidation Trust of any such claim it may have against such claimant.

Section 8.5    **Withholding Taxes and Expenses of Distribution.**  Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder.  All holders of Allowed Claims shall be required to provide any information necessary to effect the withholding of such taxes.

Section 8.6    **Disputed Identity of Holder.**  If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any distribution, the Liquidation Trust may, in lieu of making such distribution to such Entity or Person, make such distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute; provided, however, that if the dispute remains unresolved by Final Order for an unreasonable period of time, the Liquidation Trustee may request that the Bankruptcy Court order that the property which is the subject of the dispute shall irrevocably become Unclaimed Property.

Section 8.7    **Transfers of Claims and Liquidation Trust Interests.**  As of the Effective Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors, the Trustee, IPofA Shreveport, or their respective agents, shall be deemed closed, and there shall be no further changes in the holders of record of any of the Claims or Interests. No party, including but not limited to the Liquidation Trust, shall have any obligation to recognize any transfer of the Claims or Interests occurring after the Effective Date unless such transfer is expressly permitted pursuant to the Liquidation Trust Agreement and notice of the transfer of such Claim, in form and substance satisfactory to the Liquidation Trust shall have been received by the Liquidation Trustee, as appropriate, prior thereto.  Subject to the immediately preceding sentence, only those holders of record stated on the transfer ledgers as of the close of business on the Effective Date, to the extent applicable, shall be entitled to be recognized for any purposes hereunder.  No interest of any Beneficiary and/or any other holder of any Allowed Claim in or with respect to the Liquidation Trust shall be sold, traded, transferred, assigned, conveyed or otherwise disposed of without the express prior written consent of the Liquidation Trustee, except as expressly permitted by the Liquidation Trust Agreement pursuant to the laws of descent and distribution upon the death of any such Beneficiary and/or other holder, or pursuant to any applicable order or decree as to divorce of any such Beneficiary and/or

other holder, or pursuant to court order upon the bankruptcy of any such Beneficiary and/or other holder, or by operation of law to a successor Entity pursuant to a merger or consolidation of such Beneficiary and/or other holder.

**Section 8.8    Method of Cash Distributions.**  Any Cash payment to be made by the Liquidation Trust pursuant to the Plan may be made, at the sole discretion of the Liquidation Trustee, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.  Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

**Section 8.9    *De Minimis* Distributions.** If the Liquidation Trustee shall so elect, no Cash payment in an amount less than fifty dollars ($50.00) shall be made by the Liquidation Trust to any holder of a Claim unless a request therefor is made in writing to the Liquidation Trust prior to one (1) year after the Effective Date.  Cash that otherwise would be payable under the Plan but for this Section 8.9 shall be reserved and distributed with future distributions, if any, that, collectively, exceed fifty dollars ($50.00).  Distributions of Cash that otherwise would be payable under the Plan to a holder but for this Section 8.9 that never, collectively, exceed fifty dollars ($50.00) as described in the foregoing sentence and for which a request is not made within the one (1) year deadline shall become Unclaimed Property.

**Section 8.10    Exemption from Certain Transfer Taxes.** Pursuant to Section 1146(c) of the Bankruptcy Code: (a) the issuance, transfer or exchange of any securities, instruments or documents; (b) the creation or release of any other Lien, mortgage, deed of trust or other security interest; or (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of or in connection with the Plan or the sale of any assets of any of the Estates, or any deeds, releases, bills of sale or assignments executed in connection with the Plan or the Confirmation Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for under section 1146(a) of the Bankruptcy Code.

## ARTICLE IX

## EXECUTORY CONTRACTS AND LEASES

**Section 9.1    Assumption of Insurance Policies; Assignment of Rights**.  Each of the Debtors' insurance policies and any agreements, documents or instruments relating thereto (the "Insurance Policies"), unless previously cancelled shall be treated as executory contracts under the Plan, and the Plan shall constitute a motion to assume the Insurance Policies and to assign all of the Estates' rights under such Insurance Policies to the Liquidation Trust. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2) and a finding by the Bankruptcy Court that such assumption is in the best interests of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date because the Debtors are current.  To the extent the

Bankruptcy Court or the Proponents determine otherwise as to any of the Insurance Policies, the Debtors reserve the right to seek rejection of such Insurance Policy or other available relief.

**Section 9.2** **Rejection of Contracts and Leases.** Each executory contract or unexpired lease (except as provided in Section 9.1 above in the case of the Insurance Policies) of the Debtors that has not expired by its own terms prior to the Effective Date, and that has not been (a) assumed or rejected during the Chapter 11 Cases prior to the Effective Date or (b) identified in the Plan Supplement for assumption or assumption and assignment, shall be deemed rejected pursuant to Bankruptcy Code Section 365 as of the Effective Date.

**Section 9.3** **Rejection of Indemnification Obligations.**

(a) Except as otherwise provided in the Plan or any contract, instrument, release or other agreement or document entered into in connection with the Plan and approved by the Bankruptcy Court, on the Effective Date, all obligations related to any contract, instrument, limited liability company agreement, other comparable organizational document or any other document or applicable law shall be deemed rejected as of the Effective Date as they relate to any rights to indemnification, contribution and/or advancement of expenses claimed by any former member, manager, officer or employee of any of the Debtors.

(b) Indemnification obligations (whether arising by contract, operation of law, statute or otherwise) owed to any present or former professionals of any of the Debtors arising out of acts or omissions that occurred prior to the Petition Date, including without limitation, accountants, auditors, financial consultants, underwriters or attorneys, shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Bankruptcy Code section 365 under the Plan as of the Effective Date.

**Section 9.4** **Disallowance of Contribution Claims.** On the Effective Date, any Claim for reimbursement, indemnification, contribution or subrogation of an Entity that is liable with any of the Debtors on or that has secured the Claim of a Creditor not theretofore Disallowed by Order of the Bankruptcy Court shall be deemed Disallowed to the extent (a) such Creditor's Claim against any of the Debtors is Disallowed; (b) such Claim for reimbursement, indemnification, contribution or subrogation is contingent as of the Confirmation Date, including without limitation all Claims which are Disallowed under Bankruptcy Code section 502(e); or (c) such Entity asserts a right of subrogation to the rights of such Creditor under Bankruptcy Code Section 509 except as otherwise specifically provided therein.

**Section 9.5** **Bar Date For Rejection Damages.** If the rejection of any executory contract or unexpired lease under the Plan gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 3; provided, however, that the Unsecured Claim, if any, arising from such rejection shall be forever barred and shall not be enforceable against the Estates, or the Liquidation Trust, or their respective successors or properties, unless a proof of such Claim is filed and served on the Liquidation Trust within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the executory contract or unexpired lease, which may include, if applicable, the Confirmation Order.

# ARTICLE X

## DISPUTED, CONTINGENT AND
## UNLIQUIDATED CLAIMS AND INTERESTS

**Section 10.1  Objections to Claims and Interests.**

(a)     The Claims Objection Deadline shall be one (1) year after the Effective Date; provided, however, that, in the case of Disputed Excess Exchanger Claims, the Claims Objection Deadline shall be one (1) year after the date that all Allowed Basic Exchanger Claims shall have been paid in full under the Plan, and all Disputed Claims other than Disputed Excess Exchanger Claims shall have been definitively resolved, and provided further that the last date for filing Avoidance Actions against a holder of a Claim shall be the date established by Bankruptcy Code Section 546(a) and the last day for asserting any other Cause of Action shall be the last day of the applicable statute of limitations therefor provided under applicable non-bankruptcy law as such period may have been extended by Bankruptcy Code Section 108 or any other section of the Bankruptcy Code.  Notwithstanding any of the foregoing, the Liquidation Trust may request from the Bankruptcy Court one or more extensions of the Claims Objection Deadline, which such extended date shall become the new Claims Objection Deadline.

(b)     From and after the Effective Date, the Liquidation Trustee shall have the exclusive authority for reviewing, negotiating, and, if deemed appropriate, objecting to the allowance of any Claim filed in the Chapter 11 Cases.  All objections shall be litigated to a Final Order; provided, however, that the Liquidation Trustee may compromise and settle any objections to Claims, subject to the provisions of this Article X without order of the Bankruptcy Court; provided further, however, that distributions may be made to a holder of a Claim prior to the expiration of the Claims Objection Deadline applicable thereto if the Liquidation Trustee believes that objection to such holder's Claim is not appropriate under the circumstances.

(c)     Objections to Claims not otherwise deemed Allowed by the Plan shall not be subject to any defense, including, without limitation, res judicata, estoppel or any other defense because of the confirmation of the Plan.  Additionally, the rights of the Liquidation Trust to amend, modify or supplement any objection to a particular Claim to include relief pursuant to Bankruptcy Code Section 502(d) are hereby preserved until sixty (60) days after the entry of a Final Order against a holder of such Claim.

**Section 10.2  Estimation of Claims.**  Through the Claims Objection Deadline applicable thereto, the Liquidation Trust may request that the Bankruptcy Court enter an Estimation Order(s) fixing, pursuant to Bankruptcy Code Section 502(c), the amount of any Disputed Claim, regardless of whether any of the Debtors or the Chapter 11 Trustee has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the pendency of any appeal relating to any objection to any Disputed Claim.  In the event that the Bankruptcy Court enters an Estimation Order estimating any Disputed Claim,

the amount of such estimation will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidation Trust may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any mechanism permitted under the Bankruptcy Code or the Plan. The Proponents reserve all rights to seek estimation of any Administrative Claim and Fee Claim as part of the Plan confirmation process.

**Section 10.3** **Amendments to Claims.** After the Confirmation Date, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the holder of such Claim solely to decrease, but not to increase, unless otherwise provided by the Bankruptcy Court, the amount, number or priority.

**Section 10.4** **Authority To Settle Disputed Claims.** From and after the Effective Date, the Liquidation Trustee shall be authorized to compromise and settle Disputed Claims, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 105(a), with a Disputed Amount in excess of $500,000, only upon Bankruptcy Court approval. Notwithstanding any prior order of the Bankruptcy Court or the provisions of Bankruptcy Rule 9019, the Liquidation Trustee may settle or compromise any Disputed Claim with a Disputed Amount of $500,000 or less without approval of the Bankruptcy Court.

**Section 10.5** **No Recourse.** Notwithstanding that the Allowed amount or estimated amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules and, as a result of such reconsideration is Allowed in an amount for which there is insufficient value in the relevant fund or reserve to provide a recovery equal to that received by other holders of Allowed Claims in the relevant Class, no such Claim holder shall have recourse to the Liquidation Trust, the Estates, any of the Proponents, any member or manager thereof, any of the respective Professional Persons of any of them, the holder of any other Claim, or any of the respective property of any of the foregoing. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code. **THUS, THE BANKRUPTCY COURT'S ENTRY OF AN ESTIMATION ORDER MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT OR NUMBER FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.**

## ARTICLE XI

## EFFECTS OF CONFIRMATION

**Section 11.1** **Retention of Estate Causes of Action/Reservation of Rights.** On and after the Effective Date, the Liquidation Trust shall have, retain, reserve and be entitled to assert, prosecute, (subject to Section 7.18(b) hereof) settle, or abandon, any and all Estate Causes of Action.

**Section 11.2** **Compromise of Controversies.** Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the Plan Funding Party Settlement Agreements. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the Plan Funding Party Settlement Agreements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.

**Section 11.3** **Preservation of Insurance.** Except as necessary to be consistent with the Plan, the Plan shall not diminish or impair the enforceability of insurance policies that may cover Claims against any of the Debtors, the Estates, or Assets or any other Person or Entity.

**Section 11.4** **Term of Injunctions or Stays.** Until the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect. After the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect to the extent provided for herein or in the Confirmation Order.

**Section 11.5** **Debtor Releases.**

(a)     On the Effective Date,

(i)     the release, waiver and discharge granted by the Debtors and the Estates in favor of the CCB Parties pursuant to paragraph 9 of the CCB Settlement Agreement shall remain in full force and effect and is hereby confirmed (in all cases excluding from such release, waiver and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities arising out of or in connection with any of the obligations and liabilities of any of the CCB Parties under the CCB Settlement Agreement); and

(ii)     each of the Released Parties under each Plan Funding Party Settlement Agreement as shall have then been approved by Final Order(s) shall be entitled to the benefit of the release, waiver and/or discharge granted by the Debtors and the Estates (and, in the case of the Wachovia Parties, by the Class Representatives and Quirk Representative party to the Wachovia Settlement Agreement) in their favor pursuant to such Plan Funding Party Settlement Agreement (in all cases excluding from the foregoing any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities arising out of or in connection with any of the obligations and liabilities of any of such Released Parties under such Plan Funding Party Settlement Agreement).

(b)     If and to the extent that, pursuant to Section 6.1 hereof, the Proponents shall have waived, as a condition to the confirmation of the Plan, the approval by Final Order(s)

of any of the Plan Funding Party Settlement Agreements, then each of the Released Parties under each Plan Funding Party Settlement Agreement as shall be approved by Final Order(s) after the Confirmation Date shall be entitled to the benefit of the release, waiver and/or discharge provided in their favor pursuant to such Plan Funding Party Settlement Agreement (in all cases excluding from the foregoing any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities arising out of or in connection with any of the obligations and liabilities of any of such Released Parties under such Plan Funding Party Settlement Agreement).

Section 11.6  **Injunction.**

(a)  **Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or Entities, together with their respective present and former employees, agents, officers, directors, principals and affiliates, who have held, hold or may hold Claims against or Interests in any of the Debtors are permanently enjoined, from and after the Effective Date, from (i) pursuing any and all such Claims and/or Interests (other than the rights of such Persons and Entities to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered hereunder and liabilities first arising thereunder after the Effective Date), known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any actual or alleged act, omission, transaction, event, or other occurrences taking place on or prior to the Effective Date (collectively, the "Released Claims"), (ii) commencing or continuing in any manner any action or other proceeding of any kind based on any Released Claim against any of the Debtors or the Liquidation Trust or Reorganized IPofA Shreveport, (iii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, decree or other award against any of the Debtors or the Liquidation Trust or Reorganized IPofA Shreveport based on any Released Claim, (iv) creating, perfecting or enforcing any encumbrance of any kind against any of the Debtors or the Liquidation Trust or Reorganized IPofA Shreveport or against the property or interests in property of any of the Debtors or the Liquidation Trust or Reorganized IPofA Shreveport based on any Released Claim, or (v) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due or owing to any of the Debtors or against the property or interests in property of any of the Debtors, or the Liquidation Trust or Reorganized IPof A Shreveport based on any Released Claim; provided, however, that this provision shall not impact or affect the rights and powers of any governmental entity or agency exercising its police or regulatory power.**

(b)  **Without limiting the generality of the foregoing:**

(i)  **the Plan Funding Parties shall receive the injunctive relief from the Class Action Court or the Bankruptcy Court consistent in all respects with such injunctive relief as is required or provided in favor of the Plan Funding Parties under each of the applicable Plan Funding Party Settlement Agreements as shall have been approved by Final Order(s), to be granted either by the Class Action Court and/or by the Bankruptcy Court, and the Confirmation Order shall provide injunctive relief in favor of CCB consistent in all respects with such injunctive relief as is required or provided in favor**

**of CCB by the CCB Release and by paragraph 4 of the CCB Settlement Agreement (which is coextensive with the CCB Release).**

    **(ii) if and to the extent that, pursuant to Section 6.1 hereof, the Proponents shall have waived, as a condition to the confirmation of the Plan, the approval by Final Order(s) of any of the Plan Funding Party Settlement Agreements, then any and each such Final Order so approving a Plan Funding Party Settlement Agreement after the Confirmation Date-approval of which was waived as a condition to confirmation of the Plan, shall provide injunctive relief in favor of the Plan Funding Parties party to such Plan Funding Party Settlement Agreement consistent with such injunctive relief as is required or provided in favor of the such Plan Funding Parties by the applicable terms and provisions of such Plan Funding Party Settlement Agreement, to be entered by the Bankruptcy Court and/or in the Class Action.**

   **Section 11.7 <u>Exculpation</u>.** None of the Proponents, the members of the Official Creditors' Committee, the Proponents' respective Professional Persons, nor the Official Creditors' Committee's counsel, Cozen O'Connor, shall have or incur any liability whatsover, in any form, to any of the Estates, the Liquidation Trust or Reorganized IPofA Shreveport, for any act or omission in connection with or arising out of the involvement of any of them in the filing and/or conduct of the Chapter 11 Cases, including the type or value of distributions, if any, reserved under the Plan for holders of Claims, the solicitation of votes for acceptance or rejection of the Plan, the pursuit of confirmation and consummation of the Plan, the administration of the Plan and/or the Liquidation Trust and/or Reorganized IPofA Shreveport or the property to be distributed under the Plan, other than acts or omissions found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to constitute willful misconduct, gross negligence, or breach of fiduciary duty by such person or entity.

   **Section 11.8 <u>Reliance on Counsel</u>.** For purposes of the Plan, in no event shall any act or omission of any Person or Entity be deemed to constitute willful misconduct or gross negligence if such Person or Entity relies or relied upon the advice of counsel constituting a Professional Person in connection therewith or with respect to any authority, powers, duties or responsibilities under the Plan, the Liquidation Trust Agreement, the Reorganized IPofA Shreveport LLC Agreement or applicable law.

## ARTICLE XII

## RETENTION OF JURISDICTION

   **Section 12.1 <u>Retention of Exclusive Jurisdiction by the Bankruptcy Court</u>.** Notwithstanding confirmation of the Plan or occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan to the fullest extent legally permissible, including, without limitation, for the following purposes:

    (a) to the extent not otherwise determined by the Plan, to (i) determine the allowance, classification, or priority of Claims upon objection by any party-in-interest entitled to

file an objection, or (ii) the validity, extent, priority and nonavoidability of consensual and nonconsensual Liens or other encumbrances against any of the Trust Assets, Estate Causes of Action, the Mineral Servitude, or property of any of the Estates, the Liquidation Trust or Reorganized IPofA Shreveport;

(b)     to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Entity or Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Entity or Person;

(c)     to protect the Trust Assets, the Mineral Servitude, or property of the Estates and/or the Liquidation Trust or Reorganized IPofA Shreveport, including without limitation Estate Causes of Action, from claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens, security interests or encumbrances on any Trust Assets, and/or the Mineral Servitude;

(d)     to determine any and all applications for allowance of Fee Claims;

(e)     to determine any Priority Tax Claims, Priority Non-Tax Claims, Administrative Claims or any other request for payment of Claims, including both fees and expenses, entitled to priority under Bankruptcy Code Section 507(a) of the Bankruptcy Code;

(f)     to resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan or the making of distributions hereunder;

(g)     to determine any and all motions related to the rejection, assumption or assignment of executory contracts or unexpired leases, or to determine any motion to reject any executory contract or unexpired lease pursuant to Article IX of the Plan;

(h)     except as otherwise provided herein, to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including any remands;

(i)     to enter a Final Order closing the Chapter 11 Cases;

(j)     to modify the Plan under Bankruptcy Code Section 1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

(k)     to issue such orders in aid of consummation of the Plan or the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity or Person, to the full extent authorized by the Bankruptcy Code;

(l)     to determine any tax liability pursuant to Bankruptcy Code Section 505;

(m)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(n)     to resolve any disputes concerning whether an Entity or Person had sufficient notice of the Chapter 11 Cases, the applicable Claims bar date, the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing or for any other purpose;

(o)     to resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Chapter 11 Cases;

(p)     to authorize, as may be necessary or appropriate, sales of assets as necessary or desirable and resolve objections, if any, to such sales;

(q)     to resolve any disputes concerning any release, discharge, injunction, exculpation or other waivers and protections provided in the Plan;

(r)     to approve, if necessary, any distributions, or objections thereto, under the Plan;

(s)     to approve, as may be necessary or appropriate, any Claims settlement entered into or offset exercised by the Liquidation Trust;

(t)     to resolve any dispute or matter arising under or in connection with the Liquidation Trust, Reorganized IPofA Shreveport or the Mineral Servitude or any of the Plan Funding Party Settlement Agreements or the Cordell Settlement Agreement;

(u)     to order the production of documents, disclosures, or information, or to appear for deposition demanded pursuant to Bankruptcy Rule 2004; and

(v)     to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

**Section 12.2     Retention of Non-Exclusive Jurisdiction by the Bankruptcy Court.** Notwithstanding anything else in the Plan, the Bankruptcy Court shall retain non-exclusive jurisdiction over all Estate Causes of Action.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

**Section 13.1     Amendments**.

(a) **Pre-Confirmation Amendments.** The Proponents may modify the Plan at any time prior to the entry of the Confirmation Order, provided that the Plan, as modified, and the Disclosure Statement pertaining thereto meet applicable Bankruptcy Code requirements.

(b) **Post-Confirmation Immaterial Modification.** With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee, the Official Creditors' Committee or the Liquidation Trust Oversight Board, as applicable, and without notice to all holders of Claims and Equity Interests, the Proponents, the Manager, or the Liquidation Trustee, as applicable, may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan.

(c) **Post-Confirmation Material Modification.** On notice to and with an opportunity to be heard by the United States Trustee and the Official Creditors' Committee or the Liquidation Trust Oversight Board, as applicable, the Plan may be altered or amended after the Confirmation Date by the Liquidation Trustee or the Manager in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of Section 1127 of the Bankruptcy Code.

**Section 13.2 Plan Supplements.** A Plan Supplement shall be filed with the Bankruptcy Court at least fifteen (15) Business Days prior to the deadline established for voting on the Plan. Upon its filing, the Plan Supplement may be inspected in the offices of the Clerk of the Bankruptcy Court during normal business hours. A copy of the Plan Supplement shall be mailed to any holder of a Claim or Interest that makes a specific written request for such Plan Supplement to the Proponents (as provided in Section 13.13). The documents contained in the Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

**Section 13.3 Severability.** If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision and make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**Section 13.4 Successors and Assigns.** The rights, benefits and obligations of any Entity or Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Entity or Person.

**Section 13.5   Governing Law.** Except to the extent that the Bankruptcy Code or Bankruptcy Rules or, other federal laws or the DLLCA are applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of New York.

**Section 13.6   Effectuating Documents and Further Transactions.** Reorganized IPofA Shreveport and the Liquidation Trust shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan.

**Section 13.7   Extinguishment of Liens.** On the Effective Date, all Liens against any property of any of the Debtors, except to the extent provided in the Plan, the Cordell Settlement, or the Confirmation Order, shall be deemed forever extinguished and discharged.

**Section 13.8   Saturday, Sunday or Legal Holiday.** If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**Section 13.9   Confirmation Order and Plan Control.** If, but only to the extent that, the Confirmation Order and/or the Plan shall be directly in conflict with the Disclosure Statement or any agreement entered into by the Liquidation Trust and/or Reorganized IPofA Shreveport, as applicable, the Plan shall control the Disclosure Statement and any such agreement, and the Confirmation Order shall control the Plan, the Disclosure Statement and any such agreement.

**Section 13.10  Payment of Statutory Fees.** All fees due and then payable pursuant to section 1930 of title 28 of the United States Code and section 3717 of title 31 of the United States Code shall be paid in Cash on the Effective Date. With respect to the post-Confirmation period, the Liquidation Trust shall pay all fees and amounts payable pursuant to the foregoing statutes with respect to the consolidated Chapter 11 Cases until the earlier of the date of entry of an order dismissing, converting to Chapter 7 of the Bankruptcy Code, or decreeing as final the Chapter 11 Cases, as applicable.

**Section 13.11  Withdrawal of Plan.** The Proponents reserve the right, in the exercise of their discretion, to revoke and withdraw or to modify the Plan at any time prior to the Confirmation Date or, if the Proponents are for any reason unable to consummate the Plan after the Confirmation Date, at any time up to the Effective Date. If the Proponents revoke or withdraw the Plan, (a) nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against any of the Estates or to prejudice in any manner the rights of any of the Estates or any Entity or Person in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, the Plan was not filed and the Effective Date did not occur.

**Section 13.12 Payment Dates.** Whenever any payment to be made under the Plan is due on a day other than a Business Day, such payment will instead be made, without interest, on the next Business Day or as soon thereafter as practicable.

**Section 13.13 Notices.** Any notice, request or demand given or made under the Plan or under the Bankruptcy Code or the Bankruptcy Rules shall be in writing and shall be hand delivered or sent by a reputable overnight courier service, and shall be deemed given when received at the following addresses whether hand delivered or sent by overnight courier service:

**If to the Proponents**

Gerard A. McHale, Jr., as Trustee
1601 Jackson Street
Suite 200
Fort Myers, FL 33901
Telephone: (239) 337-0808
Fax: (239) 337-1178

– and –

Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, New York 10022
Attn: Jonathan L. Flaxer, Esq.
Telephone: (212) 907-7300
Fax: (212) 907-754-0330
jflaxer@golenbock.com

**Section 13.14 Cancellation of Documents.** On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, debentures, certificates and other documents evidencing Claims and Interests in a Debtor or the Debtors shall be canceled and deemed rejected and terminated.

**Section 13.15 Termination of Official Creditors' Committee and Chapter 11 Trustee.** The appointments of the Official Creditors' Committee and the Chapter 11 Trustee shall terminate on the Effective Date, and the members of the Official Creditors' Committee and the Chapter 11 Trustee thereafter shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases.

**Section 13.16 Post-Confirmation Reporting.** The Liquidation Trustee and the Liquidation Trust shall file reports of their respective activities and financial affairs with the Bankruptcy Court on a quarterly basis, within thirty (30) days after the conclusion of each such quarterly calendar period. Any such reports shall be prepared substantially consistent with (both in terms of content and format) currently applicable Bankruptcy Court and United States Trustee

guidelines for such matters, or as the Liquidation Trustee and the United States Trustee may otherwise mutually agree. The Liquidation Trustee shall also maintain and continue to update the website of the Chapter 11 Trustee through the closing of the case or until the Liquidation Trustee and the Liquidation Trust Oversight Board jointly determine that the cost of maintaining the website outweighs the benefit.


Dated: August 11, 2009

GERARD A. McHALE, JR.,
as Chapter 11 Trustee of The 1031 Debtors

/s/ Gerard A. McHale, Jr.
Gerard A. McHale, Jr.


IPOFA SHREVEPORT INDUSTRIAL PARK,
LLC


By:    /s/ Gerard A. McHale, Jr.
    Gerard A. McHale, Jr., as Manager

GOLENBOCK EISEMAN ASSOR
 BELL & PESKOE LLP
*Attorneys for Gerard A. McHale, Jr., the Chapter 11 Trustee*
 *for The 1031 Tax Group, LLC, et al. and IPofA Shreveport Industrial Park, LLC*
437 Madison Avenue
New York, New York 10022
(212) 907-7300

By: _____ /s/ Jonathan L. Flaxer _____
       Jonathan L. Flaxer, a Member of the Firm