Jonathan L. Flaxer, Esq.
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
(212) 907-7300
*Attorneys for Gerard A. McHale, Jr., the Chapter 11 Trustee*
*for The 1031 Tax Group, LLC, et al,. and IPofA Shreveport Industrial Park, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| The 1031 Tax Group, LLC, *et al.,* | : Case No. 07-B-11448(MG) |
| | : Jointly Administered |
| Debtors. | : |
| | : |

----------------------------------------------------------X

| | |
|---|---|
| In re: | : |
| | : |
| IPofA Shreveport Industrial Park, LLC | : Chapter 11 |
| | : Case No. 07-13624(MG) |
| Debtor. | : |
| | : |

----------------------------------------------------------X

## NOTICE OF FILING OF SOLICITATION VERSION OF SECOND AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF GERARD A. McHALE, JR., AS CHAPTER 11 TRUSTEE FOR EACH OF THE 1031 DEBTORS, AND IPofA SHREVEPORT INDUSTRIAL PARK, LLC <u>DATED AS OF AUGUST 11, 2009</u>

Dated: New York, New York
       August 20, 2009

                              GOLENBOCK EISEMAN ASSOR BELL &
                               PESKOE LLP
                              437 Madison Avenue
                              New York, New York 10022
                              (212) 907-7300

                              By:    /s/ Jonathan L. Flaxer
                                     Jonathan L. Flaxer

*468869.1*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

In re:                          :

                              :      Chapter 11

The 1031 Tax Group, LLC, *et al.,*     :      Case No. 07-B-11448(MG)

                              :      Jointly Administered

                 Debtors.[1]     :

                              :

-------------------------------------------------------------X

In re:                          :

                              :

IPofA Shreveport Industrial Park, LLC,    :      Chapter 11

                              :      Case No. 07-13624(MG)

                 Debtor.      :

                              :

-------------------------------------------------------------X

## SECOND AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF GERARD A. McHALE, JR., AS CHAPTER 11 TRUSTEE FOR EACH OF THE 1031 DEBTORS, AND IPofA SHREVEPORT INDUSTRIAL PARK, LLC <u>DATED AS OF AUGUST 11, 2009</u>

Jonathan L. Flaxer, Esq.
Dallas L. Albaugh, Esq.
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
(212) 907-7300

*Counsel to Gerard A. McHale, Jr., Chapter 11 Trustee*
*of The 1031 Tax Group, LLC, et al., and IPofA*
*Shreveport Industrial Park, LLC*

---

[1]The 1031 Debtors are:  The 1031 Tax Group, LLC; 1031 Advance 132 LLC; 1031 Advance, Inc.; 1031 TG Oak Harbor LLC; Atlantic Exchange Company, Inc.; Atlantic Exchange Company LLC; Investment Exchange Group, LLC; National Exchange Accommodators, LLC; National Exchange Services QI, Ltd.; NRC 1031, LLC; Real Estate Exchange Services, Inc.; Rutherford Investment LLC; Security 1031 Services, LLC; Shamrock Holdings Group, LLC; and AEC Exchange Company LLC (collectively, the "<u>1031 Debtors</u>").

# TABLE OF CONTENTS

I. DISCLAIMER ........................................................................................................2

II. INTRODUCTION TO THE DISCLOSURE STATEMENT ....................................3

III. SUMMARY OF THE PLAN...................................................................................5

    A. Classification and Treatment of Claims Under the Plan.................................6

IV. VOTING PROCEDURES ......................................................................................11

    A. Parties Entitled to Vote. .............................................................................11

    B. Vote Required for Plan Acceptance..........................................................12

V. CONFIRMATION OF THE PLAN .........................................................................12

    A. Confirmation Hearing. ...............................................................................12

    B. Requirements for Confirmation of the Plan. .............................................13

VI. GENERAL BACKGROUND CONCERNING THE DEBTORS AND EVENTS
    PRECEDING THE CHAPTER 11 FILING .................................................13

    A. Okun's Acquisition of the 1031 Debtors and the 1031 Debtors' Pre-petition
       Operations ..................................................................................................13

    B. Okun's Indictment and Conviction...........................................................16

VII. EVENTS IN THE 1031 DEBTORS' CHAPTER 11 CASES ............................17

    A. Bankruptcy Proceedings Prior to the Appointment of the Chapter 11 Trustee...........17
       1. Summary ...............................................................................................17
       2. Certain First Day Orders .......................................................................18
       3. Retention of 1031 Debtors' Professionals and Post-petition Management
          Prior to the Appointment of the Chapter 11 Trustee.............................18
       4. The Committee ......................................................................................19
       5. Claims Bar Date Applicable to the 1031 Debtors.................................19
       6. Initial Motions for Appointment of Chapter 11 Trustee or for Conversion
          to Chapter 7 ...........................................................................................19
       7. The 1031 Debtors' and the Committee's Pursuit of a Plan of
          Reorganization Funded by Okun or JPS ...............................................21
       8. Colorado Capital Bank Litigation and Related Settlements..................22
       9. Appointment of the Chapter 11 Trustee and the Asset Transfer Agreement ........26

B.  Bankruptcy Proceedings After the Appointment of the Chapter 11 Trustee .............27
    1.  The Transfer Agreement and the Okun Entities .................................................27

VIII. PLAN FUNDING PARTY SETTLEMENT AGREEMENTS/CLASS ACTION
      AGREEMENT ...............................................................................................................35

    A.  Overview of Plan Funding Party Settlement Agreements .........................................36

    B.  Class Action Agreement ............................................................................................37

    C.  Plan Funding Party Settlement Agreements...............................................................39
        1.  Settlements with E&O Carriers and Former Owners.........................................40
        2.  1031 Debtors' Crime Coverage and Settlements...............................................44
        3.  Settlement with KPKB .......................................................................................45
        4.  Settlement with Michael Rosen..........................................................................46
        5.  Settlement with Wachovia...................................................................................46

    D.  Other Pending and Potential Litigation Claims and Settlements ..............................47
        1.  JPS.......................................................................................................................47
        2.  Boulder Capital ..................................................................................................48
        3.  Hialeah ................................................................................................................48
        4.  Citibank ...............................................................................................................48
        5.  Other Claims and Avoidance Actions.................................................................49
        6.  Professional Fees Incurred Prior to the Appointment of the Chapter 11
            Trustee.................................................................................................................49

IX. SUMMARY AND DESCRIPTION OF THE PLAN ...........................................................50

    A.  Classification of Claims and Interests; General Provisions ......................................50
        1.  General Rules of Classification ..........................................................................50
        2.  Holder of Claims Entitled to Vote .....................................................................50
        3.  Acceptances by Impaired Classes ......................................................................50
        4.  Non-Consensual Confirmation ...........................................................................50
        5.  Administrative Claims, Priority Tax Claims, and Fee Claims ............................51

    B.  Treatment of Unclassified Claims .............................................................................51
        1.  Administrative Claims.........................................................................................51
        2.  Priority Tax Claims.............................................................................................51
        3.  Fee Claims. .........................................................................................................51
        4.  Subordinated Fee Claims....................................................................................52

    C.  Designation of Classes of Claims and Equity Interests ............................................52

    D.  Treatment of Classified Claims .................................................................................52
        1.  Class 1: Secured Claims. ....................................................................................52
        2.  Class 2: Priority Non-Tax Claims.......................................................................53

      3.   Class 3: General Unsecured Claims. ................................................................53

      4.   Class 4:  Interests. ...........................................................................................54

E.  Conditions to Confirmation and Effective Date ......................................................54

      1.   Conditions to Confirmation ............................................................................54

      2.   Conditions to Effective Date ...........................................................................55

      3.   Waiver of Conditions ......................................................................................55

F.  Means for Implementation ......................................................................................56

      1.   Substantive Consolidation ...............................................................................56

      2.   The Liquidation Trust. .....................................................................................56

      3.   Liquidation Trustee. ........................................................................................56

      4.   Transfer of Property to Liquidation Trust. ......................................................57

      5.   Powers of the Liquidation Trustee ...................................................................58

      6.   Withholding and Reporting Requirements .......................................................58

      7.   Resignation, Death, or Removal of Liquidation Trustee. ................................58

      8.   Resignation, Death, or Removal of Manager ..................................................59

      9.   Ratification .......................................................................................................59

      10. Termination of Liquidation Trust. ..................................................................59

      11. Liquidation Trust Oversight Board. ................................................................59

G.  Purposes of Reorganized IPofA Shreveport; Powers of the Manager. ......................60

H.  Liability, Indemnification. ......................................................................................61

I.  Compensation and Expenses of the Liquidation Trustee ..........................................63

J.  Provisions Governing Distributions ........................................................................63

      1.   Distributions of Available Cash; Liquidation Trust Accounts ...........................63

      2.   Provisions Concerning Disputed Claims Reserves ............................................63

      3.   Transfers of Claims and Liquidation Trust Interests ........................................65

K.  Disputed, Contingent and Unliquidated Claims and Interests ..................................65

      1.   Objections to Claims and Interests. .................................................................65

      2.   Estimation of Claims .......................................................................................66

      3.   Amendments to Claims ....................................................................................66

      4.   Authority To Settle Disputed Claims ...............................................................66

      5.   No Recourse .....................................................................................................66

L.  Executory Contracts and Leases ..............................................................................67

      1.   Assumption of Insurance Policies; Assignment of Rights .................................67

      2.   Rejection of Contracts and Leases ...................................................................67

      3.   Rejection of Indemnification Obligations. .......................................................67

      4.   Disallowance of Contribution Claims ..............................................................68

      5.   Bar Date For Rejection Damages .....................................................................68

M. Effects of Confirmation .........................................................................................68
    1. Retention of Estate Causes of Action/Reservation of Rights ...............................68
    2. Compromise of Controversies ..........................................................................68
    3. Preservation of Insurance .................................................................................68
    4. Term of Injunctions or Stays ............................................................................68
    5. Releases ...........................................................................................................69
    6. Injunction ........................................................................................................69
    7. Exculpation .....................................................................................................70
    8. Reliance on Counsel ........................................................................................70

N. Retention of Jurisdiction .......................................................................................70
    1. Retention of Exclusive Jurisdiction by the Bankruptcy Court ...........................70
    2. Retention of Non-Exclusive Jurisdiction by the Bankruptcy Court ...................72

O. Miscellaneous Provisions ......................................................................................72
    1. Amendments ....................................................................................................72
    2. Plan Supplements .............................................................................................73
    3. Successors and Assigns .....................................................................................73
    4. Governing Law .................................................................................................73
    5. Effectuating Documents and Further Transactions .............................................73
    6. Extinguishment of Liens ...................................................................................73
    7. Confirmation Order and Plan Control ...............................................................73
    8. Payment of Statutory Fees ................................................................................73
    9. Withdrawal of Plan ..........................................................................................73
    10. Notices ...........................................................................................................74
    11. Cancellation of Documents .............................................................................74
    12. Termination of Official Creditors' Committee and Chapter 11 Trustee ..............74
    13. Post-Confirmation Reporting ..........................................................................74

X. CERTAIN RISK FACTORS .....................................................................................75

A. Risk of Decreased Distributions to Holders of Allowed Class 3 Claims ..................75
    1. Higher Actual Amounts of Other Kinds of Allowed Claims ..............................75
    2. Material Disputed Claims ..................................................................................75
    3. Uncertainty of Potential Recoveries by Liquidation Trust .................................75

B. Uncertainty of Liquidation Analysis .......................................................................76

C. Certain Risks of Non-Confirmation .........................................................................76

D. Potential Liabilities Could Arise from Ownership of the Mineral Servitude ............77

XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................78

A. Consequences to Holders of Allowed Class 3 Claims ...............................................79
    1. Treatment of Transfers to the Liquidation Trust ...............................................79

2. Gain or Loss – Generally.......................................................................79

3. Distributions in Discharge of Accrued but Unpaid Interest.................................80

4. Tax Treatment of the Liquidation Trust and Holders of Beneficial Interests.......81

B. Other Creditors or Interest Holders..........................................................83

C. Information Reporting and Withholding.......................................................83

XII. LIQUIDATION ANALYSIS AND BEST INTERESTS TEST.........................................84

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

In re:                                              :
                                                    :        Chapter 11
The 1031 Tax Group, LLC, *et al.*,                  :        Case No. 07-B-11448(MG)
                                                    :        Jointly Administered
                        Debtors.[2]                 :
                                                    :
------------------------------------------------------------X
In re:                                              :
                                                    :
IPofA Shreveport Industrial Park, LLC,              :        Chapter 11
                                                    :        Case No. 07-13624(MG)
                        Debtor.                      :
                                                    :
------------------------------------------------------------X

## SECOND AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF GERARD A. McHALE, JR., AS CHAPTER 11 TRUSTEE FOR EACH OF THE 1031 DEBTORS, AND IPofA SHREVEPORT INDUSTRIAL PARK, LLC DATED AS OF AUGUST 11, 2009

Gerard A. McHale, Jr., the Chapter 11 Trustee (the "Chapter 11 Trustee" and together with IPofA Shreveport Industrial Park, LLC, the "Proponents") for the estates of the 1031 Debtors (the "1031 Estates" and, collectively with the chapter 11 estate of IPofA Shreveport, the "Estates"), and IPofA Shreveport Industrial Park, LLC ("IPofA Shreveport" and, collectively with the 1031 Debtors, the "Debtors") respectfully submit this Second Amended Disclosure Statement (the "Disclosure Statement") pursuant to section 1125 of title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), to accompany the Second Amended Joint Plan of Reorganization of the Chapter 11 Trustee and IPofA Shreveport dated August 11, 2009 (the "Plan"), which has been filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the Debtors' chapter 11 cases. Capitalized terms contained in this Disclosure Statement shall have the same meaning as stated in the Plan, unless otherwise defined herein. A copy of the Plan is annexed hereto as Exhibit A.

---

[2] The 1031 Debtors are: The 1031 Tax Group, LLC; 1031 Advance 132 LLC; 1031 Advance, Inc.; 1031 TG Oak Harbor LLC; Atlantic Exchange Company, Inc.; Atlantic Exchange Company LLC; Investment Exchange Group, LLC; National Exchange Accommodators, LLC; National Exchange Services QI, Ltd.; NRC 1031, LLC; Real Estate Exchange Services, Inc.; Rutherford Investment LLC; Security 1031 Services, LLC; Shamrock Holdings Group, LLC; and AEC Exchange Company LLC (collectively, the "1031 Debtors").

# I.

## DISCLAIMER

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST. THE DESCRIPTION OF THE PLAN HEREIN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO AUDIT. THE PROPONENTS ARE UNABLE TO WARRANT AND REPRESENT THE ACCURACY OF THE INFORMATION CONTAINED HEREIN, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO ENSURE ITS ACCURACY. IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND PROVISIONS OF THE PLAN SHALL CONTROL.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED IN THIS DISCLOSURE STATEMENT. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCE, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE", "MAY", "WILL", "ESTIMATE", "CONTINUE", "ANTICIPATE", "INTEND", "EXPECT", AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. ALL FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN SECTION X "CERTAIN RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. THE PROPONENTS DO NOT UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON OR ENTITY, OR BE

DEEMED EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE STATEMENTS MADE HEREIN SHALL NEITHER CONSTITUTE NOR BE CONSTRUED AS AN ADMISSION, STIPULATION, WAIVER, EVIDENCE OR FINDING OF FACT.

II.

## INTRODUCTION TO THE DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide creditors of the Debtors with adequate information to enable them to make an informed judgment in determining whether to vote to accept or reject the Plan. The Plan is the document that contains the exclusive and final statement of the rights of the Creditors, Interest holders and interested parties, including what they will receive and how they are to receive it. It is strongly recommended that the Plan be read in its entirety. The statements in the Disclosure Statement are merely explanations of the Plan. If the Plan is confirmed by the Bankruptcy Court, it will become binding on the Debtors, all of the Debtors' Creditors and Interest holders, and other interested parties.

Creditors whose Claims are impaired and will receive a distribution under the Plan have the right to vote to accept or reject the Plan. Generally speaking, a Claim or Interest is impaired if the Plan alters the legal, equitable or contractual rights to which the holder of the Claim or Interest would otherwise be entitled. A class of Creditors accepts the Plan when Creditors in that class, holding two-thirds in dollar amount and more than one-half in number of the Claims in such class, have cast their ballots to accept the Plan. The class of Interests shall not receive any distribution on account of such Interests, which shall be cancelled upon the Effective Date of the Plan.

The purpose of this Disclosure Statement is to enable Creditors entitled to vote to make an informed decision as to whether to accept or reject the Plan. The Plan is organized into twelve (12) articles. Article III of the Plan provides for (3) classes of Claims and one (1) class of Interests. Class 1, Secured Claims, is impaired and the holders of such Claims are entitled to vote to accept or reject the Plan, and will receive a ballot for purposes of voting to accept or reject the Plan. Class 2, Priority Claims, is not impaired and the holders of such Claims are not entitled to vote to accept or reject the Plan. Class 3, General Unsecured Claims, is impaired and the holders of such Claims are entitled to vote to accept or reject the Plan and will receive a ballot for purposes of voting to accept or reject the Plan. Class 4, Interests, is impaired. Holders of Interests shall not receive any distribution on account of such Interests, which shall be cancelled upon the Effective Date of the Plan. Accordingly, holders of Class 4 Interests are not entitled to vote to accept or reject the Plan.

Accompanying this Disclosure Statement are the following materials:

1.      A copy of the Plan;

2.      Ballots for Class 1 and Class 3 for accepting or rejecting the Plan;

3.      An envelope in which each ballot may be returned; and

4.      A copy of a notice which states:  (a) the date by which ballots must be received in order to be counted; (b) the date by which objections to confirmation of the Plan must be served and filed; (c) the date, time and location of the Confirmation Hearing in the Bankruptcy Court to consider the confirmation of the Plan; and (d) other relevant information.

As stated in the accompanying notice, the Bankruptcy Court has scheduled a Confirmation Hearing on whether to confirm the Plan for October 7, 2009 at 11:00 A.M.  All parties in interest may attend the Confirmation Hearing.  This Disclosure Statement has been approved by order of the Bankruptcy Court dated August 18, 2009, after notice and a hearing pursuant to section 1125 of the Bankruptcy Code.  The Bankruptcy Court found that the information contained herein is of the kind, and is sufficiently detailed, to enable a hypothetical, reasonable investor typical of the Class being solicited to make an informed judgment whether to vote to accept or reject the Plan.

**APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT CONCERNING THE FAIRNESS OR THE MERITS OF THE PLAN**.

No solicitation of votes for the Plan may be made except pursuant to this Disclosure Statement and in accordance with § 1125 of the Bankruptcy Code.  No person has been authorized to use or provide any information pertaining to the Debtors or the Plan other than information contained in this Disclosure Statement.  Creditors should not rely on any information other than that contained in this Disclosure Statement and the accompanying exhibits.

**THE PROPONENTS BELIEVE THAT THE PLAN OFFERS THE BEST POSSIBLE RECOVERIES TO HOLDERS OF CLAIMS COMPARED TO ALL REASONABLY AVAILABLE ALTERNATIVES UNDER THE CIRCUMSTANCES OF THESE CHAPTER 11 CASES.  THE PROPONENTS, THEREFORE, BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN**.

# III.

## SUMMARY OF THE PLAN

**THE PLAN DOES NOT GOVERN DISTRIBUTIONS THAT MAY BE MADE THROUGH THE PENDING CLASS ACTION LITIGATION OR THE RESTITUTION PROCEEDINGS PENDING IN RICHMOND, VIRGINIA. THE CLASS ACTION AND RESTITUTION PROCEEDING ARE NOT COVERED BY THE PLAN. CREDITORS MUST FOLLOW AND COMPLY WITH THE SEPARATE CLAIM SUBMISSION REQUIREMENTS, IF ANY, IN THE CLASS ACTION LITIGATION AND THE RESTITUTION PROCEEDINGS IN ORDER TO SHARE IN ANY RECOVERY GENERATED THROUGH THOSE PROCEEDINGS.**

The following is a summary of the Plan. This summary is qualified in its entirety by reference to the Plan, attached as Exhibit A to this Disclosure Statement.

The Plan is proposed by the Chapter 11 Trustee and IPofA Shreveport. The Plan provides for the liquidation and distribution to creditors of all Assets of the 1031 Estates, including the approval and implementation of settlement agreements with the Plan Funding Parties, and the continued investigation and prosecution of Estate Causes of Action by a Liquidation Trust to be formed pursuant to the Plan and a Liquidation Trust Agreement. The Liquidation Trust is to be managed by the Liquidation Trustee, with certain input by a Liquidation Trust Oversight Board selected by the Chapter 11 Trustee with input from the Committee. The Liquidation Trust shall be responsible for making distributions to holders of Claims, as well as all other administrative tasks necessary for ultimate resolution of the Chapter 11 cases, in accordance with the terms of the Plan and the Liquidation Trust Agreement. The Plan also provides for the reorganization of IPofA Shreveport, which owns the Mineral Servitude. The Liquidation Trust will be the sole member of Reorganized IPofA Shreveport, and the Liquidation Trustee will serve as the Manager of Reorganized IPofA Shreveport. Reorganized IPofA Shreveport's activities will relate solely to maximizing any revenues that may be potentially generated or derived from the Mineral Servitude.

The Plan Funding Party Settlement Agreements and the Class Action Agreement are an integral part of the Plan because they facilitate confirmation of the Plan, provide sufficient funds to pay Administrative Expenses and Priority Claims, and will provide for an initial distribution to general unsecured creditors as soon as practicable after the Effective Date. These proceeds will also provide the initial funding for the Liquidation Trust, which will, among other things, pursue litigation claims which have not been settled, which claims, if favorably resolved, could potentially provide substantial additional consideration to Creditors. The Class Action Agreement provides the structure for litigation against Lockton, Citibank and other parties in a collaborative manner between the Class Action Representative and the Chapter 11 Trustee, which the Chapter 11 Trustee believes will optimize the value of these claims for the benefit of the Exchangers and other Creditors of the 1031 Estates. The Plan Funding Party Settlement Agreements and Class Action Agreement are discussed in greater detail in Section VIII below.

Set forth below is a chart describing the classification and treatment of Claims under the Plan, as well as the estimated amount of aggregate allowed claims in each class and the

estimated recovery of such class expressed as a percentage of its aggregate allowed Claims. Each class has an estimated recovery of 100%, except that the Initial Distribution for General Unsecured Claims is estimated to result in a recovery of 35% (44% for Exchangers after giving effect to the Class Action Agreement). As discussed below, this estimate relates only to the Initial Distribution, and further distributions to Class 3 General Unsecured Claims by the Liquidation Trust are contemplated.

Following the chart below is a statement of the projected cash balance of the Liquidation Trust as of the Effective Date, together with a summary of the amounts payable under the respective Plan Funding Settlement Agreements that will fund and be included in such cash balance.

## A.     Classification and Treatment of Claims Under the Plan

| Summary of Classification and Treatment of Claims Under the Plan | | | |
|---|---|---|---|
| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/Estimated Recovery Under the Plan |
| N/A | Administrative Claims | $670,000[3] | Estimated Recovery: 100%<br><br>Each holder of an Allowed Administrative Claim shall be paid by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Administrative Claim in Cash on the date, or as soon thereafter as is reasonably practicable, that is the later of (i) the Effective Date or (ii) the date such Claims become Allowed Claims or otherwise become payable under the Plan; except, that sums owed the United States Trustee for fees pursuant to Section 1930(a)(6) of title 28 of the United States Code shall be paid on the Effective Date (and thereafter, as such fees may thereafter accrue and be due and payable). |

---

[3] Includes Claims against IPofA Shreveport.

| Summary of Classification and Treatment of Claims Under the Plan | | | |
|---|---|---|---|
| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/Estimated Recovery Under the Plan |
| N/A | Priority Tax Claims | $32,600 | Estimated Recovery: 100%<br><br>Each holder of an Allowed Priority Tax Claim shall be paid by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Priority Tax Claim in Cash on the date, or as soon thereafter as is reasonably practicable, that is the later of (i) the Effective Date or (ii) the date such Claims become Allowed Claims or otherwise become payable under the Plan. Any Claim or demand for penalty relating to any Priority Tax Claim (other than a penalty of the type specified in Bankruptcy Code Section 507(a)(8)(G)) shall be Disallowed, and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Estates, the Liquidation Trust, Reorganized IPofA Shreveport or any of their respective assets or property. |
| N/A | Fee Claims | $19,800,000[4] | Estimated Recovery: 100%<br><br>Each holder of an Allowed Fee Claim shall be paid by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Fee Claim in Cash on the date, or as soon thereafter as is reasonably practicable, that such Claim is Allowed. |
| Class 1 | Secured Claims | -0- | Estimated Recovery: N/A<br><br>Impaired and Entitled to Vote.<br><br>Pursuant to the CCB Settlement Agreement, CCB holds an Allowed contingent unliquidated secured Claim (the "CCB Secured Claim") for certain CCB Covered Fees and Expenses, if any, secured by (and capped at) the balance of the funds |

---

[4] In the event that the Chapter 11 Trustee is unable to reach settlements with the professionals retained prior to his appointment, the Chapter 11 Trustee intends to object to the fees, in the amount of approximately $11 million, of those professionals ("Pre-Trustee Fees"), and for purposes of this analysis, has estimated the Pre-Trustee Fees at zero and is thus not included in the amount reflected above. This $19,800,000 figure represents the Chapter 11 Trustee's estimate of claims for unpaid fees and reimbursement of expenses at confirmation assuming estimated ongoing fees and expenses at $600,000 per month for four months (that is, through the estimated time of the Effective Date). Approximately $5,400,000 in fees, and $775,000 in reimbursement of expenses, has previously been paid to Professional Persons in these cases. For purposes of this analysis, the Chapter 11 Trustee's compensation is based on anticipated hourly rate compensation, rather than the commission formula of Section 326 of the Bankruptcy Code. The Trustee reserves the right to seek compensation based on that formula, or some figure in excess of hourly rate compensation but less than the commission formula.

| Summary of Classification and Treatment of Claims Under the Plan | | | |
|---|---|---|---|
| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/Estimated Recovery Under the Plan |
| | | | (currently approximately $375,000) held in a segregated bank account at J.P. Morgan Chase Bank (the "CCB Reserve"). The CCB Secured Claim shall be deemed satisfied by either (i) entry of a final, non-appealable Confirmation Order granting the CCB Release; or (ii) maintenance of the CCB Reserve until October 23, 2009. |
| Class 2 | Priority Non-Tax Claims | $346,000 | Estimated Recovery: 100%<br><br>Unimpaired and Not Entitled to Vote.<br><br>Each holder of an Allowed Priority Non-Tax Claim shall be paid by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Priority Non-Tax Claim in Cash on the date, or as soon thereafter as is reasonably practicable, that is the later of (i) the Effective Date or (ii) the date such Claim becomes an Allowed Claim or otherwise becomes payable under the Plan. |
| Class 3 | General Unsecured Claims | $150,000,000[5] | Estimated Effective Date Distribution: 35%[6]<br><br>Impaired and Entitled to Vote.<br><br>(A) Each holder of an Allowed General Unsecured Claim that constitutes a Basic Exchanger Claim shall receive First Tranche Beneficial Interests in the Liquidation Trust with respect to such Basic Exchanger Claim in a percentage Ratable to other holders of Basic Exchanger Claims. "Basic Exchanger Claims" are the principal amount deposited by an Exchanger with a |

[5] General Unsecured Claims fall into one of two groups, Exchanger Claims (including claims of reverse exchangers) and non-Exchanger Claims. Based on the Chapter 11 Trustee's analysis of the schedules, claims docket and other materials, there are approximately 530 Exchanger Claims in the aggregate amount of approximately $149 million. In performing this analysis, the Chapter 11 Trustee has attempted to eliminate duplicate Claims and imputed Claim amounts to Exchangers who filed Claims but did not provide a dollar amount. The Chapter 11 Trustee has also taken into account the Colorado Exchangers Settlement Payment (defined below) and the Enterprises Settlement (defined below). In addition, this figure only includes the Basic Exchanger Claim amounts. The Chapter 11 Trustee's analysis to date is that there are approximately 175 non-Exchanger Claims in the aggregate amount of approximately $960,000.

[6] This represents the estimated distribution to be made on, or as soon as is practicable after, the Effective Date. Based upon the results of post-Effective Date litigation, as described below at pages 36-39 and 47-49, plus the revenues, if any, from the Mineral Servitude and/or the sale of the New Hampshire Property, this figure could be increased by subsequent distributions made from the Liquidation Trust. In addition, after giving effect to the Class Action Agreement, Exchangers will have an estimated aggregate Effective Date Distribution of 44%. See Note 11 below.

| Summary of Classification and Treatment of Claims Under the Plan | | | |
|---|---|---|---|
| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/Estimated Recovery Under the Plan |
| | | | 1031 Debtor under an Exchange Agreement plus accrued interest under such Exchange Agreement, if any, up to the Petition Date on such principal amount.<br><br>(B) Each holder of an Allowed General Unsecured Claim that constitutes in whole or part an Excess Exchanger Claim shall receive Second Tranche Beneficial Interests in the Liquidation Trust with respect to such Excess Exchanger Claim in a percentage Ratable to other holders of Excess Exchanger Claims. "Excess Exchanger Claims" are limited to the amount of such holder's Claims in excess of such holder's Basic Exchanger Claim (for example, damage claims of Exchangers for attorneys' fees, consequential, compensatory, punitive, treble, exemplary, multiple or other damages other than Basic Exchanger Claims). No distributions will be made on account of Excess Exchanger Claims until Basic Exchanger Claims are paid in full. |
| Class 4 | Interests | N/A | Recovery: 0%<br><br>Impaired and Not Entitled to Vote.<br><br>Holders of Interests shall neither receive nor retain any property under the Plan. |

The projected cash balance of the Liquidation Trust as of the Effective Date is $78,970,000 (the "Projected Effective Date Cash Balance"). The Projected Effective Date Cash Balance will be applied first to fund an aggregate of $25,848,600 of estimated Effective Date distributions in respect of Allowed Administrative Claims ($670,000), Allowed Priority Tax Claims ($32,600), Allowed Fee Claims ($19.8 million), Allowed Priority Non-Tax Claims ($346,000) and a reserve of $5 million to permit the Liquidation Trust fund ongoing litigation and other expenses. The balance of $53,121,400 remaining after payment of such amounts will be used to fund Estimated Effective Date Distributions for Class 3 General Unsecured Claims.[7]

---

[7] Under the Plan and the Liquidation Trust, distributions to holders of Allowed Unsecured Claims held by Exchangers will first be made on account of Allowed Basic Exchanger Claims, which consist of the lost Exchange Deposit, plus any interest thereon up to the Petition Date (but only to the extent that the applicable Exchange Agreement provides for interest). A schedule of all Basic Exchanger Claims showing the amount of each Basic Exchanger Claim is set forth in Schedule 1 to the Plan. If Allowed Basic Exchanger Claims and other Allowed Unsecured Claims are paid in full, then the Liquidation Trust will begin making distributions on account of Allowed Excess Exchanger Claims, which essentially consist of all other components of Claims of Exchangers, including attorneys' fees, consequential, compensatory, punitive, treble, exemplary, multiple or other damages, to the extent Allowed. The Chapter 11 Trustee believes that the foregoing is fair, practical, and will avoid extensive cost and delay in making distributions to Exchangers. The Basic Exchanger Claims are relatively easily verifiable, and

**A vote to accept the Plan does not constitute acceptance of or consent to any Fee Claims. Professional Persons must file requests with the Bankruptcy Court for allowance and payment of all Fee Claims, and all Creditors have the right to object.**

The Projected Effective Date Cash Balance will be funded by the amounts payable under the respective Plan Funding Settlement Agreements set forth below (assuming the satisfaction of all conditions contained in the respective Plan Funding Party Settlement Agreements and payment of all sums due thereunder) plus cash and an anticipated tax refund:

| Settlement Agreement | | |
|---|---|---|
| KPKB | | $12,380,000[8] |
| E&O | | 4,600,000 |
| Crime Insurance Coverage | | 23,250,000[9] |
| Former Owners | | 2,112,500[10] |
| Rosen | | 925,000 |
| Wachovia | | 27,000,000[11] |
| | SUB TOTAL: | $70,277,500 |
| | | |
| Cash | | 5,897,000 |
| Tax Refund | | 2,800,000 |
| | TOTAL: | $78,974,500 |

represent the same type of damage for each Exchanger. By contrast, Excess Exchanger Claims include widely disparate elements and thus vary among the Exchangers. Absent this proposed distribution protocol, the Liquidation Trust would be required to undertake an extensive and expensive Claims objection and estimation process to justify or eliminate the numerous and disparate components of the Excess Exchanger Claims. This process would likely cause lengthy delays in distributions. In the event that Allowed Basic Exchanger Claims are not paid in full, the difficult and expensive process of adjusting Excess Exchanger Claims will be avoided.

[8] The maximum amount to be paid by KPKB pursuant to the KPKB Settlement Agreement is $15,380,000. However, $3 million of this amount was to be paid from a contingency fee that KPKB had hoped to earn from a certain pending litigation. That litigation has since been dismissed. As a consequence, the Plan Proponents do not expect to obtain such $3 million.

[9] Including payments by the following parties thereto: Continental Casualty Company ($13 million); Federal Insurance Company ($7 million); Twin City Fire Insurance Company ($3.25 million).

[10] Including payments by the following parties pursuant to their respective Plan Funding Party Settlement Agreements: Daniel E. McCabe, Shirley L. McCabe, Andrew C. McCabe, Chad J. Greenberg and J. Peter McCann ($1.250 million); William D. Bennett ($400,000); William A. Hazel, Patrick Dowdall, James F. Livesey, Charles D. Subrt ($107,500); David B. Shefman and Marga R. Shefman ($10,000); Janet Dashiell ($75,000); Todd Pajonas ($20,000); and Steven Allred ($250,000). The Pajonas Settlement Agreement, in addition to the $20,000 payment upon approval, also provides for additional payments of $180,000 over a three year period. These funds will be distributed by the Liquidation Trust.

[11] The settlement amount with Wachovia is $45,000,000. Pursuant to the Class Action Agreement, however, this is allocated 60% to the Estates and 40% to the Class. Thus, $18 million of the proceeds of the Wachovia Settlement Agreement will be paid to the Class. After payment of the fees and expenses of Class counsel, the balance will be distributed to the Class members, which consists of Exchangers. As a result, the actual recoveries realized by Exchangers will be greater. Assuming, for example, that Class counsel receives the maximum permissible fee under the Class Action Agreement, *i.e.* 25%, then Exchangers will receive an additional $13.5 million. This would, in turn, raise the distribution percentage for Exchangers (but not for other General Unsecured Claim holders) to 43%.

# IV.

## VOTING PROCEDURES

After carefully reviewing this Disclosure Statement and the Plan, each Creditor entitled to vote should do so on the enclosed ballot.

**TO BE COUNTED, YOUR COMPLETED BALLOT MUST BE RECEIVED BY 4:00 P.M. (Eastern Time) ON SEPTEMBER 25, 2009 AT THE FOLLOWING ADDRESS**:

> Golenbock Eiseman Assor Bell & Peskoe LLP
> Counsel to the Chapter 11 Trustee and IPofA Shreveport
> 437 Madison Avenue
> New York, New York 10022
> Attn: Michael S. Weinstein, Esq.

**ANY BALLOTS WHICH ARE RETURNED BUT WHICH DO NOT INDICATE ACCEPTANCE OR REJECTION OF THE PLAN, SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN**.

You must provide all of the information requested by the ballot. Failure to do so may result in disqualification of your vote.

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan on October 7, 2009 at 11:00 A.M.

A. **Parties Entitled to Vote**.

Under the Plan, only holders of Claims in Classes 1 and 3 are entitled to vote.

A vote may be disregarded if the Bankruptcy Court determines after notice and a hearing that the Creditor's acceptance or rejection of the Plan was not in good faith or was not solicited or procured in good faith in accordance with section 1126(e) of the Bankruptcy Code.

**CREDITORS WHOSE CLAIMS ARE SUBJECT TO A PENDING OBJECTION ARE NOT ELIGIBLE TO VOTE UNLESS SUCH OBJECTION OR OBJECTIONS ARE RESOLVED IN THEIR FAVOR, OR AFTER NOTICE AND A HEARING PURSUANT TO BANKRUPTCY RULE 3018(a), THE BANKRUPTCY COURT ALLOWS THE CLAIM TEMPORARILY OR ESTIMATES THE AMOUNT OF THE CLAIM FOR THE PURPOSE OF VOTING TO ACCEPT OR REJECT THE PLAN. ANY CREDITOR THAT WANTS ITS CLAIM TO BE ALLOWED TEMPORARILY OR ESTIMATED FOR THE PURPOSE OF VOTING MUST TAKE THE STEPS NECESSARY TO ARRANGE AN APPROPRIATE HEARING WITH THE BANKRUPTCY COURT UNDER BANKRUPTCY RULE 3018(a).**

Accordingly, only Creditors who are entitled to vote on the Plan will receive a ballot with the Disclosure Statement.

**B.**     <u>Vote Required for Plan Acceptance</u>.

Under the Bankruptcy Code, an impaired Class of Claims is deemed to have accepted the Plan if the Plan is accepted by holders of two-thirds in dollar amount and a majority in number of the Claims in that Class who actually cast ballots.

**V.**

**CONFIRMATION OF THE PLAN**

**A.**     <u>Confirmation Hearing</u>.

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a Confirmation Hearing to consider confirmation of the Plan. At the Confirmation Hearing, any party in interest may object to confirmation of the Plan. By order dated August 18, 2009, the Bankruptcy Court has scheduled October 7, 2009 at 11:00 A.M. as the Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or at any adjournment thereof.

Objections to confirmation of the Plan, if any, must be in writing and filed with the Bankruptcy Court and served, so as to be received no later than 4:00 p.m. (Eastern Time) on September 25, 2009, upon:

> Golenbock Eiseman Assor Bell & Peskoe LLP
> 437 Madison Avenue
> New York, New York 10022
> Attn:    Jonathan L. Flaxer, Esq.
> Counsel to the Chapter 11 Trustee and IPofA Shreveport
>
> – and –
>
> Cozen O'Connor
> 1201 N. Market Street – Ste. 1400
> Wilmington, DE 19801
> Attn: Mark E. Felger, Esq.
> Counsel to the Committee
>
> – and –
>
> Office of the United States Trustee
> Southern District of New York
> 33 Whitehall Street, 21st Floor
> New York, New York 10004
> Attn: Andrew D. Velez-Rivera, Esq.

## B.    Requirements for Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court must find that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code to enter an order confirming the Plan.  One criterion, which is applicable unless every holder of an impaired Claim against the Debtors has voted to accept the Plan, is that the amount to be received under the Plan by each holder of a Claim is not less than the amount such holder would have received had the Estates been liquidated under chapter 7 of the Bankruptcy Code.  As discussed in Section XII below, the Proponents believe that the Plan is in the best interest of creditors because recoveries under the Plan are greater than the likely recovery in the event of a liquidation under a chapter 7 proceeding.  The Proponents believe that this criterion is satisfied.  Another criterion which the Bankruptcy Court must find has been satisfied is that the Plan is feasible; that is, confirmation is not likely to be followed by liquidation or the need for further financial reorganization. As discussed in Section XII below, the Proponents believe that no "liquidation" or "further financial reorganization" is likely to be required.


## VI.

## GENERAL BACKGROUND CONCERNING THE DEBTORS AND EVENTS PRECEDING THE CHAPTER 11 FILING[12]


## A.    Okun's Acquisition of the 1031 Debtors and the 1031 Debtors' Pre-petition Operations

On May 14, 2007 (the "Initial Petition Date"), The 1031 Tax Group, LLC (the "1031 Tax Group"), and the other 1031 Debtors[13] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  On June 11, 2007 (the "AEC Petition Date" and together with the Initial Petition Date, the "Petition Date"), AEC Exchange Company, LLC filed its own voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  As of the Petition Date, the 1031 Debtors continued in possession of their properties and managed their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[12]  The following background is based on the Chapter 11 Trustee's investigation to date into the affairs of the Debtors.  His investigation has consisted of, among other things, a review of the Debtors' books and records, examinations of witnesses pursuant to Bankruptcy Rule 2004, informal interviews of witnesses, the review of pleadings and other court papers filed by the Debtors in these bankruptcy proceedings and the review of pleadings and other court papers filed in related, non-bankruptcy litigation.  The Chapter 11 Trustee's investigation is ongoing.  The following description is not a report of the Chapter 11 Trustee's findings based on his investigation.  Rather, it is what the Chapter 11 Trustee, based on the information known to him, believes to be an accurate description of certain backgrounds facts and events included for the sole purpose of providing disclosure to creditors for the purpose of evaluating the Plan.

[13] Consisting of 1031 Advance 132 LLC, 1031 Advance, Inc., 1031 TG Oak Harbor LLC, Atlantic Exchange Company, Inc., Atlantic Exchange Company LLC, Investment Exchange Group, LLC, National Exchange Accommodators, LLC, National Exchange Services QI, Ltd., NRC 1031, LLC, Real Estate Exchange Services, Inc., Rutherford Investments LLC, Security 1031 Services, LLC, and Shamrock Holdings Group, LLC.

Edward H. Okun ("Okun") is the sole member of the 1031 Tax Group. Between August 2005 and December 2006, Okun, Lara D. Coleman ("Coleman"), and other individuals acting with them (collectively, the "Okun Parties"), through the 1031 Tax Group or Okun, acquired or assisted in the acquisition of six regional businesses that were in the business of acting as "qualified intermediaries" or "QIs" to facilitate "1031 Exchanges."[14] Most or all of the 1031 Debtors are wholly-owned direct or indirect subsidiaries of the 1031 Tax Group and are the QIs acquired by the Okun Parties. On occasion, the 1031 Tax Group was utilized as a QI for certain transactions.[15] The Okun Parties acquired the regional QI businesses as follows: (i) Atlantic Exchange Co., LLC and affiliates (collectively, "AEC") on or about August 25, 2005; (ii) Security 1031 Services, LLC and affiliates (collectively, "SOS") on or about November 15, 2005; (iii) Real Estate Exchange Services, LLC and affiliates (collectively, "REES") on or about June 9, 2006; (iv) National Exchange Services QI, Ltd. and affiliates (collectively, "NES") on or about June 22, 2006; (v) Investment Exchange Group, LLC and affiliates (collectively, "IXG") on or about August 1, 2006; and (vi) 1031 Advance, Inc. and affiliates (collectively, "1031 Advance") on or about December 19, 2006. The 1031 Tax Group was headquartered in Richmond, Virginia, where certain other entities owned or controlled by Okun were headquartered, including Investment Properties of America, LLC ("IPofA") and Okun Holdings, Inc. ("Okun Holdings"). Okun was the sole member of IPofA and the sole shareholder of Okun Holdings, and Coleman served as IPofA's chief operating officer. IPofA is the sole member of many of the Okun-controlled entities, including IPofA Shreveport.

Section 1031 of the Internal Revenue Code permits owners of investment property to defer the capital gains tax that would otherwise be due and owing upon sale, conditioned upon timely application of the sale proceeds to the purchase of an identified replacement investment property (a "1031 Exchange"). In a typical 1031 Exchange, an exchanger (the "Exchanger") sells a parcel of real estate (the "relinquished property") and has 45 days from the date of the sale to identify a replacement property and 180 days from the date of the sale to close on the purchase of the replacement property. To preserve the tax benefit of avoiding capital gains taxes on the sale of the property, the Exchangers may not take possession of the sale proceeds. Under the regulations that apply to Section 1031, the use of a qualified intermediary ("QI") in connection with a 1031 Exchange is a "safe harbor" that will result in a determination that the taxpayer is not in actual or constructive receipt of money or other property for purposes of Section 1031. The responsibilities and obligations that a QI owes to the Exchanger regarding the use of funds deposited with the QI (the "Exchange Deposit") are typically set forth in a contract between the QI and the Exchanger referred to as an exchange agreement ("Exchange Agreement"). It is the Chapter 11 Trustee's position that, pursuant to the terms of the respective Exchange Agreements

---

[14] It is not clear whether the Okun Parties ultimately made each of the 1031 Debtors subsidiaries of the 1031 Tax Group.

[15] Based upon the Chapter 11 Trustee's investigation, in 2007, the 1031 Debtors' CEO planned to integrate the 1031 Debtors' operations under one trade name, "The 1031 Group, LLC," and formed a limited liability company entity with that name. However, no operating agreement was ever signed, no member(s) and/or manager(s) were named, and little was done to effectuate the integration prior to the Petition Date. A few open exchange transactions were executed pursuant to Exchange Agreements using The 1031 Group, LLC name. The 1031 Debtors treated The 1031 Group, LLC as a d/b/a of the 1031 Tax Group and scheduled the Creditors of The 1031 Group, LLC as Creditors of the 1031 Debtors. The Chapter 11 Trustee agrees with such treatment. Accordingly, the Chapter 11 Trustee treats The 1031 Group, LLC Creditors as Creditors of the 1031 Debtors, and does not intend to object to otherwise valid Exchanger claims whose Exchange Agreements were nominally with The 1031 Group, LLC..

and applicable law, the Exchange Deposits are property of the QI once the money is received by the QI, and that the Exchangers bargained for this in order to obtain the benefits of Section 1031, which would be unavailable to them if this were not the case.

Prior to the Petition Date, certain of the 1031 Debtors also acted as QIs for "reverse exchanges." Generally, in a reverse exchange ("Reverse Exchange"), the Exchanger identifies and contracts for the purchase of the replacement property prior to selling the relinquished property. The Exchanger lends funds or guarantees a bank loan, which is made directly to the QI. The QI uses the funds to purchase and take title to the replacement property. The replacement property is leased back to the Exchanger at a rent equal to the QI's carrying costs, including debt service. The Exchanger agrees to acquire the replacement property within 180 days. The Exchanger then signs a contract to sell the relinquished property and assigns the rights under the contract to the QI. When the sale closes on the relinquished property, the replacement property is conveyed to the Exchanger in exchange for the proceeds of the sale of the relinquished property. The funds are used to repay the loan used to purchase the replacement property and the lease is cancelled. A reverse exchange can also be done where the replacement property is build-to-suit construction or a renovation. Title to the replacement property in a reverse exchange is customarily held in a single purpose entity, usually a limited liability company (the "Reverse LLC"). The 1031 Debtors formed a significant number of Reverse LLCs for this purpose, and, according to the Debtors, as of the Petition Date there were over 100 open Reverse Exchange contracts with an undetermined total value, but with an associated cash liability of approximately $8.6 million. Although certain of the 1031 Debtors held interests in the Reverse LLCs, none of the Reverse LLCs filed a petition for relief under chapter 11 of the Bankruptcy Code. First the 1031 Debtors, and subsequently the Chapter 11 Trustee, facilitated the Reverse Exchange closings.

When the Okun Parties acquired a 1031 Debtor, they typically hired some of the former owners and/or managers (collectively, the "Former Owners") to assist in the operation of the QI businesses and generate sales. Prior to being acquired by the Okun Parties, the 1031 Debtors maintained accounts at various banks based upon, among other factors, the Former Owners' and their employees' banking relationships. After acquisition by the Okun Parties, however, the 1031 Debtors and their employees were instructed by the Okun Parties to transfer the Exchange Deposits to centralized accounts controlled by the 1031 Tax Group and the Okun Parties. Beginning in August 2005 and continuing to the Petition Date, the Okun Parties engaged in numerous, unlawful misappropriations of funds belonging to the 1031 Debtors. Frequently, within days of acquisition, most or all of the "float," or funds of the QIs, would be removed from the QI, pooled into a 1031 Tax Group account, and then misappropriated to numerous recipients. A substantial amount of the misappropriated funds were transferred to or used for the benefit of Okun and entities controlled by him, including IPofA and entities related to IPofA (IPofA and other Okun-controlled entities are collectively referred to as the "Okun Entities").[16] Notes (the

---

[16] The Okun Entities include, among others: Crossroads Transportation and Logistics, Inc.; IPofA; Okun Air, LLC; Okun Air 2, LLC; Okun Air 3, LLC; Okun Air 4, LLC; Okun Holdings; FMFG Ownership, Inc.; FMFG Ownership II, Inc.; Columbus Works Virginia Trust; Parkway Virginia Trust; Okun Water, LLC; Simone Bentley, LLC; Simone Condo I, LLC; Simone Condo II, LLC. Indirectly-owned Okun Entities include: Simone Salon, LLC; Montauk Financial Corp.; IPofA Shreveport; IPofA 5201 Lender, LLC; Crossroads Miami Logistics Center, LLC; 8810 Jewella, LLC; 100 Corporate Drive; IPofA Salina Central Mall, LLC; IPofA Salina Central Mall Members, LLC; IPofA West Oaks Mall, LP; IPofA WOM JCP, LP; IPofA Waterview, LLC; IPofA Columbus Works LeaseCo, LLC; IPofA Fund Manager, Inc.; CW Acquisition, LLC; IPofA Miami Logistics Center, LLC;

"IPofA Notes") were created in the approximate principal amount of $137 million on account of funds misappropriated from the 1031 Debtors. It appears that these were not created at the time of the misappropriations, but rather at a later time to conceal the misappropriations. The Exchange Deposits of later-acquired QIs were also used to make "lulling" payments, *i.e.,* to satisfy unfunded Exchanges of earlier-acquired QIs that had already been looted.

Specifically, prior to the Petition Date, the Okun Parties used the misappropriated funds, among other things: (i) to fund Okun's lavish lifestyle, including acquiring residential properties and luxury assets (including mansions, aircraft, boats, automobiles and jewelry); (ii) to pay money and bonuses to Coleman and other Okun Parties; (iii) to invest for Okun or Okun Entities in commercial real estate; (iv) to acquire QIs and other companies; (v) to pay off lenders that provided loans secured by residential and commercial properties owned by Okun or Okun Entities (such as the IPofA Entities); (vi) to pay operating expenses for the Okun Entities; and (vii) to make "lulling" payments to Exchangers. By the Petition Date, virtually all of the Exchange Deposits had been misappropriated except for approximately $19.7 million located at Colorado Capital Bank ("CCB"), which the Okun Parties were prevented from misappropriating shortly before the Petition Date by the actions of the McCabe Group Parties, other persons and CCB.

## B.    Okun's Indictment and Conviction

Based upon the foregoing and other circumstances, on March 18, 2008, a grand jury in the Eastern District of Virginia (the "Virginia District Court") indicted Okun on three counts of mail fraud, bulk cash smuggling and making false statements in connection with a scheme to defraud Exchanger clients of the 1031 Debtors of $132,000,000. Upon indictment, Okun was incarcerated and remains incarcerated as a flight risk. On July 10, 2008, the grand jury returned a superseding indictment on similar charges against Okun and Coleman. The indictment against Okun also seeks forfeiture of Okun's assets. On July 3, 2008, Robert David Field II ("Field"), former chief financial officer of Okun Holdings, pleaded guilty in the Eastern District of Virginia to a single count of conspiracy to commit mail fraud and money laundering. On July 24, 2008, Richard Simring ("Simring"), former chief legal officer of Okun Holdings, pleaded guilty in the Eastern District of Virginia to a single count of conspiracy to commit mail fraud and money laundering. On January 6, 2009, Coleman pleaded guilty in the Eastern District of Virginia to one count of conspiracy to commit wire fraud and mail fraud, and one count of making false statements. The defendants who have pleaded guilty are subject to forfeiture of assets at the time of their sentencings. After an approximately two week trial, on March 19, 2009, Okun was found guilty on each of the 23 counts contained in the indictment, and his assets are subject to forfeiture. On August 4, 2009, Okun was sentenced to a term of 100 years. On August 13, 2009, Coleman was sentenced to a term of 10 years, and Field was sentenced to a term of 5 years. Simring has not yet been sentenced.

Pursuant to The Mandatory Victims' Restitution Act, the Government has instituted a restitution program, which is separate from the claims process in the 1031 Chapter 11 Cases. It

---

IPofA Racing, LLC; IPofA W. 86th Street LeaseCo, LLC; IPofA WOM Master LeaseCo, LP; Okun Water Ltd.; and FMFG Acquisition, Inc.

is noted in the "Government's Preliminary Report As To Restitution" filed with the Virginia District Court on May 29, 2009, it is anticipated that most of the recovery will be received through distributions made in the 1031 Chapter 11 Cases. Exchangers should be aware that proofs of claim filed against the Estates are different from the "Verification of Loss" form required in the restitution proceeding and, similarly, Verification of Loss forms will not be considered in connection with the administration of the 1031 Chapter 11 Cases.

The Chapter 11 Trustee has been cooperating with the office of the United States Attorney for the Eastern District of Virginia, which has agreed in general that in the event of conviction(s), it would not seek to exercise forfeiture over assets transferred to the 1031 Estates pursuant to the Transfer Agreement.

Okun's and the Okun Entities' assets were highly leveraged, and thus not a viable means to repay the IPofA Notes or otherwise fund the 1031 Debtors' Exchanges as they became due. Based upon the Chapter 11 Trustee's investigation to date, it appears that the event which precipitated the 1031 Debtors' chapter 11 cases was the Okun Parties' inability to misappropriate the remaining funds at CCB. Even prior thereto, the 1031 Debtors were experiencing an increasing inability to fund Exchanges as they became due. Additionally, many of the Former Owners' and other sales personnel's employment with the 1031 Debtors terminated, and the 1031 Debtors were thus unable to generate new Exchanges. Furthermore, several of the Former Owners became suspicious of the Okun Parties' activities, one of whom reported the misconduct to the Federal authorities (who then began to investigate), cooperated in their investigation, and took steps to protect Exchangers. As discussed in further detail below, in conjunction with their refusal to honor the Okun Parties' demand to move certain Exchange Deposits from CCB, IXG's Former Owners resigned from the 1031 Debtors' Denver office. In connection therewith, CCB commenced an interpleader action in state court to determine ownership of approximately $19.5 million on deposit at CCB, which had the effect of freezing the 1031 Debtors' access to the $19.5 million. The 1031 Debtors did not have any other significant source of cash to fund Exchanges or pay operating expenses and, shortly thereafter, they commenced their chapter 11 cases. As of the Petition Date, there were over 300 open Exchange Agreements, at an estimated total liability at the time from the 1031 Debtors to Exchangers of approximately $150 million, including contractual interest accrued on the exchange deposits at rates stated in the Exchange Agreements.

**VII.**

**EVENTS IN THE 1031 DEBTORS' CHAPTER 11 CASES**

**A.**     **Bankruptcy Proceedings Prior to the Appointment of the Chapter 11 Trustee**

**1.**     **Summary**

The 1031 Debtors operated as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code from the inception of their bankruptcy cases until the Bankruptcy Court ordered the appointment of the Chapter 11 Trustee in October of 2007 (further described

below).  By order entered May 22, 2007, the Bankruptcy Court authorized the joint administration of the 1031 Debtors' bankruptcy cases.

As discussed in greater detail below, the 1031 Debtors, later joined by the Committee, advocated a strategy based on the purported value of the assets of the IPofA Entities and other Okun Entities – primarily Columbus Works, the West Oaks Mall, the Shreveport Property (as defined below) and Crossroads.  The value of the Crossroads business was particularly important due to the fact that it was a major tenant at the Shreveport Property, as well as several other, less important, IPofA properties.  Thus, the proposed refinancing loan from JPS Capital Partners LLC ("JPS Capital"), as well as the alternative plan structure described below, were largely based upon the alleged value of these assets.  The basic strategy of the 1031 Debtors and the Committee was, in essence, to pursue the monetization of these assets in cooperation with Okun and to avoid conducting an investigation or engaging in any disputes or litigation involving Okun or other parties.

## 2.  Certain First Day Orders

The Bankruptcy Court entered a number of "first day orders" in the 1031 Debtors' chapter 11 cases (during the period that they were debtors-in-possession).  First day orders were entered (i) authorizing joint administration of the 1031 Debtors' chapter 11 cases; (ii) authorizing the 1031 Debtors to mail initial notices and file a consolidated list of creditors; (iii) establishing procedures for compensating and reimbursing retained professionals on a monthly basis; (iv) extending the 1031 Debtors' time to file their schedules of assets and liabilities, statements of financial affairs and lists of equity security holders; (v) authorizing the 1031 Debtors to maintain their existing bank accounts and cash management system; and (vi) authorizing the 1031 Debtors to pay pre-petition wages and salaries and maintain other employee benefits.

## 3.  Retention of 1031 Debtors' Professionals and Post-petition Management Prior to the Appointment of the Chapter 11 Trustee

Prior to the Chapter 11 Trustee's appointment, the 1031 Debtors were represented by Dreier LLP  ("Dreier"), whose retention was approved by order of the Bankruptcy Court.  The 1031 Debtors retained Kurtzman Carson Consultants LLC ("KCC") as their claims and balloting agent and to perform certain document gathering and management services.  KCC served as the 1031 Debtors' claims agent until its retention was terminated by Order of the Bankruptcy Court entered on May 30, 2008.  Subsequent to KCC's termination, the Chapter 11 Trustee and his staff transferred all proofs of Claim to the Claims Register maintained by the Bankruptcy Court.

Prior to the Petition Date, the 1031 Debtors retained Huron Consulting Services LLC ("Huron") as interim management, James M. Lukenda of Huron as the 1031 Debtors' Chief Restructuring Officer ("CRO"), Richard R. Vanderbeek, Jr. of Huron as Treasurer, and other Huron personnel as temporary staff (collectively, the "Huron Engagement").  One of the reasons for the Huron Engagement was to avoid the appointment of a chapter 11 trustee for the 1031 Debtors.  The Huron Engagement was approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code.  Okun ceded all management authority to the CRO prior to the Petition Date, but remained as sole member of the 1031 Tax Group.  Post-petition, Okun executed the Irrevocable Delegation Agreement, under which, in essence, he ratified the delegation of management authority to James Lukenda, CRO.  Thereafter, Edward G. Moran

("Moran") was appointed as sole manager/director of the 1031 Debtors, and the 1031 Debtors took steps at the corporate level to install Moran as manager or director, as applicable, of each of the 1031 Debtors. As a result, Moran, in essence, assumed the functions of a Board of Directors, and Lukenda remained as the 1031 Debtors' day-to-day manager.

### 4. The Committee

On May 30, 2007 (the "Initial Appointment Date"), the United States Trustee appointed a nine member official committee of unsecured creditors (the "Committee") comprised of James V. and Diane S. Bordoni (as Trustees), Capital Aggregates, Ltd., LJ Ambassador, Ltd., 409 Sherman Ave, LLC, Soix Realty Corp., Hampton Ward, Nona M. Garson, 100 Garfield, LLC, and Sierra Group BPT, LLC. Capital Aggregates, Ltd. and 100 Garfield, LLC serve as Co-Chairs of the Committee. Subsequent to the Initial Appointment Date, 409 Sherman Ave, LLC, Soix Realty Corp., and Sierra Group BPT, LLC resigned from the Committee, and, on October 16, 2007, the United States Trustee filed its Notice of First Amended Appointment of the Committee to reflect the resignation of 409 Sherman Ave, LLC, Soix Realty Corp., and Sierra Group BPT, LLC from the Committee and appointing Loulourgas Properties, Ltd., 222 Central Avenue Corp., and Nicholas 31, LLC as new members of the Committee. On or about February 22, 2009, Elizabeth Callanan and Grande Investments, LLC were added by the United States Trustee as members of the Committee. The Bankruptcy Court authorized the retention of Greenberg Traurig, LLP ("Greenberg") as Committee Counsel and Mesirow Financial Consulting ("Mesirow") as Financial Advisor. On January 7, 2009, the Bankruptcy Court entered an Order approving Mesirow's application to withdraw as Financial Advisor to the Committee. On April 13, 2009, the Bankruptcy Court entered an Order approving Greenberg's application to withdraw as counsel, and by Order dated May 5, 2009, the Bankruptcy Court authorized the retention Cozen O'Connor as counsel to the Committee.

### 5. Claims Bar Date Applicable to the 1031 Debtors

On July 30, 2007, the Bankruptcy Court entered an Order (the "Bar Date Order") establishing (i) August 24, 2007 (the "General Bar Date") as the last date by which creditors are permitted to file proofs of Claim; and (ii) November 10, 2007 (the "Governmental Units Bar Date" and together with the General Bar Date, the "Bar Date") as the last date by which governmental units are permitted to file proofs of Claim against the 1031 Debtors. Notice of the Bar Date was mailed to all known Creditors and published in USA Today (National Edition) on August 8, 2007. Additionally, the Bar Date Order established the General Bar Date as the deadline to file requests for payment of administrative claims under section 503(b) of the Bankruptcy Code incurred from the Petition Date through July 19, 2007 (the "Initial Administrative Claims Bar Date"). The Initial Administrative Claims Bar Date does not apply to professionals retained by Orders of the Bankruptcy Court, members of the Committee on account of Claims for reimbursement of expenses, or the United States Trustee's claim for statutory fees or charges assessable against the 1031 Debtors or their estates.

### 6. Initial Motions for Appointment of Chapter 11 Trustee or for Conversion to Chapter 7

Shortly after the Petition Date, on May 25, 2007 a group of Exchangers, John and Nancy DonKonics, Bob and Patty Hathaway, Janet Furman Bowman, Anita Hunter, Tin Cao, Miguel E.

Litvin, Cynthia Rodriguez, and Jonathan Schink, filed a motion seeking conversion of the 1031 Debtors' cases to chapter 7 or the appointment of a Chapter 11 Trustee (the "DonKonics Motion"). On May 25, 2007, another group of Exchangers[17] (the "Capital Aggregates Exchangers") filed a motion to transfer venue of the 1031 Debtors' chapter 11 cases to the United States Bankruptcy Court for Eastern District of Virginia, in which motion Celltex Site Services, Ltd. and Cody Dutton, *et al.* joined (collectively, "Capital Aggregates Venue Transfer Motion").

On May 29, 2007, (i) the Office of the United States Trustee filed its Motion for Order Directing the Appointment of a Chapter 11 Trustee or, in the Alternative, Conversion of the Cases to Chapter 7, in which motion Cody Dutton, *et al.* and 222 Central Avenue Corp. joined (collectively the "UST Motion"); and (ii) the Capital Aggregates Exchangers filed their motion for appointment of a Chapter 11 Trustee (the "Capital Aggregates Motion" and together with the DonKonics Motion, the Capital Aggregates Venue Transfer Motion, and the UST Motion, the "UST and Creditor Motions").

The UST and Creditor Motions, in summary, generally alleged that (i) the 1031 Debtors were liquidating and had no operations to rehabilitate; (ii) the 1031 Debtors' professionals had been selected by Okun, and been paid by IPofA pre-petition, (iii) the new management structure violated Delaware law because, in essence, Okun remained as sole member of 1031 Tax Group and could thus remove the CRO, and (iv) the 1031 Debtors were unrealistically pursuing a reorganization that relied upon Okun's willingness to repay to the 1031 Debtors' estates the misappropriated funds.

The 1031 Debtors and the Committee opposed the UST and Creditor Motions based upon, *inter alia*, (i) representations that the assets of certain of the Okun Entities possessed sufficient value to repay Creditors in full, and that Okun had agreed to grant liens in those assets, (ii) representations that JPS Capital was seriously considering a $300 million loan to refinance those assets based on the alleged value thereof (approximately half of which would be made available to the 1031 Debtors), and (iii) the retention of the CRO and approval of the Moran Consulting Agreement cured any perceived deficiencies in the management structure under Delaware law.

At the urging of the DonKonics parties and others, the 1031 Debtors and the Committee obtained a stipulation from Okun and certain of the Okun Entities whereby they agreed that the purportedly material assets would not be sold, transferred, pledged or encumbered pending further order of the Bankruptcy Court while the 1031 Debtors pursued a chapter 11 plan based upon a plan funding agreement that the 1031 Debtors and Okun had negotiated with JPS Capital. The 1031 Debtors and the Committee also asserted that a plan funded by JPS Capital would enable the 1031 Debtors to fund certain Exchanges before Exchangers lost the ability to close their Exchanges during the 180 day "safe harbor" period.

---

[17] Including Capitol Aggregates, Ltd., LJ Ambassador, Ltd., LJ 904 West Ave., Ltd., LJ Castle Hill Ventures, Ltd., LJ Villa Marquis, Ltd., Red Bird Ranch, Ltd., Red Bird Ranch #3, Ltd., and Red Bird Ranch #5.

On August 13, 2007, the Bankruptcy Court entered an order denying the remaining UST and Creditor Motions.[18]

### 7. The 1031 Debtors' and the Committee's Pursuit of a Plan of Reorganization Funded by Okun or JPS

On July 19, 2007 the 1031 Debtors and the Committee filed their proposed Joint Plan of Reorganization (the "JPS/Okun Plan"), and on July 29, 2007, the 1031 Debtors and the Committee filed their proposed Joint Disclosure Statement (the "Joint Disclosure Statement"). The JPS/Okun Plan, as amended,[19] contemplated two alternative funding scenarios. The first scenario, commonly called "Plan A," was predicated on the consummation of the supposed $300 million financing facility with JPS Capital, which financing was to be supported by the alleged willingness of Okun and certain entities controlled by Okun to grant to JPS Capital liens and security interests in and to assets of Okun and the Okun Entities. Assuming the loan closed, the 1031 Debtors' estates were to allegedly receive the aggregate sum of $147 million in order to fund distributions to creditors and pay administrative expenses (the balance would be used, among other things, to refinance various Okun Entity assets). The second alternative plan funding scenario, commonly called "Plan B," assumed that Okun would cooperate with a creditor-representative in order to achieve sales and/or refinancing of the assets owned by the Okun Entities in order to generate net proceeds which could then be used to fund distributions to the 1031 Debtors' creditors. Numerous objections were filed and asserted to the JPS/Okun Plan, contending, among other things, that the JPS Capital Term Sheet was illusory, that Plan B was too favorable to Okun, and that the proposed release of Okun under the JPS/Okun Plan was improper.

In its pursuit of Plan A and Plan B, the 1031 Debtors and the Committee engaged or were involved in certain transactions with Okun and others. For example, the Cordell Entities were threatening to foreclose upon the IPofA entity properties upon which it possessed a lien, including the Shreveport Property. In order to forestall this event and maintain the availability of the Shreveport Property and certain other properties for funding the JPS/Okun Plan, the 1031 Debtors and the Committee approved a loan modification agreement dated August 10, 2007, as supplemented on August 22, 2007 (the "Loan Modification Agreement"), among the Cordell Entities, Okun and the IPofA entities involved in Cordell Entities loans under which, among other things, certain funds were paid to the Cordell Entities, the Cordell Entities' liens and mortgages were reaffirmed, cross-defaulted in certain respects, cross-collateralized in certain respects, and Okun, the 1031 Debtors and the Committee agreed that the Cordell Entities' liens were valid and enforceable without defense, claim or offset. In addition, on August 17, 2007, (i) Okun, the 1031 Debtors, the Committee and JPS Capital signed a letter agreement providing for certain JPS affiliates to make loans to Okun to be secured by mortgages on Okun's home on Lake Winnipesaukee in New Hampshire, for the purpose of, in part, paying fees to JPS Capital and expenses allegedly incurred by JPS Capital, including attorneys' fees, and (ii) these transactions occurred, as a result of which the JPS affiliates became the holders of mortgages in

---

[18] The Court entered an order denying the DonKonics Motion on June 18, 2007, and the Capital Aggregates Venue Transfer Motion was withdrawn on August 7, 2007

[19] On or about August 30, 2007, the 1031 Debtors and the Committee filed a proposed amended JPS/Okun Plan and amended Disclosure Statement.

the amount of $4,550,000 against this Okun residential property. No Bankruptcy Court approval was sought or obtained in connection with these transactions.

Notwithstanding the foregoing, no loan was provided via JPS Capital, and the JPS/Okun Plan was ultimately withdrawn.

### 8. Colorado Capital Bank Litigation and Related Settlements

#### (a) Background

The IXG acquisition was the second-to-last of the 1031 Tax Group's QI acquisitions. Subsequent to the acquisition, IXG was managed by its Former Owners, the McCabe Group, in Denver, Colorado. The McCabe Group maintained IXG accounts at CCB. The McCabe Group's employment with the 1031 Tax Group terminated on or about April 27, 2007 (the "Termination Date"). As of the Termination Date, the 1031 Debtors had funds on deposit in accounts at CCB (the "IXG Accounts") in the approximate amount of $19.5 million (collectively, the "CCB Account Balance"). Prior to the Petition Date, the Okun Parties attempted to transfer the CCB Account Balance to one or more accounts that the 1031 Debtors maintained at other banks, but CCB did not permit the 1031 Debtors to access the CCB Accounts. On or about May 1, 2007, CCB commenced a state court interpleader action in the District Court, City and County of Denver (the "Colorado Court"), Case No. 07CV4352 (the "CCB Interpleader Action") to determine the ownership of the CCB Account Balance. The 1031 Debtors asserted that CCB's actions were among the factors leading up to their chapter 11 filings.

On May 15, 2007, the 1031 Debtors filed their Motion for Order Confirming Applicability of the Automatic Stay seeking a determination that (i) CCB's actions to freeze the IXG Accounts were subject to the automatic stay; and (ii) staying the CCB Interpleader Action. On May 22, 2007, the IXG Debtors and National Exchange Services QI, Ltd (collectively, the "IXG Debtor Plaintiffs") commenced a related adversary proceeding (the "CCB Adversary Proceeding") against CCB seeking a declaratory judgment that the CCB Account Balance, which had subsequently been transferred to a debtor-in-possession bank account established by the IXG Debtors (the "CCB DIP Account") pursuant to Order of the Bankruptcy Court, was property of the 1031 Debtors' estates. A number of Exchangers (the "Colorado Exchangers") asserted that the CCB Account Balance was not property of the 1031 Debtors' estates, but was rather property of the Colorado Exchangers. Certain of the Colorado Exchangers commenced adversary proceedings seeking declaratory relief and turnover of the CCB Account Balance and other of the Colorado Exchangers sought to intervene in the CCB Adversary Proceeding. Pursuant to a Bankruptcy Court Order entered on July 12, 2007, the complaint was amended to name as additional defendants 79 individuals or entities who were believed at that time to have claimed an interest in the CCB Account Balance.

As the CCB Adversary Proceeding progressed, the IXG Debtors entered into settlements with two groups of the Colorado Exchangers regarding ownership of the CCB Account Balance. Approximately a week before the CCB Adversary Proceeding was scheduled for trial, the 1031 Debtors reached a global settlement, which incorporated the earlier settlements, with all of the Colorado Exchangers. On or about October 15, 2007, the Court entered the Second Amended

Stipulation and Order Approving the Settlement (the "Colorado Exchanger Settlement")[20] with the Colorado Exchangers identified therein (the "Settling Exchangers").

**(b)     Summary of the Colorado Exchanger Settlement**

Pursuant to the Bankruptcy Court-ordered Colorado Exchanger Settlement, $7,614,472.34 of the CCB Account Balance was held to be property of the 1031 Debtors' estates. The Settling Exchangers shared in a distribution of $7 million ("Colorado Exchangers Settlement Payment") from the CCB DIP Account on pro rata basis based on the amount of funds initially deposited on behalf of each of the Settling Exchangers at CCB, less any amounts previously transferred or withdrawn on behalf of each of the Settling Exchangers prior to the Petition Date (the "Net Deposited Amounts"). All Allowed Claims of each Settling Exchanger against the 1031 Debtors' estates have been reduced by the amount of the Settlement Payment received by such Settling Exchanger, with such reduction made first from the portion of any such claim relating to the Net Deposited Amount.

In the event of a distribution which provides for a pro rata distribution to the holders of Allowed general unsecured Claims against the estates of the 1031 Debtors, each of the Settling Exchangers will be entitled to share in such distribution to the extent of their respective Allowed general unsecured Claims, if any, on a pro rata basis, subject to the Settling Exchangers receiving reduced initial distributions, as follows:

(i)     As to the Exchangers scheduled as the Group I Settling Exchangers in the Colorado Exchanger Settlement (the "Group I Settling Exchangers"), for every dollar distributed to the Group I Settling Exchangers, other holders of Allowed general unsecured Claims against the Debtors will receive two dollars, until such time as the Group I Settling Exchangers have received an additional $268,928.66, after which the Group I Settling Exchangers will share distributions on a pro rata basis (dollar for dollar) with all other holders of Allowed general unsecured Claims (other than Group 2 and 3 Settling Exchangers) against the Estates.

(ii)     As to the Exchangers scheduled as the Group 2 Settling Exchangers in the Colorado Exchanger Settlement (the "Group 2 Settling Exchangers"), other holders of Allowed general unsecured Claims against the Debtors will receive two dollars, until such time as the Group 2 Settling Exchangers shall have received an additional $898,130.12, after which the Group 2 Settling Exchangers will share distributions on a pro rata basis (dollar for dollar) with all of the other holders of Allowed general unsecured Claims (other than Group 3 Settling Exchangers) against the Estates.

(iii)     As to the Exchangers scheduled as the Group 3 Settling Exchangers in the Colorado Exchanger Settlement (the "Group 3 Settling Exchangers"), other holders of Allowed general unsecured Claims against the Debtors will receive two dollars, until such time as the Group 3 Settling Exchangers shall have received an additional $5,832,941.22, after which the

---

[20] Prior to reaching the Colorado Exchangers Settlement, the 1031 Debtors settled with five Exchangers, Kihei, Heller, NMS, Inc., Guthrie, and Maestas (collectively, the "Kihei Exchangers"), that sought turnover of certain funds on deposit with CCB. Pursuant to their settlements with the Kihei Exchangers, approximately $4 million of the funds on deposit with CCB were released to the Kihei Exchangers, and the Kihei Exchangers released their Claims against the 1031 Debtors.

Group 3 Settling Exchangers will share distributions on a pro rata basis (dollar for dollar) with all of the other holders of Allowed general unsecured Claims against the Estates.

The distribution calculations set forth in the Colorado Exchangers Settlement are intended to give effect to the intent that, for every dollar distributed to the Settling Exchangers, other holders of Allowed general unsecured Claims against the Debtors will receive two dollars, until such time as all holders of Allowed general unsecured Claims have received distributions that total the same percentage of their individual Allowed Claims. Once such parity has been achieved, the Settling Exchangers will share distributions on a pro rata basis (dollar for dollar) with all of the other holders of Allowed general unsecured Claims against the substantively consolidated Estates.

The Settling Exchangers forever waived, released, and discharged each of the 1031 Debtors and their parents, successors, assigns, affiliates, heirs, executors, administrators, attorneys and individuals or entities or professional persons engaged by the 1031 Debtors in connection with their chapter 11 cases (including by not limited to the CRO, Robert Vanderbeek, and Edward G. Moran, each individually, and any and all employees, partners, members or shareholders of Huron, Edward G. Moran, LLC, and Dreier LLP (collectively, the "Debtors Representatives") relating to commencement and prosecution of the Adversary Proceeding. The Settling Exchangers did not, however, release claims, if any, against (a) Okun, (b) Daniel McCabe, (c) Shirley McCabe, (d) Andrew McCabe, (e) Chad Greenberg and (f) Peter McCann, and their respective affiliates, insiders, companies and businesses other than the 1031 Debtors and certain Debtors' Representatives. The Settling Exchangers also agreed not to oppose substantive consolidation of the 1031 Debtors' estates.

Each of the Settling Exchangers released CCB and certain related parties of and from any and all claims and causes of action arising from events prior to the date of the Colorado Exchangers Settlement, and, in exchange for the foregoing releases, CCB waived any and all of its rights, whether by way of recoupment, setoff or otherwise, with respect to the Settlement Payment.

### (c)     The CCB Settlement

In connection with resolving the CCB Adversary Proceeding, the Bankruptcy Court entered the Stipulation and Order Approving Settlement by among CCB and the 1031 Debtors (the "CCB Settlement"). In the CCB Adversary Proceeding, the IXG Debtor Plaintiffs had asserted claims against CCB for, *inter alia*, violations of the automatic stay under section 362 of the Bankruptcy Code. The IXG Debtor Plaintiffs had alleged that by refusing to honor IXG's wire transfer requests and barring IXG's on-line access to information concerning the IXG Accounts, CCB prevented IXG Debtor Plaintiffs from operating in the ordinary course of business by, among other things, rendering IXG Debtor Plaintiffs unable to fund certain Exchanges as they became due. Additionally, the IXG Debtor Plaintiffs asserted that they were owed at least $310,374.77 (the "Marketing Services Fees") by CCB. CCB alleged rights to indemnification, setoff and recoupment and an alleged security interest arising from: (i) the Marketing Services Agreement, (ii) a Cash Management Services Agreement and Enrollment Form dated December 4, 2006 (the "Cash Management Services Agreement") between IXG and CCB, and (iii) a Deposit Account Agreement and Disclosures purportedly entered into between CCB and the IXG Debtors (together with the Marketing Services Agreement and the Cash

Management Services Agreement, the "CCB Agreements"). Based on the CCB Agreements, CCB sought indemnification for, among other things, the fees and expenses it incurred in connection with CCB Interpleader Action and the CCB Adversary Proceeding, as well as future anticipated fees. It asserted in this respect that it had already incurred attorneys' fees of $850,000. CCB also sought indemnity for potential future liability, if any, to Exchangers, and sought a $7 million reserve.

As part of the CCB Settlement, CCB received $325,000 (together with all interest earned on that amount) on January 31, 2008. Additionally, the 1031 Debtors were required to deposit an additional $400,000 into a segregated interest bearing account as a reserve (the "CCB Reserve")[21] relating to any fees and expenses reasonably incurred by CCB (i) in respect of defending any actions actually commenced by Exchangers arising out of or in connection with Exchange Agreements and/or (ii) to satisfy any judgment entered against CCB in any such action ("Covered Fees and Expenses"). CCB was granted an allowed contingent unliquidated secured claim for Covered Fees and Expenses, secured by (and capped at) the full amount of the CCB Reserve. The balance of the CCB Reserve will revert back to 1031 Debtors on the earlier of (i) confirmation of a chapter 11 plan with a channeling injunction and/or release in favor of CCB; or (ii) October 23, 2009. Furthermore, any chapter 11 plan proposed by the 1031 Debtors or any other party must provide for a third-party release and/or channeling injunction in favor of CCB of any and all claims that can or could be asserted against CCB, including without limitation, any claims in respect of (i) the CCB Account Balance; (ii) the IXG Accounts; (iii) the 1031 Debtors' qualified intermediary services to any Exchangers; (iv) the CCB Interpleader Action; (v) the 1031 Debtors' chapter 11 cases; (vi) the CCB Adversary Proceeding; and (vii) any and all acts or conduct of CCB with respect to any of the foregoing through the date of October 18, 2007 (the "CCB Third Party Release").

The Trustee is seeking approval of the CCB Third Party Release in connection with the Plan in order effect the release of the balance of the CCB Reserve, which is currently approximately $375,000, for the benefit of the Estates. Pursuant to the CCB Settlement, CCB holds an Allowed contingent unliquidated Secured Claim for the Covered Fees and Expenses, secured by (and capped at) the full amount of the CCB Reserve (the "CCB Secured Claim"). The CCB Secured Claim is impaired but shall be deemed satisfied by entry of a final, non-appealable order of the Bankruptcy Court granting the CCB Third Party Release. If the Bankruptcy Court does not enter an order granting the CCB Third Party Release, the CCB Secured Claim shall be deemed satisfied by maintenance of the CCB Reserve pursuant to the terms of the CCB Stipulation until October 23, 2009.

---

[21] On or about January 31, 2008, Ward Enterprises, LLC, an Exchanger and creditor of the 1031 Debtors, commenced that certain action styled Ward Enterprises, LLC v. Daniel E. McCabe, et al., filed in the District Court, City and County of Denver, State of Colorado (the "Ward Action") against CCB and others. CCB asserts that it incurred $29,930.82 obtaining a dismissal of the Ward Action against it. Pursuant to Order of the Bankruptcy Court, CCB was paid $25,000 for costs incurred defending the Ward Action. Accordingly, the CCB Reserve has been reduced by $25,000.

## 9.    Appointment of the Chapter 11 Trustee and the Asset Transfer Agreement

On October 11, 2007, the Ad Hoc Committee of Exchangers[22] filed a Motion Seeking Appointment of a Chapter 11 Trustee or, Alternatively, Termination of Exclusivity (the "Ad Hoc Motion").  The relief sought in the Ad Hoc Motion was based upon, among other things, termination of the JPS Capital Term Sheet, Okun's failure to collateralize his guarantee of the IPofA Notes, and the commencement by certain IPofA Entities (collectively, the "Virginia Debtors"[23]), that owned the West Oaks Mall, one of the allegedly most valuable IPofA assets, of their own chapter 11 cases in the Eastern District of Virginia.  On October 15, 2007, the United States Trustee filed a renewed Motion (the "UST Motion") for an Order Directing the Appointment of a Chapter 11 Trustee, or in the Alternative, Conversion of the Cases to Chapter 7, which was based upon the same case developments set forth in the Ad Hoc Motion. Additional groups of Exchangers joined in the Ad Hoc and UST Motions.  After an evidentiary hearing held on October 23, 2007, the Bankruptcy Court entered an amended memorandum opinion and order granting the motions for the appointment of a Chapter 11 Trustee.  On October 24, 2007, the United States Trustee filed a motion for approval of the appointment of Gerard A. McHale, Jr., as the Chapter 11 Trustee.  The Bankruptcy Court granted the United States Trustee's motion by Order dated October 25, 2007.

While the Ad Hoc and UST Motions were pending, the 1031 Debtors and the Committee sought Bankruptcy Court authorization to effectuate that certain asset transfer agreement (the "Transfer Agreement"), dated October 11, 2007, pursuant to which the 1031 Debtors would become the transferee of essentially all of the assets, subject to certain exclusions (the "Transferred Okun Assets"), of Okun and his wife, Simone Bolani ("Bolani"), which assets included Okun's interest in the Okun Entities.  The 1031 Debtors and the Committee contended that the liquidation value of the assets transferred under the Transfer Agreement, which include the assets that had previously been represented to have sufficient value to support the purported $300 million JPS Capital loan, had a liquidation value of $19.7 million.  In papers filed in support of approval of the Transfer Agreement, the movants asserted that with the proper management, bridge financing, sales, property negotiations, and sales of Okun's "Toys" (certain planes, boats and automobiles), value could be returned to creditors substantially in excess of the stated liquidation value.  One day after the Chapter 11 Trustee's appointment as approved by the Bankruptcy Court, the Transfer Agreement was approved by order of the Bankruptcy Court entered October 26, 2007.

The Chapter 11 Trustee is represented by the New York law firm of Golenbock Eiseman Assor Bell & Peskoe LLP.  Deloitte Financial Advisory Services LLP has been retained as the Chapter 11 Trustee's Financial Advisor.  Additionally, the Chapter 11 Trustee has retained the following counsel and advisors: the Florida law firm of Johnson Pope Bokor Ruppel & Burns LLP; Gilbert Oshinsky LLP (formerly Gilbert Randolph LLP) as Special Insurance Counsel; Olshan Grundman Frome Rosenzweig & Wolosky LLP as Special Litigation Counsel; Kaufman & Canoles as Special Virginia Counsel; Ayres, Warren, Shelton & Williams, LLC (substituted

---

[22] Comprised of 222 Central Avenue Corp., ASM Capital, L.P., Stonehill Institutional Partners, L.P., and Hain Capital Holdings, LLC.

[23] Comprised of IPofA West Oaks Mall, LP, IPofA WOM Master LeaseCo, LP, and IPofA West Oaks Mall LeaseCo, LP.

for Cook, Yancey, King & Galloway, P.C.) as Special Louisiana Counsel; SEKO Enterprises, Inc. as Aircraft Broker; Robert Davenport as Financial and Real Estate Consultant; Rivero, Gordimer & Company, P.A. as Management Consultant; Moran Yacht & Ship, Inc. as Vessel Broker; Keen Consultants, the Real Estate Division of KPMG Corporate Finance LLC, along with its wholly-owned subsidiary KPMG CF Realty LLC as Special Real Estate Advisor; Roseline Tax Advisors, PLLC as Tax Advisors; S. Sackowitz Jewelers, Inc. as Jewelry Broker; and Kennedy Berkley Yarnevich & Williamson as Kansas Counsel.

## B.    Bankruptcy Proceedings After the Appointment of the Chapter 11 Trustee

### 1.    The Transfer Agreement and the Okun Entities

The Chapter 11 Trustee became transferee of the Transferred Okun Assets, including the equity interests in the Okun Entities, pursuant to the Transfer Agreement. Many of the Transferred Okun Assets, consisting of indirect interests in real estate, were in various stages of foreclosure at the time of the Chapter 11 Trustee's appointment, and the Committee took the position that they had been advised that assets possessed substantial value, and that the Chapter 11 Trustee should act quickly to preserve them. The Chapter 11 Trustee and his professionals accordingly took steps to gain control of and evaluate the Transferred Okun Assets, including commencing an adversary proceeding against various lenders, captioned *McHale v. Cordell Funding, LLP, et al*. Case No. 07-03069, pursuant to §§ 105 and 362 of the Bankruptcy Code, seeking to enjoin the defendants from commencing or prosecuting foreclosure proceedings or other litigation seeking control of certain assets owned by the IPofA Entities. In addition, in order to implement the Transfer Agreement, all officers and managers that were serving in positions of authority with respect to the Okun Entities were removed, and the Chapter 11 Trustee was substituted in their place in his capacity as transferee under the Transfer Agreement.

### (a)    The IPofA Debtors

Based on the fact that many of the IPofA Entities' real property assets were under immediate threat of foreclosure, and in light of the expense and uncertainty of the pending injunction litigation, on November 15, 2007 (the "IPofA Petition Date"),[24] the Chapter 11 Trustee decided to cause Investment Properties of America, LLC, IPofA 5201 Lender, LLC, IPofA Columbus Works LeaseCo, LLC, IPofA West 86th Street LeaseCo, LLC, 100 Corporate Drive, LLC, Crossroads Miami Logistics Center, LLC, CW Acquisition, LLC, Simone Condo I, LLC, Simone Condo II, LLC, Parkway Virginia Trust, and Columbus Works Virginia Trust (collectively, the "IPofA Debtors") to file petitions in the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code (the "IPofA Chapter 11 Cases"). The IPofA Debtors' chapter 11 cases, including IPofA Shreveport's chapter 11 case, are jointly administered under Case Number 07-13621. In connection with evaluating the IPofA Debtors' assets, the Chapter 11 Trustee and his professionals engaged extensively in valuing the IPofA Debtors' real estate assets and negotiated with their secured lenders and other parties in interest.

As a result of his investigation, the Chapter 11 Trustee concluded that the real estate and interests in real estate owned by the IPofA Debtors were, for the most part, highly leveraged, and

---

[24]  Parkway Virginia Trust's and Columbus Works Virginia Trust's chapter 11 cases were commenced on November 30, 2007.

very little or no equity remained for the benefit of the 1031 Debtors' estates. An outline of steps that the Chapter 11 Trustee took to preserve value in the Transferred Okun Assets for the benefit of the 1031 Estates is set forth below. This description also outlines IPofA Shreveport's chapter 11 case.

### (i) Investment Properties of America, LLC

IPofA is the lead debtor in the IPofA Debtors' chapter 11 cases, and is also the direct or indirect owner of many of the Okun Entities (including each of the IPofA Debtors other than Simone Condo I, LLC, Simone Condo II, LLC, Columbus Works Virginia Trust, and Parkway Virginia Trust). A substantial portion of the misappropriated funds were initially transferred to IPofA, and IPofA is the obligor under many of the IPofA Notes, and is indebted to the 1031 Debtors for an amount in excess of $100 million. IPofA does not own any real estate or other material assets. In addition to its indebtedness to the 1031 Debtors' estates, IPofA has some trade debt. The Chapter 11 Trustee has evaluated the real estate assets held by the IPofA Debtors and concluded that there is little or no equity in most or all of those properties. Accordingly, the Chapter 11 Trustee has concluded that dismissal of IPofA's chapter 11 case is appropriate. IPofA's equity interest in IPofA Shreveport will be cancelled upon the Effective Date of the Plan.

### (ii) IPofA Shreveport

As of the IPofA Petition Date, IPofA Shreveport's main assets were its ownership interest in a warehouse facility in Shreveport, LA located on an approximately 200 acre parcel (the "Shreveport Property") and claims against the Cordell Entities, which were the secured lenders to a number of the IPofA Debtors, including IPofA Shreveport. Based upon the Chapter 11 Trustee's investigation, the Chapter 11 Trustee learned that the Shreveport Property was acquired with approximately $7.5 million of funds misappropriated from the 1031 Debtors, (the "Shreveport Constructive Trust Claim") and that potential claims against the Cordell Entities existed arising from its various transactions involving the Okun Parties and the IPofA Debtors (the "Trustee/Cordell Claims"). However, the Cordell Entities had a lien on the Shreveport Property, and the warehouse facility's operations were not generating sufficient revenue to meet operating expenses and debt service. The Cordell Entities vigorously denied the Trustee/Cordell Claims, and asserted, among other things, that any potential claims against them had been waived by the 1031 Debtors and the Committee under the Loan Modification Agreement.

In December, 2007, the Cordell Entities moved in the IPofA Debtors' chapter 11 cases to lift the automatic stay to foreclose on certain of the properties, including the Shreveport Property. After a preliminary hearing and protracted negotiations, the IPofA Debtors, the Chapter 11 Trustee, and the Cordell Entities agreed to a consensual lift stay stipulation and order regarding three properties, including the Shreveport Property, subject to conditions to be later negotiated or litigated. The IPofA Debtors, the Chapter 11 Trustee, and the Cordell Entities thereafter entered into a second stipulation regarding the conditions for the lifting of the stay in order to, among other things, preserve the Estates' claims asserted against the Cordell Entities. Soon thereafter, it became known that a large shale natural gas deposit, the Haynesville Shale, was possibly located underneath the Shreveport Property. The Haynesville Shale is potentially the largest natural gas find in the United States. As a result of the announcement of the Haynesville Shale find, the Chapter 11 Trustee moved, pursuant to Fed. Rule Civ. P. 60(b) to, essentially, reinstate the stay

regarding the Shreveport Property (the "60(b) Motion"). At the same time, the Chapter 11 Trustee was actively investigating the Trustee/Cordell Claims. The Cordell Entities vigorously opposed the 60(b) Motion.

The Chapter 11 Trustee, on behalf of the Estates, and the Cordell Parties began negotiations regarding the claims that could be asserted against one another, as well as the resolution of the 60(b) Motion. These negotiations resulted in a settlement agreement (the "Shreveport Settlement Agreement") between and among the Chapter 11 Trustee, the IPofA Debtors, and the Cordell Entities, which was approved by the Bankruptcy Court on December 1, 2008. Pursuant to the Shreveport Settlement Agreement, the Cordell Entities were granted a deed-in-lieu of foreclosure with respect to the Shreveport Property, but the Chapter 11 Trustee and IPofA Shreveport reserved the below-ground rights to exploit the shale gas deposits (the "Mineral Servitude") subject to a sharing agreement with the Cordell Entities. Accordingly, pursuant to the Plan, the Mineral Servitude will vest in Reorganized IPofA Shreveport, the sole member of which will be the Liquidating Trust, and the Liquidating Trustee will serve as the Manager of Reorganized IPofA Shreveport. Pursuant to the Shreveport Settlement Agreement, Reorganized IPofA Shreveport and the Cordell Entities are to cooperate in leasing the Mineral Servitude to an energy exploration company. The Chapter 11 Trustee's special Louisiana counsel has advised the Chapter 11 Trustee that the general industry practice is for mineral leases to provide for an up-front bonus based on an amount per acre. The lessee then has three years to explore and, if commercially viable deposits are located, the lessee will extract them, paying a royalty equal to a percentage of the revenue realized, frequently in the range of 25%. Such bonus and royalty would be subject to a sharing formula[25] between Reorganized IPofA Shreveport and the Cordell Entities.

The expert reports submitted by the Chapter 11 Trustee's and IPofA Shreveport's experts, on one hand, and the Cordell Entities' experts, on the other hand, in connection with the 60(b) Motion regarding the value of the Mineral Servitude varied widely from a low estimate of $4.32 million to a high estimate of $57.81 million over 20 years. In the absence of actual geological studies, estimating the value of the Mineral Servitude to Reorganized IPofA Shreveport (i.e., Reorganized IPofA Shreveport's share of the revenue under the sharing formula with the Cordell Entities) is highly speculative. Accordingly, once the geological studies and the initial exploration have been completed, the Liquidation Trustee will be in a better position to determine the value of the Mineral Servitude and potential opportunities to enter a lease therefor or sell the Mineral Servitude (or Reorganized IPofA Shreveport's interest therein).

---

[25] The sharing formula is as follows:

| Amount | Reorganized IPofA Shreveport % | Cordell Parties % |
|---|---|---|
| Net bonus payments on execution of mineral lease(s) | 50 | 50 |
| first $ 2.0 million | 100 | |
| next $ 2.0 million | | 100 |
| next $ 5.5 million | 25 | 75 |
| next $ 5.5 million | 75 | 25 |
| next $ 6.0 million | 50 | 50 |
| next $ 4.0 million | 60 | 40 |
| next $10.0 million | 80 | 20 |
| balance through expiration | 90 | 10 |

In addition to the sharing agreement reached with respect to the mineral royalties discussed above, under the Shreveport Settlement Agreement, the Cordell Entities released claims of up to $60 million against all Okun Entities (reserving claims against its collateral with some exceptions), and the Chapter 11 Trustee and the IPofA Debtors released the Trustee/Cordell Claims. The Bankruptcy Court order approving the Shreveport Settlement Agreement ordered a permanent injunction against third parties pursuing any claims derivative of any of the 1031 Debtors' claims against the Cordell Parties, as well as a directive that the injunction be memorialized in the Plan. Accordingly, the Cordell Parties are Released Parties under the Plan.

Other than the Shreveport Constructive Trust Claim and the Cordell Entities' claims (which have been released), $408,000 of pre-petition trade Claims against IPofA Shreveport have been filed. Priority Tax Claims were satisfied by the Cordell Entities at closing of the deed-in-lieu of foreclosure of the Shreveport Property, and will only be reimbursed to the Cordell Entities from any Mineral Servitude Revenues payable to them pursuant to the sharing agreement set forth in the Shreveport Settlement Agreement. Based on the substantive consolidation of the Debtors' Estates, the Shreveport Constructive Trust Claim will be discharged upon the Effective Date of the Plan. The Bankruptcy Court established April 3, 2009 as the last day to (a) file pre-petition Proofs of Claim, and (b) file requests for payment of Claims of Administrative Expenses incurred through February 17, 2009, against IPofA Shreveport.

### (iii)    Crossroads Transportation & Logistics, Inc.

Crossroads Transportation & Logistics, Inc. ("Crossroads") was the only non-real estate operating business among the Okun Entities of which the Chapter 11 Trustee is aware. It was owned by Okun, and engaged in a trucking and logistics business. Its accounts, inventory, and other assets were pledged to Marquette Transportation Finance ("Marquette"), which possessed a lien on all of the accounts receivable of Crossroads. In addition, all of its rolling stock (e.g., trucks and trailers) were leased from Stoops Nationwide Leasing ("Stoops"). The supposed value of the Shreveport Property, the West 86th Property and the Miami Logistics Property was based, in large measure on the lease payments supposedly made by Crossroads. It had been believed prior to the appointment of the Chapter 11 Trustee that Crossroads was a potentially very valuable business. Upon his appointment, the Chapter 11 Trustee investigated the value of Crossroads, and determined that Crossroads was in severe financial straits, payments to Stoops were in arrears, payments on fuel, utilities and other items were in arrears, its records were in shambles, financial controls had not been put in place, and it was unable to produce any reliable operating information or projections. It also appeared that Crossroads had never paid any rent in connection with the leases which purportedly rendered the Shreveport Property and the West 86th Property valuable. It also appears that substantial amounts of funds misappropriated from the 1031 Debtors were transferred to Crossroads. Approximately $5.7 million of Exchange Deposits went into the proposed, but not consummated, acquisition of the Crossroads Hialeah facility, and an additional approximately $10 million of funds from various accounts of IPofA entities and 1031 Debtor entities went into Crossroads. Although it would be difficult and time-consuming to trace the hundreds of transactions involved with these accounts, it is clear that tens of millions of dollars misappropriated from the 1031 Debtors flowed through the accounts of the IPofA entities, and it is thus very likely that much of the funds from IPofA accounts consisted of comingled Exchange Deposits. In light of the circumstances described above, the Chapter 11 Trustee closed down Crossroads' operations.

**(iv)**     **IPofA Columbus Works LeaseCo, LLC,**
           **Columbus Works Virginia Trust, and CW Acquisition, LLC**

The fee interest of the improved real property located at 6200 East Broad Street, Columbus, Ohio ("Columbus Works") was initially acquired by an Okun Entity at some time prior to August, 2005.  The Okun Parties caused the then-owner of Columbus Works to enter into a master lease for Columbus Works (the "Columbus Works Master Lease"), with IPofA Columbus Works LeaseCo, LLC, as master lessee.  The Columbus Works Master Lease was subject to a lease dated December 11, 2003, as amended through June 28, 2005, which subleased substantially all of Columbus Works to Alcatel/Lucent ("Lucent").  Thereafter, the Okun Parties sold interests in Columbus Works, subject to the Columbus Works Master Lease and Lucent Lease, to approximately thirty-three TIC owners (the "Columbus Works Owners") who hold fee title to Columbus Works as co-tenants and who constitute the landlord pursuant to the Columbus Works Master Lease.  The Columbus Works Owners paid approximately $25 million in cash for this fee interest.  In addition, they each expressly assumed their respective pro rata share of an existing $27 million mortgage secured by Columbus Works (the "Columbus Mortgage"), which Columbus Mortgage was held by another IPofA Debtor, Columbus Works Virginia Trust.  In 2006, Columbus Works Virginia Trust assigned its interest in the Columbus Mortgage to Cordell as security for a $26 million loan to it.  The Chapter 11 Trustee determined that IPofA Columbus Works LeaseCo, LLC's monthly base rent obligation to the Columbus Works Owners was approximately $166,667.  In addition, debt service payments under the Columbus Mortgage were owed as additional rent under the Columbus Works Master Lease and as a result the project had substantial negative cash flow.

After investigation, the Chapter 11 Trustee concluded that IPofA Columbus Works LeaseCo, LLC's interest in the Columbus Works Master Lease was of no benefit and sought and obtained Bankruptcy Court authority to reject the Columbus Works Master Lease.  Separately, the Chapter 11 Trustee concluded that there was no equity in Columbus Works and consented to Cordell's motion for relief from the stay to foreclose on the Columbus Mortgage, which was held by Columbus Works Virginia Trust.  As is set forth above in the discussion regarding IPofA Shreveport, the Chapter 11 Trustee reached a global resolution of claims against Cordell.  Accordingly, IPofA Columbus Works LeaseCo, LLC's and Columbus Works Virginia Trust's chapter 11 cases were dismissed by Order of the Bankruptcy Court dated May 5, 2009.

CW Acquisition, LLC was formed for the sole purpose of holding a tenant-in-common option ("TIC Option") for Columbus Works.  The Chapter 11 Trustee caused CW Acquisition, LLC to commence its chapter 11 case for the sole purpose of preserving the value of its sole asset, the TIC Option; however the Trustee concluded that the TIC Option does not have any value. The Bankruptcy Court approved dismissal of CW Acquisition, LLC's chapter 11 case on December 18, 2008.

**(v)**      **IPofA 5201 Lender, LLC and IPofA**
           **West 86th Street LeaseCo, LLC**

Prior to the Petition Date, the fee interest in the premises (consisting of a 468,000 square foot warehouse and distribution center) located at 5201 West 86th Street, Indianapolis, Indiana (the "West 86th Property") was initially acquired by an IPofA Entity and then sold by that entity to approximately twenty TIC owners (the "West 86th Street Owners") in or about late 2004.  The

West 86th Property was subject to a master lease dated December 31, 2004 (as amended, the "West 86th Street Master Lease") held by IPofA West 86th Street LeaseCo, LLC, as tenant. IPofA West 86th Street LeaseCo, LLC thereafter subleased the West 86th Property to Crossroads. At the time of the acquisition by the West 86th Street Owners, the West 86th Property was subject to a mortgage in the amount of $6.5 million. In or about February 2005, the West 86th Street Owners refinanced that mortgage by obtaining a loan in the amount of $7.1 million from Morgan Stanley Mortgage Capital, Inc. ("Morgan Stanley"). The terms of that indebtedness, among other things, required a deposit of $1 million into a reserve account (the "Reserve"), which was accomplished. In addition, the West 86th Street Owners were required, and did, deposit approximately $65,000 into escrow for payment of real estate taxes and approximately $19,000 into escrow for payment of property insurance premiums (collectively, the "Escrow"). The West 86th Street Owners allege that their monthly mortgage payment through Morgan Stanley, and, thereafter, to IPofA 5201 Lender, LLC included amounts for taxes and insurance premiums which were added to the Escrow.

IPofA West 86th Street LeaseCo, LLC defaulted under the West 86th Street Master Lease by failing to pay the August 2007 payment or any payment coming due thereafter, as well as by failing to pay real property taxes due in August 2007 and by failing to make monthly Escrow payments for taxes, insurance, and interest. By reason of these defaults, the West 86th Street Owners gave notice of default to IPofA West 86th Street LeaseCo, LLC, and purported to terminate the Master Lease on or about October 23, 2007. In late October 2007, the West 86th Street Owners commenced and action against IPofA West 86th Street LeaseCo, LLC and IPofA 5201 Lender, LLC for, in essence, converting the Reserve and the Escrow. When the Chapter 11 Trustee assumed the equity ownership position pursuant to the Transfer Agreement with respect to IPofA West 86th Street LeaseCo, LLC and IPofA 5201 Lender, LLC, he learned that, in fact, no funds were in either the Reserve or the Escrow. It also appears that, as discussed above, Crossroads never paid any rent pursuant to its master sublease. Accordingly, the Chapter 11 Trustee sought and obtained authorization to terminate the West 86th Street Master Lease and the Crossroads sublease. Separately, the Chapter 11 Trustee concluded that there was no equity in the West 86th Property, and consented to Cordell's motion for relief from the stay to foreclose on the mortgage held by IPofA 5201 Lender, LLC. As is set forth above in the discussion regarding IPofA Shreveport, the Chapter 11 Trustee reached a global resolution of claims against Cordell. Accordingly, IPofA 5201 Lender, LLC's and IPofA West 86th Street LeaseCo, LLC's chapter 11 cases were dismissed by order of the Bankruptcy Court dated May 5, 2009.

### (vi)   Simone Condo I, LLC and Simone Condo II, LLC

Prior to the Petition Date, Simone Condo I, LLC held the deed to that certain Condominium Unit 3404 at 901 Brickell, Miami, Florida (the "Simone I Deed") and Simone Condo II, LLC held the deed to that certain Condominium Unit 1808 at 901 Brickell, Miami, Florida (the "Simone II Deed"). These properties had been acquired with approximately $2,475,000 of Exchange Deposits misappropriated from the 1031 Debtors. The Simone I and Simone II Deeds were pledged to Cordell as security. Prior to the Petition Date, and contemporaneously with the Loan Modification Agreement, Cordell foreclosed on these condominiums. The Chapter 11 Trustee's claims against Cordell have been settled as is discussed above under the Shreveport Settlement Agreement. Accordingly, Simone Condo I, LLC's and Simone Chapter II, LLC's chapter 11 cases were dismissed pursuant to Order of the Bankruptcy Court dated May 5, 2009.

### (vii) 100 Corporate Drive, LLC

As of the IPofA Petition Date, 100 Corporate Drive, LLC owned three commercial condominiums (the "100 Corporate Drive Condo") commonly known as Units A201, A202, and A203, 100 Corporate Drive, Trumbull, CT.  This property was also acquired with funds misappropriated from the 1031 Debtors.  The Chapter 11 Trustee, through a broker, negotiated a sale of the 100 Corporate Drive Condo to Heather Nelson for $575,000 (the "Purchase Price") pursuant to an Agreement of Sale ("Sale Agreement") dated June 16, 2008.  After certain closing costs, real estate taxes, and broker's fees were paid, 100 Corporate Drive, LLC netted $516,616.05 (the "100 Corporate Drive Sale Proceeds") from the sale of 100 Corporate Drive. During the course of his investigation, the Chapter 11 Trustee traced a diversion of $776,161.92 from an account belonging to Real Estate Exchange Services, Inc., one of the 1031 Debtors, to 100 Corporate Drive's attorneys to fund the initial purchase of the 100 Corporate Drive Condo. The 1031 Debtors did not receive any consideration from 100 Corporate Drive for the transfer. Accordingly, the Chapter 11 Trustee sought Bankruptcy Court authority to transfer the 100 Corporate Drive Sale Proceeds to the 1031 Debtors' estates and dismissal of 100 Corporate Drive, LLC's chapter 11 case.  100 Corporate Drive, LLC's chapter 11 case was dismissed on December 18, 2008, and the Corporate Drive Sale Proceeds, less outstanding United States Trustee's fees, were transferred to the 1031 Debtors' estates.

### (viii) Crossroads Miami Logistics Center, LLC

This entity was a tenant at, and had an option to purchase the leased property located in Miami, FL (the "Miami Logistics Property").  The option, however, was not exercised.  The Chapter 11 Trustee commenced Crossroads Miami Logistics Center, LLC's chapter 11 case to preserve a claim for recovery of approximately $4,000,000 which was transferred to WH Hialeah Investors, LLC, the owner and landlord.  However, upon further investigation, the Chapter 11 Trustee determined that the claim to recover the $4,000,000 primarily belongs to the 1031 Debtors' estates because the funds transferred were misappropriated from the 1031 Debtors.  The Chapter 11 Trustee has commenced avoidance action to recover the $4,000,000 on behalf of the 1031 Debtors' estates.  The Chapter 11 Trustee has sought dismissal of Crossroads Miami Logistics Center, LLC's chapter 11 case.

### (ix) Parkway Virginia Trust

Parkway Virginia Trust held a $2 million mortgage against that certain real property known as 4201 Millersville Road, Indianapolis, Indiana ("Millersville Road").  The Okun parties pledged the mortgage to Cordell as partial collateral for one of the Cordell Loans.  Millersville Road was purchased from an Okun Entity by tenant-in-common owners, and was subject to a master lease.  The Chapter 11 Trustee determined that there was no equity in Millersville Road, and consented to Cordell's motion for relief from the stay to foreclose on the mortgage held by Parkway Virginia Trust.  As is set forth above in the discussion regarding IPofA Shreveport, the Chapter 11 Trustee reached a global resolution of claims against Cordell.  Accordingly, Parkway Virginia Trust's chapter 11 case was dismissed pursuant to Order of the Bankruptcy Court dated May 5, 2009.

### (b)    Other Okun/IPofA Entities

The Chapter 11 Trustee also evaluated the real estate assets and interests held by IPofA Waterview, LLC, IPofA Jewella, LLC, IPofA Crooked Creek, LLC, IPofA Parkway Complex, LLC, and IPA Richmond Square LeaseCo, LLC, and concluded that the properties were overleveraged or otherwise provided no value to the relevant Okun Entity. Accordingly, the Chapter 11 Trustee negotiated dispositions of the real property interests so that the Chapter 11 Trustee and the 1031 Debtors' estates would not incur further expenses managing or administering the properties.

### (i)    IPofA Salina

Another of the IPofA properties which the Chapter 11 Trustee attempted to realize value from is the Salina Central Mall, which had been acquired by another of the Okun Entities, IPofA Salina Central Mall, LLC ("IPofA Salina"). The Salina Central Mall, located in Salina, Kansas is encumbered by mortgage indebtedness asserted by Wachovia in an amount, with interest, in excess of $34 million. In addition, the membership interest in IPofA Salina is encumbered by liens held by Boulder and the Cordell Entities. Approximately $3 million of funds misappropriated from the 1031 Debtors were utilized to acquire the Salina Central Mall, and the Wachovia Adversary Proceeding, discussed below, included a claim that, in essence, under theories of constructive trust and equitable lien, recovery of those funds, with interest, by the 1031 Debtors was prior to Wachovia's mortgage. The Chapter 11 Trustee investigated the value of the Salina Central Mall, and considered filing a chapter 11 petition for it in order to conduct a sale of this property pursuant to Sections 363(b) and (f) of the Bankruptcy Code. In furtherance of such potential sale, the Chapter 11 Trustee retained Keen Consultants, the real estate division of KPMG Corporate Finance LLC ("KPMG"), to assist in the sale of the Salina Central Mall. One of the reasons for pursuing such a transaction through a chapter 11 case was to preserve a potential equitable subordination claim against Wachovia. Ultimately, however, it was determined that the value of the Salina Central Mall was substantially less than the Wachovia indebtedness. In addition, it was not possible to identify a purchaser willing to execute a firm contract, even at prices well below the Wachovia indebtedness. The Chapter 11 Trustee thus determined to abandon efforts to sell the Salina Central Mall. Wachovia commenced a foreclosure action, and a receiver has been appointed for the Salina Central Mall.

### (ii)    JC Penney/West Oaks Mall Property

Another of the Okun Entities is IPofA WOM JCP, LP ("WOM JCP"), which owns a vacant building adjacent to the West Oaks Mall. It is encumbered by an approximately $3 million mortgage loan from Wachovia. The Chapter 11 Trustee's investigation of the value of this property, including preliminary sale efforts by KPMG, resulted in concluding that the property was worth substantially less than the mortgage indebtedness. Accordingly, the Chapter 11 Trustee has not pursued sale of this property.

### (c)    Okun's "Toys"

The Chapter 11 Trustee has already liquidated Okun's "Toys" that were transferred to the 1031 Estates pursuant to the Transfer Agreement. The net to the 1031 Estates reflects the payment of certain costs incurred in connection with the sales, including satisfaction of liens and

brokers' fees. To date, the 1031 Estates received the net total amount of approximately $3,919,317 from the Chapter 11 Trustee's sales of the following Toys: helicopter for $815,614; Gulfstream jet for $937,201; yacht for $200,850; Lear jet for $324,176; vehicles and certain watercraft for $1,150,000; certain additional watercraft for $117,500; and jewelry that the Chapter 11 Trustee recovered from Bolani for $273,974. Additionally, the Chapter 11 Trustee negotiated the sale of shares Common Stock of First Montauk Financial Corp. ("First Montauk") that were owned by FMFG Ownership Inc. ("FMFG"), one of the Okun Entities, for $100,000.[26] Substantial funds of the 1031 Debtors were used to acquire and/or maintain the Toys. Additionally, the Chapter 11 Trustee and his advisors are pursuing Federal and State Tax Refunds for 2004-2005 for Okun and Bolani in the amount of $2,819,638.

### (d) West Oaks Mall Settlement

Prior to the Chapter 11 Trustee's appointment, Okun, in violation of his supposed cooperation with the 1031 Debtors and the Committee, caused the Virginia Debtors to commence their own chapter 11 cases in the United States Bankruptcy Court for the Eastern District of Virginia. The Virginia Debtors' sole asset was a piece of real property known as the West Oaks Mall located at 1000 West Oaks Mall, Houston, Texas. Approximately $25 million of Exchange Deposits were misappropriated to acquire, or facilitate the refinancing of, the West Oaks Mall. The Chapter 11 Trustee alleged that the 1031 Debtors held a constructive trust claim against the Virginia Debtors arising from the misappropriated funds. On November 1, 2007, the Chapter 11 Trustee filed a motion to transfer venue of the Virginia Debtors' cases to the Bankruptcy Court. The Virginia Debtors' trustee opposed the motion. The Chapter 11 Trustee's investigation revealed that, like most of the other IPofA entities' real estate holdings, the West Oaks Mall was overleveraged, and possessed no value for the equity interest. After negotiations, the Virginia Debtors' lender agreed to fund a $550,000 settlement to resolve the proceeding, which was approved by both courts. Accordingly, the 1031 Debtors' received $550,000 in settlement of the dispute.


# VIII.

# PLAN FUNDING PARTY SETTLEMENT
# AGREEMENTS/CLASS ACTION AGREEMENT

The initial stages of the Trustee's stewardship were largely devoted to attempting to realize value from the IPofA Debtors and other Okun Entities and Toys. In addition, the Trustee began to lay the groundwork for investigating and pursuing claims and causes of action to fund a plan of reorganization and distribution to creditors. A necessary step in this process was the creation of a database containing, in searchable form, the thousands of financial transfers and transactions orchestrated by the Okun Parties in furtherance of the Misconduct, and related documents and communications, including e-mail traffic. Based upon this database, Deloitte created a "tracing analysis," which formed and forms an important component leading to the settlement reached, and litigation commenced, as described below.

---

[26] As part of Okun's unwinding of his agreement to, through FMFG and related Chapter 11 entities, acquire First Montauk, he received $2 million after the Petition Date, but prior to the appointment of the Trustee.

## A. Overview of Plan Funding Party Settlement Agreements

As mentioned above, the cornerstones of the Plan are the Plan Funding Party Settlement Agreements and the Class Action Agreement. Each is described below. By way of summary, one of the important elements of the Class Action Agreement is the contemplated approval by the Class Action Court of the Plan Funding Party Settlement Agreements. **It is anticipated that the order of the Class Action Court approving Plan Funding Party Settlement Agreements will include a release and bar of all claims of Exchangers against any of the applicable Plan Funding Parties. Copies of each of the Plan Funding Party Settlement Agreements are annexed to the Plan.**

Early in the negotiations with various of the Plan Funding Parties, each insisted upon some type of injunction so that, upon the payment of the settlement amount pursuant to the applicable agreement, the applicable Plan Funding Party would no longer be subject to liability for (i) conduct relating to the 1031 Debtors or the Misappropriations, and (ii) in the case of insurance carriers, for any obligations under policies issued to the 1031 Debtors. Although the Chapter 11 Trustee believes that justification exists under the circumstances of the Debtors' cases for the Bankruptcy Court to grant such relief to the Plan Funding Parties under applicable law, this proposition is not free from doubt. In order to provide an alternative means for achieving such relief, approval of the Plan Funding Party Settlement Agreements, together with a bar against all Exchangers claims against Plan Funding Parties, is being sought from the Class Action Court. **Most of the Plan Funding Party Settlement Agreements provide that obtaining orders from the Class Action Court or the Bankruptcy Court barring all Exchangers from asserting any claims against the applicable Plan Funding Parties will be sufficient to render the various agreements effective, so long as such an order is coupled with approval of the various Plan Funding Party Settlement Agreements from the Bankruptcy Court as reasonable settlements pursuant to Bankruptcy Rule 9019(a). Any such bar order from the Class Action Court must bind all Exchangers, and if any Exchangers opt out, the applicable Plan Funding Party may declare the Plan Funding Party Settlement Agreement null and void.**

The Plan Funding Party Settlement Agreements, in large measure, also require that Class Action Court and the Bankruptcy Court issue, in favor of the Plan Funding Parties, a contribution bar provision. Under such a provision, in essence, parties who are or may be defendants in actions commenced by the Chapter 11 Trustee, the Liquidation Trust, or the Putative Class are barred from seeking contribution or indemnity from any of the Plan Funding Parties. In consideration therefor, such defendants or potential defendants are entitled to "judgment reduction," that is, to the extent that they establish at trial that a Plan Funding Party was responsible for some percentage of the liability or damage, any judgment in favor of the Chapter 11 Trustee, the Liquidation Trust or the Class against such non-settling party will be reduced on a pro rata basis. It is noted that these provisions are somewhat complex, and the actual Plan Funding Party Settlement Agreements should be consulted for a full description of their terms. The general description of the structure of the various Plan Funding Party Settlement Agreements set forth above is for illustrative purposes only, and there are variations among the Plan Funding Party Settlement Agreements and the approval process with respect thereto. The purpose of this discussion is to explain the principles underlying the Plan Funding Party Settlement Agreements. It is the Chapter 11 Trustee's intention to seek approval of the Plan Funding Party Settlement Agreements in the context of the Plan Confirmation Hearing, and, as

mentioned above, to work with Class Action Counsel to propose to both the Bankruptcy Court and the Class Action Court that the Class Action approval hearing occur simultaneously or contemporaneously with the Plan confirmation process.

## B.    Class Action Agreement

On or about May 30, 2007, Anita Hunter filed a class action lawsuit in the United States District Court for the Northern District of California (the "Class Action Court") to proceed as a putative class on behalf of herself and "all other similarly situated" Exchangers (the "Putative Class") against Okun and others, captioned *Hunter v. Okun, et al.,* Case No 5:07-CV-02795-JW ("Class Action").  On or about November 19, 2008, an amended complaint (the "First Amended Complaint") was filed, adding four additional named plaintiffs (collectively, the "Representatives").[27]  The First Amended Complaint, in summary, adds additional defendants and alleges, on behalf of all Exchangers, claims which rely on facts similar to the facts on which the Chapter 11 Trustee relies, except that the First Amended Complaint alleges that the defendants owed duties directly to the Exchangers and that the Exchange Deposits were held in trust for the Exchangers.  Included as defendants are the Former Owners, Okun, Simring, Coleman, Field, Wachovia, CNA, Federal, Twin City and Lockton.  Counsel for the Putative Class is Hollister & Brace and Foley, Bezeck, Behle & Curtis, LLP (collectively, "HBFB"), and Zelle McDonough & Cohen, LLP (collectively with HBFB, "Class Counsel").  The First Amended Complaint also alleges claims relating to the 1031 Debtors' insurance.  This portion of the complaint alleges claims against Lockton, an insurance producer, and the three insurance companies (CNA, Federal and Twin City), which issued to the 1031 Debtors commercial crime policies or excess policies.  The First Amended Complaint alleges that these defendants falsely represented to the public that the 1031 Debtors were "bonded" and that a "fidelity bond" would cover the theft of the Exchanger Deposits.  Plaintiffs allege, among other things, that they would not have deposited the Exchange funds but for the certification that the 1031 Debtors were "bonded" by a large per occurrence fidelity bond.

On May 12, 2009, the Class Representatives commenced a related action in the Class Action Court, captioned *Hunter v. Citibank, N.A., et al.,* Case No. 5:09-CV-02079-JW (the "Related Action" and together with the Class Action, the "Class Litigation").  The Class Action and the Related Action were both commenced by the Class Representatives based upon similar facts, and the cases are being treated as related actions by the Class Action Court.  The first amended complaint filed in the Related Action asserts claims against the following defendants, which include banks, hard money lenders, and professional firms: Citibank, N.A., Countrywide Bank, FSB, Bank of America, N.A., United Western Bank, Boulder, Roy S. MacDowell, Jr.,

---

[27] On or about November 14, 2008, Zelle, McDonough & Cohen, LLP filed an action (the "Quirk Litigation") on behalf of Quirk Infinity, Inc., as class representative ("Quirk Representative" and together with the Representatives, collectively, the "Class Representatives") of a putative class ("Quirk Class"), in the United States District Court for the District of Massachusetts.  A motion of the Class Representatives to consolidate and transfer venue of this action was filed with the Panel for Multi District Litigation ("MDL") on January 29, 2009.  On February 26, 2009, the Quirk Representative joined the Class-Trustee Agreement.  A hearing on the motion before the MDL Panel was held on March 26, 2009, and decision was reserved.  On April 15, 2009, the MDL Panel directed that the Class Litigation and the Quirk Litigation proceed in the Class Action Court on a consolidated basis.

Cordell,[28] Robin Rodriquez, Jorden Burt LLP, Kutak Rock, LLP, Joseph O. Kavan, Foley & Lardner, LLP, Stephen I. Burr, and Silicon Valley Law Group

The Chapter 11 Trustee, through counsel, engaged in negotiations with the Class Action Representatives, through Class Counsel, regarding the relative benefits of jointly pursuing litigation and settlement negotiations. On January 20, 2009, the Trustee and the Class Representatives entered into an agreement concerning the prosecution of claims by the Trustee and the Class Representatives (as amended, the "Class Action Agreement"), which should be consulted for a full description of all of its terms. The Class Action Agreement was approved by Order of the Bankruptcy Court dated May 18, 2009. In essence, it provides for the Chapter 11 Trustee and the Class Representatives, through their respective counsel, to work together with respect to recoveries from the various claims and causes of action asserted by the Estates and by the Class Representatives, to allocate recoveries between the Class Action and the Estates, to set a method of establishing attorneys' fees, and to provide for the approval of the Plan Funding Party Settlement Agreements by both the Class Action Court and the Bankruptcy Court, and the issuance by the Class Action Court of an order barring and releasing all claims of Exchangers against the Plan Funding Parties. Schedule A to the Class Action Agreement lists 15 parties (collectively, the "Schedule A Parties"). With respect to Schedule A Parties 1-12, consisting of twelve of the Plan Funding Parties, Class Counsel and the Class Representatives have already reviewed and approved as in the best interests of the Putative Class the terms of settlements that the Chapter 11 Trustee is considering and will review the remaining terms of such settlements as they are reached. With respect to Schedule A Party number 13, JPS Capital Partners, the Chapter 11 Trustee has reached a settlement which the Class Representatives have approved. That settlement is described in subsection D(1) below. The Estates have commenced an action against Schedule A Party number 15, WH Hialeah Investors V, LLC pursuant to the Class Action Agreement.

Any recovery obtained from the settlement or litigation of claims against a Schedule A Party (other than Boulder) will be allocated to the Estates, unless Class Counsel and GEABP agree that a portion of the proceeds of such recoveries should be allocated to the Class to facilitate approval of the settlement and to payment of Class Counsel's fees and costs in processing the settlement and obtaining approval from the Class Action Court.

With respect to Wachovia, one of the Plan Funding Parties, 60% of the settlement with Wachovia will be allocated to the Estates, and 40% of the settlement with Wachovia will be allocated to the Class. With respect to the claims of the Chapter 11 Trustee and/or the Class against Boulder (the "Boulder Claims") or Lockton (the "Lockton Claims"), any and all recoveries obtained on behalf of the Estates or the Class shall be allocated (i) with respect to any Boulder Claims, 60 percent to the Estates and 40 percent to the Class; and (ii) with respect to any Lockton Claims, 40 percent to the Estates and 60 percent to the Class, without regard to the source of such recovery and without regard to the particular claim in connection with which the recovery or any portion of it was obtained. With respect to claims (i) against other banks which held Exchange Deposits of the 1031 Debtors, and (ii) against other professionals retained by 1031 Debtors (except for post-Petition Date professionals) and family members and relatives of

---

[28] The Estates have already settled their claims against Cordell and Robin Rodriquez; accordingly those parties are not included in the Class Action Agreement.

Okun (collectively, "Other Claims") recoveries will be shared based on the same terms and conditions as pertain to the Boulder Claims and Lockton Claims, except that the sharing percentage will be 50/50 with respect to any Other Claims. The parties, before commencing any settlement discussions or litigation with any parties not covered by the Class Action Agreement, shall endeavor to agree on terms of coordination and cooperation that will mutually benefit the Estates and the Putative Class and an appropriate allocation of any recoveries as between the Estates and the Putative Class.

With respect to recoveries resulting from Wachovia, the Boulder Claims, Lockton Claims, or Other Claims, Class Counsel will not seek, and will not accept, a fee that results in a payment, not including reimbursement of reasonable expenses, of an amount which exceeds the lesser of (i) its reasonable hourly fee multiplied by the reasonable hours worked on such claims, multiplied by a factor of 1.7, and (ii) 25% of the recovery allocated to the Class. With respect to recoveries based on claims against the Schedule A Parties, Class Counsel will not seek, and will not accept, a fee that results in a payment, after reimbursement of reasonable expenses, of an amount which exceeds its reasonable hourly fee multiplied by the reasonable hours worked in connection with such matters, including obtaining approval from the Class Action Court of any settlement of such claims.

The Chapter 11 Trustee or the Liquidation Trustee, as applicable, will be engaged by the Class Representative to make the distributions to the Class members in the Class Action; the Chapter 11 Trustee's role or the Liquidation Trustee's role, as applicable, in this context is limited to distribution agent for the Class. It should be noted that holders of Allowed Class 3 General Unsecured Claims are not identical to the members of the Class Action, and the fact that a Creditor holds an Allowed Class 3 General Unsecured Claim does not mean that such holder is automatically a member of the Class Action. Any questions or disputes with regard to membership in the Class Action should be brought to the attention of Class Counsel. If any such questions or disputes cannot be resolved consensually, they will be resolved by the Class Action Court.

The Class Representatives and the Chapter 11 Trustee agreed to cooperate, whether in settlement or litigation, for the purpose of achieving the largest overall recovery and reducing duplicative effort and expenses, by conducting joint settlement discussions, coordinating discovery, and conducting joint depositions where authorized.

## C. **Plan Funding Party Settlement Agreements**

The following description of the Plan Funding Party Settlement Agreements is subject in all respects to the specific terms of the respective settlement agreements.

The Class Representatives have sought preliminary approval of the E&O Settlement Agreement, the Former Owner Plan Funding Agreements, the Crime Coverage Settlements with CNA, Federal, and Twin City, the KPKB Settlement Agreement, the Rosen Settlement Agreement, and the Wachovia Settlement Agreement.

1. **Settlements with E&O Carriers and Former Owners**

    (a) **Overview of Potential Disputes Among Chapter 11 Trustee, E&O Carriers and Former Owners**

As set forth in more detail below, the Chapter 11 Trustee has entered into settlement agreements with certain underwriters at Lloyds of London (collectively, "Lloyd's") which are the carriers of the E&O Policies (as defined below) (the "E&O Settlement Agreements") and with several of the Former Owners of AEC, NES, IXG, REES, SOS and 1031 Advance (the "Former Owner Plan Funding Agreements").

The Chapter 11 Trustee's investigation of the affairs of the 1031 Debtors includes potential claims against the Former Owners of AEC, NES, SOS, IXG and 1031 Advance, and the related issue of the 1031 Debtors' claims and rights under the E&O Policies. With respect to the Former Owners, among other things, the Chapter 11 Trustee has investigated the following potential claims: (1) fraudulent transfers arising from receiving excessive consideration for the sale of the QI business; (2) breach of fiduciary or other duties, owed by the Former Owners to the 1031 Debtors; and (3) misrepresentations concerning policies or practices of the 1031 Debtors or failure to follow those practices (collectively, the "Trustee's Former Owner Claims").

Summarized below are actions commenced against the Former Owners who are also defendants in the Class Action, and related actions.

On November 14, 2007, Sergio S. Alvarez and others filed a lawsuit ("Alvarez Matter") against the McCabe Group and others in the State Court in Colorado based on allegations regarding the McCabe Group's actions while employed by the 1031 Tax Group. On January 1, 2008, Ward Enterprises, LLC filed a substantially similar lawsuit against the McCabe Group, in the Colorado Court ("Ward Matter"). The Alvarez and Ward Matters have been consolidated into one action in Colorado entitled *Alvarez, et al. v. McCabe, et al.*, Case No. 07-CV-11495. On or about September 12, 2008, MSN Properties, LLC and others filed a complaint in the Colorado Court against the McCabe Group, entitled *MSN Properties, LLC, et al. v. McCabe, et al.*, Case No. 2008CV8144 (the "MSN Matter"), making allegations similar to those contained in the Alvarez Matter. The Alvarez and MSN Matters have been stayed by agreement among the parties pursuant to settlements that the Chapter 11 Trustee negotiated with the Alvarez and MSN plaintiffs.[29] If those settlements are approved by the Bankruptcy Court and the Plan is consummated, those actions will be withdrawn. The Chapter 11 Trustee has entered into a settlement agreement (the "Enterprises Settlement") with Ward Enterprises, LLC ("Enterprises") dated on or about March 5, 2009. The Enterprises Settlement provides, *inter alia*, that Enterprises shall dismiss the Enterprises Matter with prejudice.

On or about December 2, 2008, Lee Kucera and Jiri Kucera filed an action in the Superior Court for the State of California (County of Santa Clara) against Janet Dashiell ("Dashiell") and others, captioned *Kucera, et al. v. Schwerin, et al.*, Case No. 108CV129051, asserting causes of action against Dashiell arising out of her involvement with 1031 Advance.

---

[29] By Order of the Bankruptcy Court dated, June 23, 2009 the settlements with the Alvarez and MSN plaintiffs were approved.

The Former Owners, including those named as defendants in the cases described above, have generally asserted that there is no merit to the claims asserted against them in these cases, in the Class Action Litigation, or in the Trustee's Former Owner Claims, and are prepared to defend against such claims. Some of the Former Owners claim that they are owed money with respect to employment agreements between them and the 1031 Debtors, and/or that they are owed substantial portions of the purchase price promised them for the sale of their QI businesses to the 1031 Debtors.

     (b)     **E&O Insurance Policies**

Several of the 1031 Debtors had Errors and Omissions insurance policies (the "E&O Policies"), and under these policies, both the 1031 Debtors and certain of the 1031 Debtors' employees and officers, including the Former Owners assert that they are insureds. Thus, the Former Owners assert that they are entitled to, among other things, payment of attorneys' fees incurred in defending against claims brought by either the Chapter 11 Trustee, the Class Action or any of the Exchangers, plus payments if found liable on such claims. The E&O Policies apply to one or both of two policy years, July 2005 to July 2006, and July 2006 to July 2007. Set forth below is a general description of the E&O Policies, but the language of the E&O Policies control, and this description is not intended to be a statement of the Chapter 11 Trustee's contentions as to the E&O Policies in the event any issues thereunder are ever litigated. The E&O Policies provide coverage for certain entities and persons (the "Insureds") for claims made against them for wrongful acts, which are generally defined as negligence, but exclude intentional acts. The Insureds are defined as various officers, directors, and employees, *and* the covered 1031 Debtor entity, which is a defined Insured.

The total coverage limits for the five E&O Policies is $5.5 million, as follows: (1) for NES and related 1031 Debtors, $1,000,000; (2) for SOS and related 1031 Debtors, $1,000,000; (3) for IXG, $500,000; (4) for REES, $1,000,000; and (5) for AEC and related 1031 Debtors, $2,000,000.[30]

Most of the Former Owners have filed claims for payment (the "Former Owner Coverage Claims") under one or more of the E&O Policies on the grounds that the cases against them and/or the Trustee's Former Owner Claims are based at least in part on alleged acts which would be covered under the E&O Policies. The Chapter 11 Trustee has objected to the Former Owner Coverage Claims and has asserted that as assets of the Estates, any payments under these Policies are subject to the automatic stay provisions of the Bankruptcy Code. Lloyd's has not yet taken a

---

[30] There are issues concerning ownership of the NES E&O Policy. As further described below, on June 22, 2006, National Intermediary, Ltd. ("NIL") sold NES to 1031 Tax Group, and NIL did not continue in the 1031 Exchange QI business in any way affiliated with the 1031 Debtors. NIL contends that it retained ownership of NES's policy, and the Chapter 11 Trustee contends that this policy still provides coverage to NES for wrongful acts. Similar issues relate to AEC. As further described below, on August 25, 2005, AEC Massachusetts sold certain assets to AEC, one of the 1031 Debtors, and did not continue in the 1031 Exchange QI business in any way affiliated with the 1031 Debtors. AEC Massachusetts contends that it retained ownership of the AEC E&O Policy, and the Chapter 11 Trustee contends that this policy still provides certain coverage to AEC for wrongful acts. The Chapter 11 Trustee contends that the losses asserted in the Exchangers' claims against the Estates are covered under the E&O Policies for the benefit of the Estates, and the Estates have filed with the Insurers claims for such coverage, up to the policy limits.

position regarding coverage under the E&O Policies, except to reserve all rights, and to date has not paid any of the Coverage Claims.

(c)      **Former Owners**

AEC.  On or about August 25, 2005, Atlantic Exchange Company, LLC ("AEC Massachusetts") sold substantially all of its assets (including subsidiaries) to AEC, in consideration of a payment of $4,250,000.  Hazel and Dowdall owned 25% and 65% interests in AEC Massachusetts, respectively.  The remaining 10% was owned by Subrt and Livesey (5% each).  Hazel and Dowdall represent that they are each a Managing Member of AEC Massachusetts.  Contemporaneous with the closing, Hazel and Dowdall executed Consulting Agreements with AEC, and Hazel, Dowdall, and Subrt continued to work for AEC, but Livesey did not.  Hazel and Dowdall remained employed by AEC through September 28, 2005.  Subrt remained employed there through March 2007.

NEC.  Prior to June 22, 2006, NIL directly or indirectly owned 100% of certain subsidiaries engaged in the 1031 Exchange business, including 1031 Debtors National Exchange Services, QI, Ltd. and NES.  Bennett and Reagan Davis were the managers of these businesses, and were limited partners in NIL.  On or about June 22, 2006, NIL sold substantially all of its assets to the 1031 Tax Group in consideration of a payment of $5,000,000, of which Bennett Davis received $1,471,625.  Following the closing, only Bennett and Davis continued to work for the 1031 Debtors; none of the other limited partners in NIL worked for the 1031 Debtors following the closing.

IXG.  On or about August 4, 2006, the McCabe Group sold the IXG QI business to the 1031 Tax Group, in consideration of a payment of $9,000,000, of which $7,000,000 was paid at closing, with an additional $2,000,000 to be paid thereafter, but which was not paid.  Following the closing, the McCabe Group became employees of the 1031 Tax Group.

REES. Prior to June 9, 2006, the Shefmans owned the REES QI business.  On or about June 9, 2006, the Shefmans sold the REES business to the 1031 Tax Group in consideration of $4,250,000, of which $3,000,000 was paid at closing, with an additional $1,250,000 to be paid thereafter, but which was not paid.  Following the closing, the Shefmans remained as employees of the 1031 Tax Group.

SOS.  On or about November 15, 2005, Pajonas and Regal Holdings, LLC sold SOS to the 1031 Tax Group in consideration of a payment of $3,000,000, which amount was paid at closing.  Pajonas received $2,400,000 and Regal received $600,000 of the purchase price, and Pajonas became an employee and officer of the 1031 Tax Group.

1031 Advance.  On or about December 18, 2006, Allred and Dashiell sold the 1031 Advance business to the 1031 Tax Group in consideration of a payment of $2,500,000, which amount was paid at closing.  Dashiell and Allred each received $1,250,000 of the purchase price. Dashiell and Allred became employees of the 1031 Tax Group.

**(d)**       **The E&O Settlement Agreement**

The E&O Settlement Agreement settles all claims under the E&O Policies by selling these policies back to the E&O Carriers in exchange for the payment of $4.6 million ("E&O Settlement Amount"). As a condition of paying the E&O Settlement Amount, the Chapter 11 Trustee must obtain an order of the Bankruptcy Court protecting the Insurers against any claims against the E&O Policies by any other party, and channeling any such claims into the Bankruptcy Court against a reserve fund of $250,000, to cover all claims of non-debtor Insureds under the E&O Policies. **As a result, any person or entity, including any former employers or officers of any of the 1031 Debtors, who asserts any claim under any of the E&O Policies will only be able to assert such claim against the $250,000 reserve fund.**

**(e)**       **The Former Owner Plan Funding Agreements**

The Chapter 11 Trustee has engaged in extensive negotiations with the Former Owners resulting in the Former Owner Plan Funding Agreements (each of which is a Plan Funding Party Settlement Agreement), as described below. The financial terms of the Former Owner Plan Funding Agreements are as follows:

     (i)       Hazel, Dowdall, Subrt and Livesey (AEC): $107,500;

     (ii)       Bennett (NEC): $400,000;

     (iii)       McCabe Group (IXG): $1.2 million

     (iv)       Pajonas (SOS): $200,000; $20,000 paid immediately and the balance payable over three years, without interest;

     (v)       Shefmans (REES): $10,000; and

     (vi)       Allred and Dashiell (1031 Advance): Allred: $250,000; Dashiell: $75,000.

In addition to these financial terms, the Former Owner Plan Funding Agreements provide as follows:

     (i)       The assignment to the Chapter 11 Trustee of all rights and claims to and under the relevant E&O Policy, as well as all claims under all E&O Policies;

     (ii)       Exchange of Releases;

     (iii)       Each settling Former Owner is barred from asserting any contribution or indemnity claims against third parties for amounts paid to the Chapter 11 Trustee, and non-settling third parties are barred from any contribution or indemnity claims against any settling Former Owner, but these third parties obtain pro rata reduction of the Chapter 11 Trustee's claims against them, if any;

(iv)    The Chapter 11 Trustee must obtain an order from the Class Action Court or the Bankruptcy Court barring all Exchanger claims against the settling Former Owner; and

(v)     Settling Former Owners waive all claims against the Estates, which are believed to aggregate approximately $4.4 million.

## 2.      1031 Debtors' Crime Coverage and Settlements

The 1031 Debtors are variously insured under commercial crime policies issued by Continental Casualty Company ("CNA") and Federal Insurance Company ("Federal") for two consecutive annual policy periods commencing on August 15, 2005, and by Twin City Fire Insurance Company ("Twin City") for the policy period from February 21, 2007, through August 15, 2007.  The commercial crime policies generally cover the 1031 Debtors for direct losses of covered property resulting from "Employee Theft" or "Employee Dishonesty," as those terms are defined in the policies.

The insurers dispute the amount and application of the limits of liability contained in the policies.  They contend that the maximum amount of coverage potentially available for the thefts at issue is the amount of the per-occurrence or per-loss limits of the potentially applicable policies.  In addition, the insurers have raised various defenses to coverage or other issues that they contend negate or at least significantly limit any coverage obligations they might have.  Twin City has filed a motion for relief from the automatic stay to permit it to file a complaint seeking to rescind its policy.  In the event of coverage litigation, the insurers likely would vigorously press these and other alleged defenses and issues.

Although the Chapter 11 Trustee strongly disagrees with the insurers' positions, defenses, and other issues described above, litigating the coverage claims would involve significant litigation risk, expense and delay.  Accordingly, the Chapter 11 Trustee expended considerable efforts to explore whether it would be possible to reach reasonable settlements of the coverage claims.  Following extended negotiations, the Chapter 11 Trustee has entered into agreements to settle with each of the insurers, subject to Bankruptcy Court and Class Action Court approval, as described below.

The agreements provide for the insurers to pay a collective amount of $23,250,000 to the Chapter 11 Trustee for the benefit of the Estates, subject to certain specified contingencies.  The contingencies, which must occur before the settlement proceeds are released to the Estates, include that there are orders of the Bankruptcy Court that have become final orders approving the settlements; that there are orders of the Bankruptcy Court that have become Final Orders barring claims for contribution or indemnification against the insurers by non-settling defendants in the Class Action or any action brought by the Trustee; and that there are orders of the Class Action Court that have become Final Orders incorporating, among other things, a complete release of all claims by each of the Exchangers and barring and enjoining every Exchanger from prosecuting any claims against the insurers.  The latter two contingencies may in effect be waived by the insurers.  In certain circumstances (including the non-occurrence of the latter two contingencies), either or both parties to each settlement may declare it null and void.  The

agreements provide for broad releases of claims as between the Chapter 11 Trustee, on behalf of the Estates, and the insurers, and related covenants not to sue or assign released claims.

### 3.    Settlement with KPKB

The Chapter 11 Trustee has entered into a settlement agreement ("KPKB Settlement Agreement") with Kluger Peretz Kaplan & Berlin, PL ("KPKB"), which previously represented Okun, one or more of the Debtors or their affiliates, and other Okun Entities (the "Legal Services"). At various times, KPKB submitted bills ("Bills") for the Legal Services. KPKB contends that it is owed no less than $1.9 million in connection with the Bills already submitted plus an additional sum for unbilled Legal Services. KPKB has advised the Chapter 11 Trustee that approximately $1,600,000 of the Bills are attributable to Legal Services rendered on behalf of the IPofA Debtors and the Okun Entities.

In May 2007, Okun granted KPKB a mortgage on real estate owned by him, directly or indirectly, at 12 Christian Cove Road, Tuftonboro, NH to secure legal fees owed to KPKB by himself, the Debtors and the Okun Entities. Pursuant to Stipulation between the Chapter 11 Trustee and KPKB dated as of November 19, 2007, which was approved by Order of the Bankruptcy Court dated December 7, 2007, that real estate was sold and the proceeds in the amount of approximately $1,630,000 (the "Christian Cove Escrow") were placed into escrow pending resolution of the disputes between the Estates and KPKB.

The Chapter 11 Trustee and his counsel have been conducting an investigation of any potential claims that the Debtors could assert against KPKB ("Potential KPKB Claims'). In this respect, KPKB has advised the Chapter 11 Trustee that: (i) it did not prepare or produce any materials which were intended to be disseminated to investors or Exchangers, nor did it have direct communications with investors or Exchangers prior to their investments or exchanges, and (ii) there were no intended third party beneficiaries of the Legal Services. KPKB asserts that it has valid defenses to any potential claims that the Chapter 11 Trustee and Creditors of the 1031 Debtors or the Okun Entities may assert against it.

KPKB has represented that certain insurance carriers issued certain policies (the "KPKB Policies") to KPKB as follows: (1) an insurance policy with policy limits of $5,000,000; and (2) an excess insurance policy with policy limits of $5,000,000, which KPKB represents are the full limits of coverage under these Policies and the total amount of insurance available to KPKB in connection with any potential claims of the 1031 Debtors or other Okun Entities against it. These are wasting policies and KPKB would thus be entitled to use the policies to defend against the potential claims, and there is a risk of exhaustion of the KPKB Policies.

Under the KPKB Settlement Agreement, KPKB has agreed to pay:

(i)     a total of $10,000,000 from the two KPKB Policies, without deduction for any fees or expenses incurred by KPKB in its defense;

(ii)    $750,000 as follows:  $250,000 within 10 days of the execution of the Agreement (which sum has been received); $250,000 within five days of obtaining certain court orders of approval; and $250,000 nine months after the second payment; and

       (iii)     release of the Christian Cove Escrow to the Estates and release of all claims for payment for Legal Services.

The KPKB Settlement Agreement is otherwise generally similar to the Former Owner Plan Funding Agreements in that in order for the KPKB Settlement Agreement to become effective, it must receive either a Bankruptcy Court injunction or a Class Action bar order. In addition, the agreement provides for the parties to exchange releases, including releases of KPKB by all of the Okun Entities.

## 4. Settlement with Michael Rosen

The Chapter 11 Trustee has entered into a settlement agreement (the "Rosen Settlement Agreement") with Michael J. Rosen and Michael J. Rosen P.A. (collectively, "Rosen"), former counsel to Okun and, according to the Chapter 11 Trustee, former counsel to one or more of the 1031 Debtors and other Okun Entities. Rosen contends that it is owed in excess of $400,000 for legal services rendered, repayment of which is secured by a junior mortgage on the NH Property (defined below). Rosen has represented that a certain insurance carrier has issued a policy to it with a policy limit of $1 million, which is a "wasting policy" in that defense costs incurred in litigation would diminish, and potentially exhaust, the policy.

Under the Rosen Settlement Agreement, the sum of $925,000 shall be paid to the Estates from the policy. The Rosen Settlement Agreement is otherwise generally similar to the Former Owner Plan Funding Agreements in that in order for the Rosen Settlement Agreement to become effective, it must receive either a Bankruptcy Court injunction or a Class Action bar order. In addition, the Rosen Settlement Agreement provides for the parties to exchange releases, including releases of Rosen by all of the Okun Entities.

## 5. Settlement with Wachovia

As of May 28, 2009, the Chapter 11 Trustee entered into a Settlement and Release Agreement (the "Wachovia Settlement Agreement") with the Class Representatives and Wachovia Bank, National Association and certain of its affiliates (collectively "Wachovia"). The settlement provides, among other things, for the payment by Wachovia of $45 million ("Settlement Amount") in full settlement of all claims asserted by the Trustee and both plaintiff classes and the exchange of mutual releases, as summarized below.

On October 3, 2008, the Chapter 11 Trustee brought an adversary proceeding against Wachovia[31] ("Adversary Proceeding"), seeking to recover damages of no less than $140 million, as well as equitable relief. In summary, the Chapter 11 Trustee alleged that Wachovia, (i) assisted the Okun Parties in misappropriating funds of the 1031 Debtors and that, as a result of such conduct, Wachovia was liable to the 1031 Debtors for aiding and abetting breach of fiduciary duties by the Okun Parties and others; and (ii) received various fraudulent transfers of assets of the 1031 Debtors, including (x) funds misappropriated from the 1031 Debtors and paid to Wachovia in repayment of loans made to third parties, and (y) liens obtained by Wachovia,

---

[31] Adv. No. 08-01604 (MG).

and proceeds received by Wachovia in connection with such liens, on assets that were acquired in whole or in part with funds misappropriated from the 1031 Debtors. The Chapter 11 Trustee asserted equitable interests (constructive trust and equitable liens) in assets acquired in whole or in part with funds misappropriated from the 1031 Debtors. Wachovia vigorously denies all such allegations.

The Wachovia Settlement Agreement provides for the payment by Wachovia of the $45 million Settlement Amount into escrow within 21 days after the Agreement is signed. Ten days after the "Payment Release Date," the Settlement Amount will be released to the Trustee for the benefit of the 1031 Debtors' Estates and the Class, pursuant to the Class-Trustee Agreement. The "Payment Release Date" will occur seven business days after (i) an order in agreed form approving the Wachovia Settlement Agreement has become a Final Order ("Approval Order"), and (ii) (a) an order of the Bankruptcy Court permanently barring, enjoining and restraining all Exchangers and other creditors of the 1031 Debtors from prosecuting any Claims against Wachovia ("Bankruptcy Court Protection Order") and/or (b) an order of the Class Action Court releasing Wachovia from all liability to Exchangers, barring and enjoining all Exchangers from prosecuting any Claims against Wachovia, and containing a contribution bar and judgment reduction provision in agreed form ("Class Action Bar Order"), has become a Final Order.

The Wachovia Settlement Agreement will become null and void 20 days after the entry of a Final Order refusing to enter the Approval Order, or by notice from the Chapter 11 Trustee to Wachovia or from Wachovia to the Chapter 11 Trustee if the Approval Order, and either the Bankruptcy Court Protection Order or the Class Action Bar Order, have not been entered within one year after the Wachovia Settlement Agreement is signed.

### D. Other Pending and Potential Litigation Claims and Settlements

#### 1. JPS

On September 5, 2008, the Chapter 11 Trustee filed a complaint, which was amended on November 14, 2008, against JPS NH, LLC and NH Aaron Road, LLC, as trustee for the Edward H. Okun Amended and Restated Revocable Trust (the "Okun Trust"), Newton Bayard Limited Partnership ("Newton Bayard") and Michael Rosen, P.A. (collectively, the "JPS Defendants") seeking damages and the imposition of a constructive trust and equitable lien on two parcels of residential real property, located, respectively, at 39 and 49 Aaron Road, Wolfeboro, New Hampshire (the "NH Property"). The Amended Complaint alleges, among other things, that the NH Property was purchased using at least $5.1 million of funds misappropriated from the 1031 Debtors. The Okun Trust is the current owner of the NH Property. The Defendants assert mortgage or other interests in the NH Property based on post-petition transactions with Okun including, but not limited to, purported loans and loan commitments made to Okun and the Okun Trust. The Chapter 11 Trustee has asserted claims against the JPS Defendants for unjust enrichment, equitable lien, and fraudulent conveyance under the Bankruptcy Code and state law, and for a declaratory judgment that the interest of the 1031 Debtors in the NH Property is superior to and has priority over the interests of the Defendants.

The Chapter 11 Trustee settled the Estates' claims against the JPS Defendants pursuant to a settlement agreement dated May 26, 2009 (the "JPS Settlement"), which was approved by the

Order dated June 23, 2009. The JPS Settlement provides that the net proceeds from the sale of the NH Property (net of sale expenses and certain Wachovia indebtedness) shall be divided 56% to the Estates, 38% to the JPS Defendants and 6% to Newton Bayard. To implement the foregoing, a second and third mortgage on the NH Property was assigned to the Estates, and all of the pending litigation, including a certain adversary proceeding and a Newton Bayard action, are being dismissed. The Estates shall pay the sum of $60,000 to Newton Bayard, in satisfaction of its asserted substantial contribution claim arising from the legal fees incurred by it in commencing a case in New Hampshire state court, seeking to enjoin a foreclosure on the NH Property, and in obtaining an adjournment of such foreclosure. Of this amount, $40,000 has been paid and $20,000 will be paid at Plan confirmation.

## 2. Boulder Capital

On March 20, 2009 the Chapter 11 Trustee filed a complaint against Boulder Capital LLC and several affiliates (Boulder Columbus LLC, Boulder West Oaks LLC, Boulder Holdings VI, LLC and Boulder Holdings X, LLC) (collectively, "Boulder") seeking to recover damages in an amount no less than $40 million under fraudulent conveyance and other theories, as well as equitable relief. On April 22, 2009, the Chapter 11 Trustee filed an amended complaint against Boulder, which included Roy S. MacDowell, Jr. ("MacDowell") as a defendant and including a claim for aiding and abetting breach of fiduciary duty seeking damages in an amount not less than $150 million. Boulder and MacDowell filed their answer to the amended complaint on June 12, 2009.

## 3. Hialeah

On February 19, 2009, the Chapter 11 Trustee commenced a fraudulent conveyance action against WH Hialeah Investors V, LLC ("Hialeah") to recover approximately $4.1 million of funds that were misappropriated from the 1031 Debtors in 2007 and used by an IPofA Entity as an earnest money deposit and rental payment in connection with the potential acquisition of a warehouse property located in Hialeah, Florida. The property was not acquired, and the potential seller, Hialeah, retained the funds. Hialeah filed its answer to the complaint on April 27, 2009.

## 4. Citibank

In May of 2009, the Chapter 11 Trustee filed a complaint ("Citibank Complaint") asserting a claim for aiding and abetting breach of fiduciary duty against Citibank, N.A. ("Citibank"), and seeks to recover the damages which the 1031 Debtors suffered as a result of Citibank's alleged knowing facilitation of the taking of hundreds of millions of dollars of funds from the 1031 Debtors. The complaint alleges that, through the knowledge gained from its relationships with the 1031 Debtors and their principals, Citibank knew, as early as March, 2005, but no later than September 28, 2006, that Okun was taking funds from the 1031 Debtors in violation of his fiduciary duties, but nevertheless, continued to carry on business as usual with the Okun Parties, assisting them and others in their misconduct. The complaint seeks damages in an amount no less than $150 million. On July 2, 2009, Citibank moved to (i) dismiss the Citibank Complaint; and (ii) withdraw the reference to the Bankruptcy Court and transfer the action to the Class Action Court. On July 7, 2009, Citibank also filed a motion with the Joint Panel on Multidistrict Litigation to designate the Chapter 11 Trustee's action against Citibank as a tag-along action and to transfer it to the Class Action Court. The Chapter 11 Trustee has filed

his opposition to each of Citibank's motions. The hearing to consider Citibank's motion to dismiss the Citibank Complaint is currently scheduled for September 10, 2009, and the other motions filed by Citibank are not currently scheduled for hearing.

### 5.     Other Claims and Avoidance Actions

On or about May 13, 2009, the Chapter 11 Trustee commenced approximately 38 avoidance actions against vendors, Exchangers, and former employees of the Debtors and their affiliates. Additionally, the Chapter 11 Trustee has entered into tolling agreements with several former insiders of the Debtors.

On or about May 13, 2009, the Chapter 11 Trustee commenced (i) an action against Okun seeking a judgment in the amount of $150 million; and (ii) an avoidance action against Okun's former wife, Dorothy E. Jones in the amount of $5,950,000.

In addition to the foregoing, the Chapter 11 Trustee has investigated asserting a claim against Lockton. In addition, Class Counsel has investigated asserting claims against Lockton on behalf of the Punitive Class. These claims relate to Lockton's conduct in creating and marketing crime insurance products for the QI industry, including the commercial crime insurance policies discussed above, which are the subject of settlement agreements. These claims, in essence, arise out of alleged misrepresentations made with respect to, among other things, the evidences of insurance issued by Lockton in connection with these policies. Lockton denies any liability. The Chapter 11 Trustee is also investigating potential claims against other financial institutions which transacted business with, and housed deposits made by, the 1031 Debtors.

### 6.     Professional Fees Incurred Prior to the Appointment of the Chapter 11 Trustee

In response to the submission of interim fee applications by the professionals employed in the case prior to the Chapter 11 Trustee's appointment, on May 29, 2008, the United States Trustee and a number of creditors, objected to the final fee applications of Dreier,[32] Huron, Mesirow and Greenberg (collectively, the "Pre-Trustee Professionals").

By Order dated July 1, 2008, the Bankruptcy Court granted reimbursement of disbursements, but did not award compensation to, the Pre-Trustee Professionals and deferred the issue of awards to the Pre-Trustee Professionals to a final fee application hearing to be held at a date which has not yet been set.

The Chapter 11 Trustee is currently investigating and analyzing the potential assertion of objections to the Pre-Trustee Fees, as well as affirmative claims and causes of action against one or more of the Pre-Trustee Professionals. The Chapter 11 Trustee has joined in the United States Trustee's objection to Dreier's fee application, and currently intends to object to the final fee applications of the other Pre-Trustee Professionals. The Chapter 11 Trustee may assert various affirmative claims for relief as against one or more of the Pre-Trustee Professionals. Objections to fees, as well as any claims for affirmative recovery, may include, *inter alia*, malpractice, fraud

---

[32] On or about December 16, 2008, Dreier filed a petition for relief under chapter 11 of the Bankruptcy Code. Sheila Gowan, Esq. has been appointed as chapter 11 trustee in that case.

on the court, breach of loyalty, breach of fiduciary duty, breach of duty of care, aiding and abetting fraud and violations of New York Judiciary Law section 487. The Pre-Trustee Professionals believe that their respective fee applications are meritorious, and that any claims for affirmative recoveries against them have no merit.

The Chapter 11 Trustee has recently entered into settlement agreements with Greenberg and Mesirow pursuant to which, in essence, both firms have agreed to subordinate all fees incurred prior to the appointment of the Trustee (in the aggregate amount of $2,723,000) to all components of all other claims until all such other claims have been paid in full. With respect to fees incurred after the appointment of the Chapter 11 Trustee, Mesirow has agreed to discount such fees by 25%, and Greenberg has reserved its right to seek payment of post-Chapter 11 Trustee fees, and the Chapter 11 Trustee and the Committee reserved the right to object to such request provided, however, that any such opposition shall not be based upon the malpractice and related affirmative claims that the Chapter 11 Trustee had asserted with respect to the Pre-Chapter 11 Trustee fees.

## IX.

## SUMMARY AND DESCRIPTION OF THE PLAN

The following is a summary of certain provisions of the Plan. This summary is qualified in its entirety by reference to the Plan, attached as Exhibit A to this Disclosure Statement.

### A.     Classification of Claims and Interests; General Provisions

1.     **General Rules of Classification**. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim is in a particular Class only to the extent that such Claim is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

2.     **Holder of Claims Entitled to Vote**. Each holder of an Allowed Claim and each holder of a Claim that has been temporarily allowed for voting purposes by order of the Bankruptcy Court under Bankruptcy Rule 3018(a), which Claim is in an Impaired Class of Claims, shall be entitled to vote separately to accept or reject the Plan as provided by the Solicitation Procedures Order. Any Unimpaired Class of Claims shall be deemed to have accepted the Plan.

3.     **Acceptances by Impaired Classes**. An Impaired Class of Claims shall have Accepted the Plan if all of the necessary conditions of the Bankruptcy Code and the Bankruptcy Rules have been satisfied.

4.     **Non-Consensual Confirmation**. To the extent necessary, the Proponents have requested that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code Section 1129(b). Subject to Bankruptcy Code Section 1127, the Proponents reserve the right to

modify the Plan to the extent that confirmation pursuant to Bankruptcy Code Section 1129(b) requires modification, provided such modifications are consistent with Section 13.1 of the Plan.

     **5.**     **Administrative Claims, Priority Tax Claims, and Fee Claims**. Administrative Claims, Priority Tax Claims, and Fee Claims have not been classified and are excluded from the Classes set forth in Article IV of the Plan in accordance with Bankruptcy Code Section 1123(a)(1).

## B.     **Treatment of Unclassified Claims**

     **1.**     **Administrative Claims**.

        **(a)**     **Administrative Claims Bar Date**. To be eligible to receive distributions under the Plan on account of an Administrative Claim that is not otherwise Allowed by the Plan, a proof of Administrative Claim must be filed with the Bankruptcy Court so as to be received (i) with respect to the 1031 Debtors, on or before the Administrative Claims Bar Date, and (ii) with respect to IPofA Shreveport, on or before the IPofA Shreveport Administrative Claims Bar Date or such other date as may be agreed by the Liquidation Trust.

        **(b)**     **Treatment**. Subject to the terms of the Plan, and unless the holder of an Allowed Administrative Claim agrees to receive other less favorable treatment, each holder of an Allowed Administrative Claim shall be paid, by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Administrative Claim in Cash on the date that is the later of (i) the Effective Date, (ii) the date such Claims become Allowed Claims or otherwise become payable under the Plan, and (iii) as soon thereafter as is reasonably practicable.

     **2.**     **Priority Tax Claims**.

        **(a)**     **Treatment**. Subject to the terms of the Plan, and unless the holder of an Allowed Priority Tax Claim agrees to receive other less favorable treatment, each holder of an Allowed Priority Tax Claim shall be paid, by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Priority Tax Claim in Cash on the date that is the later of (i) the Effective Date, (ii) the date such Claims become Allowed Claims or otherwise become payable under the Plan, and (iii) as soon thereafter as is reasonably practicable. Any Claim or demand for penalty relating to any Priority Tax Claim (other than a penalty of the type specified in Bankruptcy Code Section 507(a)(8)(G)) shall be Disallowed, and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Estates, the Liquidation Trust, Reorganized IPofA Shreveport or any of their respective Assets or property.

     **3.**     **Fee Claims**.

        **(a)**     **Fee Claims Bar Date**. All final applications for payment of Fee Claims shall be filed with the Bankruptcy Court and served on or before the Fee Claims Bar Date, or such later date as may be agreed by the Liquidation Trust. The Bankruptcy Court will schedule a hearing on notice on these applications, and all Creditors and parties-in-interest, including the United States Trustee, may object to the allowance and payment of all or any

portion of the Fee Claims. Any holder of a Fee Claim that does not assert such Claim in accordance with Section 3.3 of the Plan shall have its Claim be deemed Disallowed under the Plan and be forever barred from asserting such Claim against any of the Estates, the Liquidation Trust, Reorganized IPofA Shreveport, or any of their Assets or property. Any such Claim shall be Disallowed and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

        **(b)**     **Treatment**. Subject to the terms of the Plan, and unless the holder of an Allowed Fee Claim agrees to receive other less favorable treatment, each holder of an Allowed Fee Claim shall be paid, by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Fee Claim in Cash on the date, or as soon thereafter as is reasonably practicable, that such Claim (i) is Allowed by Final Order or (ii) becomes Allowed after the Effective Date.

    **4.**     **Subordinated Fee Claims.**

        **(a)**     **Treatment**. Subordinated Fee Claims shall only be paid after all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims, Allowed Secured Claims, Allowed Priority Non-Tax Claims, and Allowed General Unsecured Claims are paid in full. Allowed General Unsecured Claims shall be paid in full when all Allowed General Unsecured Claims, including Allowed Excess Exchanger Claims, have been paid in full, including the payment of postpetition interest. The Subordinated Fee Claims are not subordinated to Class 4 Interests.

**C.**     **Designation of Classes of Claims and Equity Interests**

    The classification of Claims and Interests for purposes of the Plan are as follows:

| Class | Claim | Status | Entitled to Vote |
|---|---|---|---|
| Class 1 | Secured Claims | Impaired | Yes |
| Class 2 | Priority Non-Tax Claims | Unimpaired | No |
| Class 3 | General Unsecured Claims | Impaired | Yes |
| Class 4 | Interests | Impaired | No (deemed to reject) |

**D.**     **Treatment of Classified Claims**

    **1.**     **Class 1: Secured Claims.**

        **(a)**     **Classification**. Class 1 will consist of all Secured Claims. CCB is the only member of Class 1.

        **(b)**     **Impairment and Voting**. The Class 1 Claim is Impaired by the Plan and CCB shall be entitled to vote to accept or reject the Plan.

        **(c)**     **Treatment**. Pursuant to the CCB Settlement Agreement, CCB holds an Allowed contingent unliquidated Secured Claim (the "CCB Secured Claim") for the CCB Covered Fees and Expenses, if any, secured by (and capped at) the balance of the funds, in the

original deposit amount of $400,000, held in a segregated bank account at J.P. Morgan Chase Bank (the "CCB Reserve"). The CCB Secured Claim shall be deemed satisfied by either (i) entry of a final, non-appealable Confirmation Order granting the CCB Release; or (ii) maintenance of the CCB Reserve until October 23, 2009 in accordance with the CCB Settlement Agreement.

**2.** **Class 2: Priority Non-Tax Claims.**

**(a)** **Classification**. Class 2 shall consist of Allowed Claims entitled to priority under Bankruptcy Code Sections 507(a)(3), (4), (5), (6) or (7).

**(b)** **Impairment and Voting**. Class 2 Claims are Unimpaired by the Plan and the holders of Allowed Class 2 Claims are deemed to accept the Plan and therefore are not entitled to vote.

**(c)** **Treatment**. Subject to the terms herein and unless the holder of an Allowed Priority Non-Tax Claim agrees to receive other less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall be paid, by the Chapter 11 Trustee or the Liquidation Trust, as applicable, 100% of the unpaid amount of such Allowed Priority Non-Tax Claim in Cash on the date that is the later of (i) the Effective Date, (ii) the date such Claim becomes an Allowed Claim or otherwise becomes payable under the Plan, and (iii) as soon thereafter as is reasonably practicable.

**3.** **Class 3: General Unsecured Claims.**

**(a)** **Classification**. Class 3 will consist of all General Unsecured Claims.

**(b)** **Impairment and Voting**. Holders of Class 3 Claims shall be Impaired and shall be entitled to vote to accept or reject the Plan.

**(c)** **Treatment**. Subject to the terms of the Plan, and unless the holder of an Allowed General Unsecured Claim agrees to receive other less favorable treatment, each holder of an Allowed General Unsecured Claim shall be entitled to receive: (A) Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 3, other than those Excess Exchanger Claims covered by clause (B) immediately below (which percentage shall be adjusted upon the allowance of any Disputed Claim in Class 3, other than Disputed Excess Exchanger Claims, as defined below), and with the further understanding that, in the case of any Exchanger Claim, such Allowed Claim in respect thereof covered by this clause (A) shall be limited to the sum of the Exchange Amount thereof plus such Exchange Agreement Contractual Interest that shall have accrued on such Exchange Amount up to the Petition Date (the "Basic Exchanger Claims", and such Trust Beneficial Interests being herein called the "First Tranche Beneficial Interests"); (B) additional Trust Beneficial Interests in respect of Allowed Claims in Class 3 which are Exchanger Claims corresponding in each case only to the portion thereof that is in excess of the Basic Exchanger Claim of the applicable Exchanger (for example, damage claims of Exchangers for consequential, compensatory, punitive, treble, exemplary, multiple or other damages other than Basic Exchanger Claims) (the "Excess Exchanger Claims"), in a percentage Ratable to other holders of Excess Exchanger Claims (which percentage shall be adjusted upon the allowance of any Disputed Excess Exchanger Claims) (such additional Trust

Beneficial Interests being herein called the "Second Tranche Beneficial Interests"); and (C) all proceeds attributable thereto distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement. A schedule of all Basic Exchanger Claims showing the amount of each Basic Exchanger Claim is attached to the Plan as Schedule 1. Holders of Allowed General Unsecured Claims shall be paid postpetition interest on all Allowed General Unsecured Claims, after payment of Allowed Excess Exchanger Claims but prior to any distribution to or payment of Subordinated Fee Claims or Class 4 Interests.

In calculating the Ratable percentages for distributions to Settling Exchangers in respect of their respective Trust Beneficial Interests, the Liquidation Trust shall take into account the applicable provisions of the Settling Exchangers Settlement Agreement, including, without limitation, Section 8 thereof.

In calculating distributions and Ratable percentages for distribution in respect of their Trust Beneficial Interests to holders of Allowed Exchanger Claims, unless the holder of such Claim agrees to receive other less favorable treatment, the Liquidation Trust shall apply the following payment scheme, wherein payments in respect of such Allowed Exchanger Claims shall be made as follows:

(i) first, on account of Allowed Basic Exchanger Claims (subject to and after the allocation to the Disputed Claims Reserve for all Disputed Claims which if Allowed would constitute Basic Exchanger Claims), Ratably among the holders thereof until payment in full of the aggregate amount of all Allowed Basic Exchanger Claims; and

(ii) second, subject to and only after the payment in full of all Allowed Basic Exchanger Claims and the allocation to the Disputed Claims Reserve for all Disputed Claims, on account of all Allowed Excess Exchanger Claims, Ratably among the holders thereof.

4. **Class 4: Interests**.

(a) **Classification**. Class 4 will consist of all Interests in the Debtors. Class 4 is impaired by the Plan.

(b) **Impairment and Voting**. Holders of Interests in Class 4 are deemed to have rejected the Plan and thus, solicitation of acceptances of the Plan with respect to holders of Interests in this Class is not required.

(c) **Treatment**. Holders of Interests shall neither receive nor retain any property under the Plan.

E. **Conditions to Confirmation and Effective Date**

1. **Conditions to Confirmation**. The following conditions are conditions precedent to Confirmation of the Plan, except to the extent waived in whole or in part by the Proponents:

(a) The Confirmation Order shall be substantially in the form as proposed by the Proponents;

(b)     The Confirmation Date of the Plan shall have occurred on or before February 1, 2010; and

(c)     Such of the Plan Funding Party Settlement Agreements as the Proponents deem necessary to the Plan shall have been approved by Final Order(s) in accordance with the respective terms thereof.

**2.     Conditions to Effective Date**.  The Proponents reserve the right to request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry and shall be a Final Order.  Notwithstanding the foregoing, the Plan may not be consummated, and the Effective Date shall not occur, unless and until each of the conditions set forth below is satisfied, to the extent not waived in whole or in part by the Proponents:

(a)     The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Proponents and such Confirmation Order shall not be the subject of any stay;

(b)     The Liquidation Trust Agreement shall have been approved and executed in form and substance satisfactory to the Proponents;

(c)     The Assets (other than the Effective Date Administrative and Priority Claims Cash) and Estate Causes of Action shall have been transferred to the Liquidation Trust;

(d)     The Mineral Servitude shall have vested in Reorganized IPofA Shreveport;

(e)     The Liquidation Trustee shall have been appointed in accordance with the Plan and the Liquidation Trust Agreement;

(f)     Such of the Plan Funding Party Settlement Agreements as the Proponents deem necessary to the Plan shall have been approved by Final Order(s) in accordance with the respective terms thereof;

(g)     All statutory fees and amounts then due and payable to the United States Trustee shall have been paid in full;

(h)     Such documents as the Proponents shall deem necessary to the consummation of the Plan shall be executed, delivered, or filed pursuant to the Plan, as the case may be; and

(i)     Such actions, authorizations, filings, consents and regulatory approvals (if any) as the Proponents shall deem necessary to the consummation of the Plan shall have been obtained, effected or executed in a manner acceptable to the Proponents, and shall then remain in effect in full force and effect.

**3.     Waiver of Conditions**.  The waiver of any condition set forth in the Plan may be made by the Proponents, in their sole and absolute discretion, in consultation with the Committee and in accordance with the Plan, without further notice or order of the Bankruptcy Court.

### F. Means for Implementation

**1. Substantive Consolidation**. On the Effective Date, the Estates will be substantively consolidated for all purposes related to the Plan. For the avoidance of any doubt, IPofA Shreveport will be substantively consolidated with all of the 1031 Debtors.

(a) The substantive consolidation of the Estates will have the following effects: (i) all assets and liabilities of the Estates shall be treated as though they were merged for purposes of distribution; (ii) all pre-petition and post-petition Claims held by a Debtor against any other Debtor, including cross-corporate guarantees of the Debtors shall be eliminated; (iii) all Claims based upon guarantees of collection, payment or performance made by one or more Debtors as to the obligations of another Debtor or of any other Entity or Person shall be discharged, released and of no further force or effect; (iv) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be one obligation of the Estates; (v) any Claims filed or to be filed in connection with any such obligation and such guarantees shall be deemed one Claim against the Estates; and (vi) each and every Claim filed in the individual Chapter 11 Case of any of the Debtors shall be deemed filed against the consolidated Estates in the consolidated Chapter 11 Cases and shall be deemed a single obligation of the consolidated Estates under the Plan on and after the Effective Date.

(b) The substantive consolidation shall not, other than for purposes related to the Plan and distributions to be made hereunder, affect the legal and corporate existence or structure of the Debtors or the rights and defenses of the Liquidation Trust and/or Reorganized IPofA Shreveport pertaining to any Estate Causes of Action.

(c) The Plan will serve as a motion seeking entry of an order substantively consolidating the Estates as provided therein.

**2. The Liquidation Trust.**

As of the Effective Date, the Liquidation Trust shall be established in accordance with the Liquidation Trust Agreement. The Liquidation Trust shall be created for the primary purpose of liquidating and distributing the Trust Assets to the Beneficiaries (and other holders of Allowed Claims) in accordance with the Plan and the Confirmation Order, and in an expeditious but orderly manner, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Liquidation Trust and the Plan.

**3. Liquidation Trustee.**

(a) As of the Effective Date, and without further action, the Chapter 11 Trustee shall be deemed discharged and Gerard A. McHale, Jr., P.A. shall become the Liquidation Trustee, which shall become, and thereupon shall be, the representative of the Estates in accordance with Section 1123(b)(3) of the Bankruptcy Code. The Liquidation Trustee shall post a bond in an amount to be agreed upon by the Liquidation Trustee and the Office of the United States Trustee.

(b)     The Liquidation Trustee shall be deemed to be the successor to the Chapter 11 Trustee under the Class Action Agreement.

(c)     The Liquidation Trust may retain such counsel and other Professional Persons (and all on such terms) as the Liquidation Trustee deems appropriate to assist the Liquidation Trustee in performing its duties and obligations and exercising its rights, powers and authority under the Plan and/or the Liquidation Trust Agreement, and shall be entitled to cause the Liquidation Trust to pay from time to time all reasonable fees and expenses of such Professional Persons, with prior notice to the Liquidation Trust Oversight Board and without approval or order of the Bankruptcy Court.

(d)     The Liquidation Trust shall hold and disburse the Trust Assets in accordance with the Plan and the Liquidation Trust Agreement, and, in this regard, shall maintain a Disputed Claims Reserve in accordance with Section 8.2 of the Plan, and shall be entitled to pay ongoing Liquidation Trust Expenses, all without any order or approval of the Bankruptcy Court.

As of the Effective Date, and without further action, the Liquidation Trustee shall become the sole Manager of Reorganized IPofA Shreveport, the Liquidation Trust shall become the sole member of Reorganized IPofA Shreveport and Reorganized IPofA Shreveport shall be operated in accordance with the Reorganized IPofA Shreveport LLC Agreement.

**4.      Transfer of Property to Liquidation Trust.**

(a)     As of the Effective Date, and without further action by any party, all of the property of any one or more of the Estates (with the exception of the Mineral Servitude), as defined by Section 541 of the Bankruptcy Code, including but not limited to:  (i) the Assets (with the exception of the Mineral Servitude (but including Mineral Servitude Revenues) and Effective Date Administrative and Priority Claims Cash), free and clear of all Liens, Claims, and encumbrances (which, pursuant to the Confirmation Order, shall be fully and completely released and discharged, except as otherwise specifically provided in the Plan); (ii) all of the rights and defenses of the Estates or any of them, including, without limitation, setoff rights, arising out of or directly related to any executory contract or unexpired lease rejected by the Chapter 11 Trustee or by the terms of the Plan, against the other party to such contract or lease; (iii) all sums in the future received by or recovered by or for the Liquidation Trust from any source; and (iv) any defenses and counterclaims of any of the Estates to any Claim filed or asserted against any of the Estates (collectively, the "Trust Assets"), shall be deemed transferred to the Liquidation Trust.  The Trust Assets shall vest in the Liquidation Trust in accordance with Section 1141(b) of the Bankruptcy Code.

(b)     Notwithstanding anything to the contrary in the Plan, the Liquidation Trust may, in the sole and absolute discretion of the Liquidation Trustee, after consultation with the Liquidation Trust Oversight Board, abandon or otherwise not accept any Trust Assets that the Liquidation Trustee believes, in good faith, have no value to the Liquidation Trust or that in the interests of the Liquidation Trust should otherwise be abandoned or rejected.

(c)     As of the Effective Date, the entire membership interest in Reorganized IPofA Shreveport shall vest in the Liquidation Trust, and become a Trust Asset, and the Liquidation Trust shall become the sole member of Reorganized IPofA Shreveport.

(d)     The Mineral Servitude shall not be transferred to the Liquidation Trust, although Mineral Servitude Revenues are to be transferred from time to time to the Liquidation Trust by Reorganized IPofA Shreveport (after the funding of and subject to any reserves as the Manager may establish and maintain in its discretion and the payment by Reorganized IPofA Shreveport of Liquidation Trust Expenses attributable to Reorganized IPofA Shreveport), and will thereupon become Trust Assets.

(e)     All Claims and Causes of Action of or owned by the Official Creditors' Committee will be, without the need for any act or document, assigned to and vested in the Liquidation Trust as of the Effective Date.

**5.     Powers of the Liquidation Trustee**.  Except as otherwise provided in the Liquidating Trust Agreement, the Plan, or the Confirmation Order, the Liquidation Trustee shall have all authority to take all steps deemed by the Liquidation Trustee to be necessary or appropriate to administer and/or otherwise control or exercise authority over the Trust Assets, including without limitation, over the acquisition, management and disposition thereof, and over the management and conduct of the administration of the Liquidation Trust, including, without limitation, to cause or authorize distributions to the Beneficiaries (and other holders of Allowed Claims), to review and maintain objections to or compromise Claims, and to pursue and/or compromise Estate Causes of Action, after consultation with the Liquidation Trust Oversight Board. The Liquidation Trustee shall have all authority, power, responsibilities and rights set forth in or contemplated by the Plan or the Liquidation Trust Agreement.  Without limiting the foregoing, the Liquidation Trustee shall have the power, and authority, in its discretion, to take any and all action for or on behalf of the Liquidation Trust or as a member of Reorganized IPofA Shreveport required or permitted by, or otherwise in accordance with, the Reorganized IPofA Shreveport LLC Agreement or the Delaware Limited Liability Company Act (as amended and in effect from time to time, the "DLLCA"), and such other powers and authority as may be vested in or assumed by the Liquidation Trustee pursuant to the Plan, the Liquidation Trust Agreement or a Bankruptcy Court order or as may be necessary or appropriate to carry out the provisions of the Plan.

**6.     Withholding and Reporting Requirements.**  In connection with the administration of the Plan and the Liquidation Trust Agreement, and the making of distributions under the Plan and the Liquidation Trust Agreement, the Liquidation Trust will endeavor to comply in all material respects with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority.

**7.     Resignation, Death, or Removal of Liquidation Trustee.**  A party in interest, upon application, and upon a showing of willful misconduct or gross negligence and upon prior notice to the Liquidation Trustee and the Liquidation Trust Oversight Board, may move the Bankruptcy Court to remove the Liquidation Trustee from its role as Liquidation Trustee. The movant shall have the burden of establishing such cause as aforesaid for such requested removal. In the event of the resignation or removal, death, or incapacity of the Liquidation Trustee, the Liquidation Trust Oversight Board shall designate another Person to become

Liquidation Trustee and such successor Liquidation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor, under terms to be agreed by the successor Liquidation Trustee and the Liquidation Trust Oversight Board. In the event of the resignation of the Liquidation Trustee, the Liquidation Trustee shall remain as the Liquidation Trustee until such time as the Liquidation Trust Oversight Board, or the Bankruptcy Court if the Liquidation Trust Oversight Board fails to act within thirty (30) days of resignation, designates a successor.

        **8.**     **Resignation, Death, or Removal of Manager**.  A party in interest, upon application and upon a showing of willful misconduct or gross negligence and upon prior notice to the Liquidation Trust Oversight Board, may move the Bankruptcy Court to remove the Manager from its role as Manager. In the event of the resignation or removal, death, or incapacity of the Manager, the Liquidation Trust Oversight Board shall designate another Person to become Manager and such successor Manager, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor under terms to be agreed by the Liquidation Trust Oversight Board. In the event of the resignation of the Manager, the Manager shall remain as the Manager until such time as the Liquidation Trust Oversight Board, or the Bankruptcy Court if the Liquidation Trust Oversight Board fails to act within thirty (30) days of resignation, designates a successor.

        **9.**     **Ratification**.  On the Effective Date, each Holder of a Claim in Class 3 shall be deemed to have ratified and become bound by the terms of the Liquidation Trust Agreement.

        **10.**     **Termination of Liquidation Trust.** The Liquidation Trustee shall be discharged and the Liquidation Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidation Trustee hereunder have been fulfilled, (iv) all distributions required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust Agreement have been made, and (v) the Chapter 11 Case has been closed; provided, that in no event shall the Liquidation Trust be terminated later than the term of the Liquidation Trust under the Liquidation Trust Agreement, as such term may be extended pursuant thereto.  As soon as practicable after the final Distribution Date, if any, or such other time as the Liquidation Trustee deems appropriate, the Liquidation Trustee may seek entry of a Final Order closing the Chapter 11 Cases pursuant to Bankruptcy Code Section 350.

        **11.**     **Liquidation Trust Oversight Board.**

        (a)     The Liquidation Trust Oversight Board shall be formed and constituted on the Effective Date. The Liquidation Trust Oversight Board shall consist of seven (7) members, to be named in a Plan Supplement.  A member shall resign if it (or its designating Creditor, as applicable) sells, transfers or assigns all of its right to or interest in its Class 3 Claim or Trust Beneficial Interests, as applicable.  The Liquidation Trust Oversight Board shall have the right, but shall not be required, to fill any vacancy that arises for any reason with another holder of an allowed Class 3 claim.  The Liquidation Trust Oversight Board may, in its discretion, retain legal counsel, provided that the cost of any such legal counsel shall not exceed $7,500 per month. Members of the Liquidation Trust Oversight Board shall be entitled to reimbursement of their actual and reasonable out of pocket expenses as a Liquidation Trust Oversight Board Member.

(b)     The Liquidation Trustee shall regularly consult with members of the Liquidation Trust Oversight Board regarding the prosecution and/or settlement of Estate Causes of Action. The Liquidation Trustee shall report to the Liquidation Trust Oversight Board on a regular basis. The Liquidation Trustee shall seek approval from the Liquidation Trust Oversight Board regarding the prosecution and/or settlement of each Estate Cause of Action if the amount claimed by the Liquidation Trustee against the defendant(s) in such Estate Cause of Action is more than $500,000.  In the event that the Liquidation Trust Oversight Board declines to approve a settlement proposed by the Liquidation Trustee, then the dispute shall promptly be brought before the Bankruptcy Court for resolution.  Should the Liquidation Trust Oversight Board obtain an order of the Bankruptcy Court sustaining its challenge, then the reasonable legal fees incurred by the Liquidation Trust Oversight Board in connection with such successful challenge shall be paid from the funds held by the Liquidation Trust, subject to Bankruptcy Court approval, and shall not be subject to the monthly limit set forth above.  Other duties and provisions regarding the Liquidation Trust Oversight Board are set forth herein and in the Liquidation Trust Agreement.  Members of the Liquidation Trust Oversight Board shall be entitled to reimbursement of their actual and reasonable out of pocket expenses as a board member.

(c)     A Liquidation Trust Oversight Board member shall recuse him/herself from participation in decision-making by the Liquidation Trust Oversight Board on matters in which such member has a conflict of interest.

## G.     Purposes of Reorganized IPofA Shreveport; Powers of the Manager.

(a)     The purposes of Reorganized IPofA Shreveport are:

(i)     to negotiate, execute, deliver, perform, administer, enforce and exercise any and all rights and remedies under or with respect to one or more leases (including without limitation any Mineral Lease and/or any Subsequent Mineral Lease, as such terms are defined in the Cordell Settlement Agreement), royalty arrangements and/or other contracts relating to or in connection with the exploitation of the Mineral Servitude (collectively "MS Contracts"), and to cause Mineral Servitude Revenues to be paid and/or transferred to the Liquidation Trust (after funding of and subject to any reserves as the Manager may establish and maintain in its discretion and the payment by Reorganized IPofA Shreveport of any Liquidation Trust Expenses incurred thereby or allocable thereto), as the sole Member, in all cases to provide funds for and/or facilitate and/or in furtherance of the purposes and intent of the Liquidation Trust;

(ii)     to manage, administer, exploit, sell, assign, transfer, convey, mortgage, lien, hypothecate, pledge, abandon and otherwise dispose of all or any part of the Mineral Servitude and/or any MS Contract;

(iii)     to engage in any other lawful act or activity in connection with or in furtherance of any of the foregoing for which limited liability companies may be formed under the DLLCA; and

(iv)     to do any and all other acts and things which may be necessary, appropriate or incidental to the carrying out any or all of such purposes.

(b)     Reorganized IPofA Shreveport, and the Manager, in the name or on behalf of Reorganized IPofA Shreveport, without the necessity of any order or approval of or by the Bankruptcy Court, have the power and authority to take any and all actions deemed by the Manager to be necessary, appropriate, proper, advisable, convenient or incidental to or for or in furtherance of any of the purposes of Reorganized IPofA Shreveport, including, but not limited to the powers and authority set forth in the Reorganized IPofA Shreveport LLC Agreement or otherwise provided or permitted under the DLLCA.  The Manager shall consult with the Liquidation Trust Oversight Board regarding any proposed transaction in excess of $500,000.

## H.     Liability, Indemnification.

(a)     Neither the Liquidation Trustee, nor the Manager, nor the Liquidation Trust Oversight Board, nor any of their respective present or former shareholders, directors, officers, partners, members, managers, designees, Professional Persons and employees, nor any of the respective present or former shareholders, directors, officers, partners, members, managers or employees of any of the foregoing, shall be liable for any act or omission taken or omitted to be taken in their respective capacities as such, other than acts or omissions found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to constitute willful misconduct or gross negligence by such person or entity.

(b)     Neither the Liquidation Trustee, nor the Liquidation Trust Oversight Board, shall be liable for the act or omission of the other, nor shall any member of the Liquidation Trust Oversight Board be liable for any act or omission of any other member thereof.

(c)     The Liquidation Trust shall indemnify and hold harmless the Liquidation Trustee, the Manager, the Liquidation Trust Oversight Board, and the respective present or former shareholders, directors, officers, partners, members, managers, designees, attorneys, accountants, or other professionals and employees, of any of them, and the respective present or former shareholders, directors, officers, partners, members, managers, attorneys, accountants, or other professionals and employees of any of the foregoing (in their capacity as such) (each, an "Indemnified Party"), from and against and in response to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to reasonable attorneys' fees and expenses, arising out of or due to any of the actions or omissions of any of them, or consequences of any of such actions or omissions, or the status or capacity of any of the foregoing as contemplated by or in connection with the Plan, the Liquidation Trust, Reorganized IPofA Shreveport, or any Causes of Action, or the implementation, administration, pursuit or prosecution of any thereof, and including without limitation all costs and expenses (including without limitation reasonable attorneys' fees and expenses) in connection with the enforcement of the right to indemnification set forth herein, except in the case of any such Indemnified Party or entity for such liabilities, losses, damages, costs and expenses that are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have directly resulted from such Indemnified Party's or entity's willful misconduct or gross negligence.

(d)     The Liquidation Trust and Reorganized IPofA Shreveport, respectively, shall, as provided in the Liquidation Trust Agreement and the Reorganized IPofA Shreveport LLC Agreement, promptly pay expenses reasonably incurred by any Indemnified Party in defending, participating in, or settling any action, proceeding or investigation in which such indemnified party is a party or is threatened to be made a party or otherwise is participating, in connection

with the Liquidation Trust, Reorganized IPofA Shreveport, the Liquidation Trustee, the Liquidation Trust Oversight Board, the Manager (in the capacity thereof as such), and the Liquidation Trust (in its capacity as member of Reorganized IPofA Shreveport), upon submission of invoices therefore, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise; provided such Indemnified Party undertakes to the Liquidation Trust to repay any and all such amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor under the Plan, the Liquidation Trust Agreement or the Reorganized IPofA Shreveport LLC Agreement, as applicable.

(e)     The right to indemnification conferred in the Plan shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, agreement, vote or determination of the Liquidation Trustee, the Manager or otherwise (including without limitation the Liquidation Trust Agreement or the Reorganized IPofA Shreveport LLC Agreement).

(f)     With respect to any Person or Entity entitled to indemnification and/or advancement of expenses by the Liquidation Trust and Reorganized IPofA Shreveport, (i) the Liquidation Trust shall be the indemnitor of first resort (i.e., its obligations to such indemnitee shall be primary and any obligation of Reorganized IPofA Shreveport to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such indemnitee shall be secondary), (ii) if the Liquidation Trust determines to make advances to such indemnitee to cover the costs of defending any claim or action against such indemnitee, the Liquidation Trust shall be primarily liable for such costs, without regard to any rights such indemnitee may have against Reorganized IPofA Shreveport, and (iii) the Liquidation Trust irrevocably waives, relinquishes and releases Reorganized IPofA Shreveport from any and all claims against Reorganized IPofA Shreveport for contribution, subrogation or any other recovery of any kind in respect thereof.  It is further agreed that no advancement or payment by Reorganized IPofA Shreveport on behalf of an indemnitee with respect to any claim for which such indemnitee shall have sought indemnification from the Liquidation Trust shall affect the foregoing and Reorganized IPofA Shreveport shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such indemnitee against the Liquidation Trust.

(h)     Notwithstanding the authority to do so, neither the Liquidation Trustee, the Liquidation Trust Oversight Board nor the Manager shall be under any obligation to consult with any attorneys, accountants, or other professionals or agents, and the determination to not do so shall not result in the imposition of liability on the Liquidation Trustee, the Liquidation Trust Oversight Board, the Manager or any of their respective present or former shareholders, directors, officers, partners, members, managers designees, attorneys, accountants, or other professionals or employees, or any of the respective shareholders, directors, officers, partners, members, managers or employees of any of the foregoing, unless such determination constitutes willful misconduct or gross negligence.

(i)     The Liquidation Trustee may purchase, using Trust Assets, and carry, all insurance policies and pay all insurance premiums and costs the Liquidation Trustee deems reasonably necessary or advisable, including, without limitation, purchasing any errors and omissions insurance with regard to any liabilities, losses, damages, claims, costs, and expenses the Liquidation Trustee or the Manager may incur, including but not limited to reasonable

attorneys' fees, arising out of or due to any actions or omissions, or consequences of such actions or omissions, with respect to the management, conduct, implementation and/or administration of the Liquidation Trust, Reorganized IPofA Shreveport, the Plan, the Liquidation Trust Agreement or the Reorganized IPofA Shreveport LLC Agreement.

**I.      Compensation and Expenses of the Liquidation Trustee**

The Liquidation Trustee shall be compensated in accordance with <u>Schedule A</u> to the Liquidation Trust Agreement for its reasonable fees and expenses by the Liquidation Trust with prior notice to the Liquidation Trust Oversight Board, but without any requirement of approval by the Bankruptcy Court.

**J.      Provisions Governing Distributions**

**1.      Distributions of Available Cash; Liquidation Trust Accounts**

(a)      All payments to be made by the Liquidation Trust to any Beneficiary, and/or any other holder of any Allowed Claim, shall be made only in accordance with the Plan, the Confirmation Order, and the Liquidation Trust Agreement and from the Trust Assets (or from the income and proceeds realized from the Trust Assets) net of any Reserves established pursuant to the Plan, the Confirmation Order, or the Liquidation Trust Agreement and only to the extent that the Liquidation Trust has sufficient Trust Assets (or income and proceeds realized from the Trust Assets) to make such payments in accordance with and to the extent provided for in the Plan, the Confirmation Order, and the Liquidation Trust Agreement.

(b)      Available Cash shall be distributed to holders of Allowed Claims on the Initial Distribution Date and each Quarterly Distribution Date, or as soon thereafter as reasonably practicable, in accordance with the provisions of the Plan governing the Class of Claims in which the Claim is classified.

(c)      Cash shall be maintained by or for the Liquidation Trust in such bank and other financial institution accounts as the Liquidation Trustee shall establish from time to time in its discretion.

(d)      The Liquidation Trustee shall have no responsibility or liability for or by reason of or in connection with the financial performance of, or any diminution in value or losses suffered or incurred in connection with, any of such accounts, or the solvency of any bank or other financial institution.

**2.      Provisions Concerning Disputed Claims Reserves**

(a)      **Establishment of Disputed Claims Reserves**.  In connection with the Initial Distribution Date (or any other date on which distributions for any particular Class of Claims are made pursuant to the Plan by the Liquidation Trust), and in connection with making all distributions required to be made on any such date under the Plan, the Liquidation Trustee shall establish, for record keeping purposes only (and not as a separate or distinct fund or account and without interest), a Disputed Claims Reserve for holders of Disputed Claims as necessary pursuant to the Plan; provided, however that no amounts shall be allocated to the

Disputed Claims Reserve in respect of Disputed Claims which if Allowed would constitute Excess Exchanger Claims ("Disputed Excess Exchanger Claims"), unless and until all Allowed Basic Exchanger Claims shall have been paid in full and there shall have been allocated to the Disputed Claims Reserve the entire Face Amount of all Disputed Claims other than Disputed Excess Exchanger Claims, and, after giving effect to the all of the foregoing, the Liquidation Trust shall have Available Cash remaining to further fund the Disputed Claims Reserve for such Disputed Excess Exchanger Claims.

(b) **Amounts to be Reserved**. Except as otherwise provided in paragraph (a) above with respect to Disputed Excess Exchanger Claims, the Liquidation Trust shall reserve the Ratable proportion of all Cash allocated for distribution on account of each Disputed Claim based upon the Face Amount of each such Disputed Claim, or such lesser amount as may be agreed to by the holder of the Claim on one hand and the Liquidation Trustee on the other hand, as applicable, or as may otherwise be determined by order of the Bankruptcy Court. All Cash or other property allocable to the relevant Class hereunder with respect to Disputed Claims shall be allocated for record keeping purposes only (and not as a separate or distinct fund or account and without interest), to the Disputed Claims Reserve with respect to the Initial Distribution Date (or such other date on which distributions for any particular Class of Claims are made pursuant to the Plan).

(c) **Distributions**. Payments on any Disputed Claim that becomes an Allowed Claim shall be distributed on the first Quarterly Distribution Date after the Claim is Allowed, but only to the extent consistent with Section 5.3(c) of the Plan. Distributions shall be made only to the extent of the aggregate distributions that the holder of any such Allowed Claim would have received had such Claim been Allowed as of the Effective Date (less any taxes paid with respect to amounts held in the Disputed Claims Reserve), and without interest. Distributions to each holder of a Disputed Claim that has become an Allowed Claim (and to the extent that the holder of the Disputed Claim has not received prior distributions on account of that Claim) shall be made in accordance with the provisions of the Plan governing the Class of Claims in which the Claim is classified.

(d) **Termination of Disputed Claims Reserve**. The Disputed Claims Reserve shall no longer be necessary at the earlier of (i) when all Disputed Claims have been resolved, or (ii) when all distributions and other dispositions of Cash or other property required to be made therefrom under the Plan and the Liquidation Trust Agreement have been made. Thereafter, all Cash and other property deemed allocated to the Disputed Claims Reserve shall remain held for the Liquidation Trust and shall be distributed to the holders of Allowed Claims in accordance with the Plan.

(e) **No Liability for Funding the Disputed Claims Reserve**. The Liquidation Trustee shall have no duty to fund, or to set aside any separate account for, the Disputed Claims Reserve.

(f) **Setoffs**. The Liquidation Trust may, but shall not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that any of the Estates or the Liquidation Trust may have against the claimant, but neither the failure to do so nor the

allowance of any Claim hereunder shall constitute a waiver or release by the Liquidation Trust of any such claim it may have against such claimant.

(g)     **Withholding Taxes and Expenses of Distribution**.  Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder.  All holders of Allowed Claims shall be required to provide any information necessary to effect the withholding of such taxes.

3.     **Transfers of Claims and Liquidation Trust Interests**.  As of the Effective Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors, the Trustee, IPofA Shreveport, or their respective agents, shall be deemed closed, and there shall be no further changes in the holders of record of any of the Claims or Interests.  No party, including but not limited to the Liquidation Trust, shall have any obligation to recognize any transfer of the Claims or Interests occurring after the Effective Date unless such transfer is expressly permitted pursuant to the Liquidation Trust Agreement and notice of the transfer of such Claim, in form and substance satisfactory to the Liquidation Trust shall have been received by the Liquidation Trustee, as appropriate, prior thereto.  Subject to the immediately preceding sentence, only those holders of record stated on the transfer ledgers as of the close of business on the Effective Date, to the extent applicable, shall be entitled to be recognized for any purposes hereunder.  No interest of any Beneficiary and/or any other holder of any Allowed Claim in or with respect to the Liquidation Trust shall be sold, traded, transferred, assigned, conveyed or otherwise disposed of without the express prior written consent of the Liquidation Trustee, except as expressly permitted by the Liquidation Trust Agreement pursuant to the laws of descent and distribution upon the death of any such Beneficiary and/or other holder, or pursuant to any applicable order or decree as to divorce of any such Beneficiary and/or other holder, or pursuant to court order upon the bankruptcy of any such Beneficiary and/or other holder, or by operation of law to a successor Entity pursuant to a merger or consolidation of such Beneficiary and/or other holder.

## K.     **Disputed, Contingent and Unliquidated Claims and Interests**

1.     **Objections to Claims and Interests.**

(a)     The Claims Objection Deadline shall be one (1) year after the Effective Date; provided, however, that, in the case of Disputed Excess Exchanger Claims, the Claims Objection Deadline shall be one (1) year after the date that all Allowed Basic Exchanger Claims shall have been paid in full under the Plan, and all Disputed Claims other than Disputed Excess Exchanger Claims shall have been definitively resolved, and provided further that the last date for filing Avoidance Actions against a holder of a Claim shall be the date established by Bankruptcy Code Section 546(a) and the last day for asserting any other Cause of Action shall be the last day of the applicable statute of limitations therefor provided under applicable non-bankruptcy law as such period may have been extended by Bankruptcy Code Section 108 or any other section of the Bankruptcy Code.  Notwithstanding any of the foregoing, the Liquidation Trust may request from the Bankruptcy Court one or more extensions of the Claims Objection Deadline, which such extended date shall become the new Claims Objection Deadline.

(b)     From and after the Effective Date, the Liquidation Trustee shall have the exclusive authority for reviewing, negotiating, and, if deemed appropriate, objecting to the allowance of any Claim filed in the Chapter 11 Cases.  All objections shall be litigated to a Final

Order; provided, however, that the Liquidation Trustee may compromise and settle any objections to Claims, subject to the provisions of Article X of the Plan without order of the Bankruptcy Court; provided further, however, that distributions may be made to a holder of a Claim prior to the expiration of the Claims Objection Deadline applicable thereto if the Liquidation Trustee believes that objection to such holder's Claim is not appropriate under the circumstances.

(c)      Objections to Claims not otherwise deemed Allowed by the Plan shall not be subject to any defense, including, without limitation, res judicata, estoppel or any other defense because of the Plan. Additionally, the rights of the Liquidation Trust to amend, modify or supplement any objection to a particular Claim to include relief pursuant to Bankruptcy Code Section 502(d) are preserved until sixty (60) days after the entry of a Final Order against a holder of such Claim.

2.      **Estimation of Claims**. Through the Claims Objection Deadline applicable thereto, the Liquidation Trust may request that the Bankruptcy Court enter an Estimation Order(s) fixing, pursuant to Bankruptcy Code Section 502(c), the amount of any Disputed Claim, regardless of whether any of the Debtors or the Chapter 11 Trustee has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the pendency of any appeal relating to any objection to any Disputed Claim. In the event that the Bankruptcy Court enters an Estimation Order estimating any Disputed Claim, the amount of such estimation will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidation Trust may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any mechanism permitted under the Bankruptcy Code or the Plan. The Proponents reserve all rights to seek estimation of any Administrative Claim and Fee Claim as part of the Plan confirmation process.

3.      **Amendments to Claims**. After the Confirmation Date, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the holder of such Claim solely to decrease, but not to increase, unless otherwise provided by the Bankruptcy Court, the amount, number or priority.

4.      **Authority To Settle Disputed Claims**. From and after the Effective Date, the Liquidation Trustee shall be authorized to compromise and settle Disputed Claims, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 105(a), with a Disputed Amount in excess of $500,000, only upon Bankruptcy Court approval. Notwithstanding any prior order of the Bankruptcy Court or the provisions of Bankruptcy Rule 9019, the Liquidation Trustee may settle or compromise any Disputed Claim with a Disputed Amount of $500,000 or less without approval of the Bankruptcy Court.

5.      **No Recourse**. Notwithstanding that the Allowed amount or estimated amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules and, as a result of such reconsideration is Allowed in an amount for which there is insufficient value in the relevant fund or reserve to provide a recovery equal to

that received by other holders of Allowed Claims in the relevant Class, no such Claim holder shall have recourse to the Liquidation Trust, the Estates, any of the Proponents, any member or manager thereof, any of the respective Professional Persons of any of them, the holder of any other Claim, or any of the respective property of any of the foregoing.  However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code. **THUS, THE BANKRUPTCY COURT'S ENTRY OF AN ESTIMATION ORDER MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT OR NUMBER FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.**

## L.    Executory Contracts and Leases

**1.    Assumption of Insurance Policies; Assignment of Rights**.  Each of the Debtors' insurance policies and any agreements, documents or instruments relating thereto (the "Insurance Policies"), unless previously cancelled shall be treated as executory contracts under the Plan, and the Plan shall constitute a motion to assume the Insurance Policies and to assign all of the Estates' rights under such Insurance Policies to the Liquidation Trust.  Subject to the occurrence of the Effective Date, the entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2) and a finding by the Bankruptcy Court that such assumption is in the best interests of the Debtors, their Estates, and all parties in interest in the Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date because the Debtors are current.  To the extent the Bankruptcy Court or the Proponents determine otherwise as to any of the Insurance Policies, the Debtors reserve the right to seek rejection of such Insurance Policy or other available relief.

**2.    Rejection of Contracts and Leases**.  Each executory contract or unexpired lease (except as provided in paragraph L.1 above in the case of the Insurance Policies) of the Debtors that has not expired by its own terms prior to the Effective Date, and that has not been (a) assumed or rejected during the Chapter 11 Cases prior to the Effective Date or (b) identified in the Plan Supplement for assumption or assumption and assignment, shall be deemed rejected pursuant to Bankruptcy Code Section 365 as of the Effective Date.

**3.    Rejection of Indemnification Obligations.**

(a)    Except as otherwise provided in the Plan or any contract, instrument, release or other agreement or document entered into in connection with the Plan and approved by the Bankruptcy Court, on the Effective Date, all obligations related to any contract, instrument, limited liability company agreement, other comparable organizational document or any other document or applicable law shall be deemed rejected as of the Effective Date as they relate to any rights to indemnification, contribution and/or advancement of expenses claimed by any former member, manager, officer or employee of any of the Debtors.

(b)    Indemnification obligations (whether arising by contract, operation of law, statute or otherwise) owed to any present or former professionals of any of the Debtors arising out of acts or omissions that occurred prior to the Petition Date, including without limitation, accountants, auditors, financial consultants, underwriters or attorneys, shall be deemed to be, and

shall be treated as though they are, executory contracts that are rejected pursuant to Bankruptcy Code Section 365 under the Plan as of the Effective Date.

**4. Disallowance of Contribution Claims**.  On the Effective Date, any Claim for reimbursement, indemnification, contribution or subrogation of an Entity that is liable with any of the Debtors on or that has secured the Claim of a Creditor not theretofore Disallowed by Order of the Bankruptcy Court shall be deemed Disallowed to the extent (a) such Creditor's Claim against any of the Debtors is Disallowed; (b) such Claim for reimbursement, indemnification, contribution or subrogation is contingent as of the Confirmation Date, including without limitation all Claims which are Disallowed under Bankruptcy Code section 502(e); or (c) such Entity asserts a right of subrogation to the rights of such Creditor under Bankruptcy Code Section 509 except as otherwise specifically provided therein.

**5. Bar Date For Rejection Damages**.  If the rejection of any executory contract or unexpired lease under the Plan gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 3; provided, however, that the Unsecured Claim, if any, arising from such rejection shall be forever barred and shall not be enforceable against the Estates, or the Liquidation Trust, or their respective successors or properties, unless a proof of such Claim is filed and served on the Liquidation Trust within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the executory contract or unexpired lease, which may include, if applicable, the Confirmation Order.

**M. Effects of Confirmation**

**1. Retention of Estate Causes of Action/Reservation of Rights**.  On and after the Effective Date, the Liquidation Trust shall have, retain, reserve and be entitled to assert, prosecute, (subject to Section 7.18(b) of the Plan) settle, or abandon, any and all Estate Causes of Action.

**2. Compromise of Controversies**.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the Plan Funding Party Settlement Agreements.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the Plan Funding Party Settlement Agreements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.

**3. Preservation of Insurance**.  Except as necessary to be consistent with the Plan, the Plan shall not diminish or impair the enforceability of insurance policies that may cover Claims against any of the Debtors, the Estates, or Assets or any other Person or Entity.

**4. Term of Injunctions or Stays**.  Until the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect.  After

the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect to the extent provided for herein or in the Confirmation Order.

5.    <u>Releases</u>.  **On the Effective Date:**

**(a)    the release, waiver and discharge granted by the Debtors and the Estates in favor of the CCB Parties pursuant to paragraph 9 of the CCB Settlement Agreement shall remain in full force and effect; and**

**(b)    each of the Released Parties under each Plan Funding Party Settlement Agreement as shall have then been approved by Final Order(s) shall be entitled to the benefit of the release, waiver and/or discharge granted by the Debtors and the Estates (and, in the case of the Wachovia Parties, by the Class Representatives and Quirk Representative party to the Wachovia Settlement Agreement) in their favor pursuant to such Plan Funding Party Settlement Agreement to be granted either in the Class Action and/or by the Bankruptcy Court.**

6.    <u>Injunction</u>.

**(a)    Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or Entities, together with their respective present and former employees, agents, officers, directors, principals and affiliates, who have held, hold or may hold Claims against or Interests in any of the Debtors are permanently enjoined, from and after the Effective Date, from (i) pursuing any and all such Claims and/or Interests (other than the rights of such Persons and Entities to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered hereunder and liabilities first arising thereunder after the Effective Date), known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any actual or alleged act, omission, transaction, event, or other occurrences taking place on or prior to the Effective Date (collectively, the "Released Claims"), (ii) commencing or continuing in any manner any action or other proceeding of any kind based on any Released Claim against any of the Debtors or the Liquidation Trust or Reorganized IPofA Shreveport, (iii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, decree or other award against any of the Debtors or the Liquidation Trust or Reorganized IPofA Shreveport based on any Released Claim, (iv) creating, perfecting or enforcing any encumbrance of any kind against any of the Debtors or the Liquidation Trust or Reorganized IPofA Shreveport or against the property or interests in property of any of the Debtors or the Liquidation Trust or Reorganized IPofA Shreveport based on any Released Claim, or (v) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due or owing to any of the Debtors or against the property or interests in property of any of the Debtors, or the Liquidation Trust or Reorganized IPofA Shreveport based on any Released Claim; provided, however, that this provision shall not impact or affect the rights and powers of any governmental entity or agency exercising its police or regulatory power.**

(b)     Without limiting the generality of the foregoing, the Plan Funding Parties shall receive the injunctive relief from the Class Action Court or the Bankruptcy Court consistent in all respects with such injunctive relief as is required or provided in favor of the Plan Funding Parties under each of the applicable Plan Funding Party Settlement Agreements as shall have been approved by Final Order(s), to be granted either by the Class Action Court and/or by the Bankruptcy Court.  In addition, the Confirmation Order shall provide injunctive relief in favor of CCB consistent in all respects with such injunctive relief as is required or provided in favor of CCB by the CCB Release and by paragraph 4 of the CCB Settlement Agreement (which is coextensive with the CCB Release).

7.     **Exculpation**.  None of the Proponents, the members of the Official Creditors' Committee, the Proponents' respective Professional Persons, nor the Official Creditors' Committee's counsel, Cozen O'Connor, shall have or incur any liability whatsover, in any form, to any of the Estates, the Liquidation Trust or Reorganized IPofA Shreveport, for any act or omission in connection with or arising out of the involvement of any of them in the filing and/or conduct of the Chapter 11 Cases, including the type or value of distributions, if any, reserved under the Plan for holders of Claims, the solicitation of votes for acceptance or rejection of the Plan, the pursuit of confirmation and consummation of the Plan, the administration of the Plan and/or the Liquidation Trust and/or Reorganized IPofA Shreveport or the property to be distributed under the Plan, other than acts or omissions found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to constitute willful misconduct, gross negligence, or breach of fiduciary duty by such person or entity.

8.     **Reliance on Counsel**.  For purposes of the Plan, in no event shall any act or omission of any Person or Entity be deemed to constitute willful misconduct or gross negligence if such Person or Entity relies or relied upon the advice of counsel constituting a Professional Person in connection therewith or with respect to any authority, powers, duties or responsibilities under the Plan, the Liquidation Trust Agreement, the Reorganized IPofA Shreveport LLC Agreement or applicable law.

## N.     **Retention of Jurisdiction**

1.     **Retention of Exclusive Jurisdiction by the Bankruptcy Court**. Notwithstanding confirmation of the Plan or occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan to the fullest extent legally permissible, including, without limitation, for the following purposes:

(a)     to the extent not otherwise determined by the Plan, to (i) determine the allowance, classification, or priority of Claims upon objection by any party-in-interest entitled to file an objection, or (ii) the validity, extent, priority and nonavoidability of consensual and nonconsensual Liens or other encumbrances against any of the Trust Assets, Estate Causes of Action, the Mineral Servitude, or property of any of the Estates or the Liquidation Trust or Reorganized IPofA Shreveport;

(b)     to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Entity or Person, to construe and to take any other action to enforce and

execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Entity or Person;

(c)      to protect the Trust Assets, the Mineral Servitude, or property of the Estates and/or the Liquidation Trust or Reorganized IPofA Shreveport, including without limitation Estate Causes of Action, from claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens, security interests or encumbrances on any Trust Assets, and/or the Mineral Servitude;

(d)      to determine any and all applications for allowance of Fee Claims;

(e)      to determine any Priority Tax Claims, Priority Non-Tax Claims, Administrative Claims or any other request for payment of Claims, including both fees and expenses, entitled to priority under Bankruptcy Code Section 507(a) of the Bankruptcy Code;

(f)      to resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan or the making of distributions hereunder;

(g)      to determine any and all motions related to the rejection, assumption or assignment of executory contracts or unexpired leases, or to determine any motion to reject any executory contract or unexpired lease pursuant to Article IX of the Plan;

(h)      except as otherwise provided herein, to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including any remands;

(i)      to enter a Final Order closing the Chapter 11 Cases;

(j)      to modify the Plan under Bankruptcy Code Section 1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

(k)      to issue such orders in aid of consummation of the Plan or the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity or Person, to the full extent authorized by the Bankruptcy Code;

(l)      to determine any tax liability pursuant to Bankruptcy Code Section 505;

(m)      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(n)      to resolve any disputes concerning whether an Entity or Person had sufficient notice of the Chapter 11 Cases, the applicable Claims bar date, the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing or for any other purpose;

(o)     to resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Chapter 11 Cases;

(p)     to authorize, as may be necessary or appropriate, sales of assets as necessary or desirable and resolve objections, if any, to such sales;

(q)     to resolve any disputes concerning any release, discharge, injunction, exculpation or other waivers and protections provided in the Plan;

(r)     to approve, if necessary, any distributions, or objections thereto, under the Plan;

(s)     to approve, as may be necessary or appropriate, any Claims settlement entered into or offset exercised by the Liquidation Trust;

(t)     to resolve any dispute or matter arising under or in connection with the Liquidation Trust, Reorganized IPofA Shreveport or the Mineral Servitude or any of the Plan Funding Party Settlement Agreements or the Cordell Settlement Agreement;

(u)     to order the production of documents, disclosures, or information, or to appear for deposition demanded pursuant to Bankruptcy Rule 2004; and

(v)     to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

**2.     Retention of Non-Exclusive Jurisdiction by the Bankruptcy Court**. Notwithstanding anything else in the Plan, the Bankruptcy Court shall retain non-exclusive jurisdiction over all Estate Causes of Action.

## O.     Miscellaneous Provisions

**1.     Amendments.**

(a)     **Pre-Confirmation Amendments**.  The Proponents may modify the Plan at any time prior to the entry of the Confirmation Order, provided that the Plan, as modified, and the Disclosure Statement pertaining thereto meet applicable Bankruptcy Code requirements.

(b)     **Post-Confirmation Immaterial Modification**.  With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee and the Official Creditors' Committee or the Liquidation Trust Oversight Board, as applicable, and without notice to all holders of Claims and Equity Interests, the Proponents, the Manager, or the Liquidation Trustee, as applicable, may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan.

(c)     **Post-Confirmation Material Modification**.  On notice to and with an opportunity to be heard by the United States Trustee and the Official Creditors' Committee or the Liquidation Trust Oversight Board, as applicable, the Plan may be altered or amended after the Confirmation Date by the Liquidation Trustee or the Manager in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided

that such alteration or modification is made after a hearing and otherwise meets the requirements of Section 1127 of the Bankruptcy Code.

2. **Plan Supplements**. A Plan Supplement shall be filed with the Bankruptcy Court at least fifteen (15) Business Days prior to the deadline established for voting on the Plan. Upon its filing, the Plan Supplement may be inspected in the offices of the Clerk of the Bankruptcy Court during normal business hours. A copy of the Plan Supplement shall be mailed to any holder of a Claim or Interest that makes a specific written request for such Plan Supplement to the Proponents (as provided in Section 13.13 of the Plan). The documents contained in the Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

3. **Successors and Assigns**. The rights, benefits and obligations of any Entity or Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Entity or Person.

4. **Governing Law**. Except to the extent that the Bankruptcy Code or Bankruptcy Rules, other federal laws or the DLLCA are applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of New York.

5. **Effectuating Documents and Further Transactions**. Reorganized IPofA Shreveport and the Liquidation Trust shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan.

6. **Extinguishment of Liens**. On the Effective Date, all Liens against any property of any of the Debtors, except to the extent provided in the Plan, the Cordell Settlement, or the Confirmation Order, shall be deemed forever extinguished and discharged.

7. **Confirmation Order and Plan Control**. If, but only to the extent that, the Confirmation Order and/or the Plan shall be directly in conflict with the Disclosure Statement or any agreement entered into by the Liquidation Trust and/or Reorganized IPofA Shreveport, as applicable, the Plan shall control the Disclosure Statement and any such agreement, and the Confirmation Order shall control the Plan, the Disclosure Statement and any such agreement.

8. **Payment of Statutory Fees**. All fees due and then payable pursuant to section 1930 of title 28 of the United States Code and section 3717 of title 31 of the United States Code shall be paid in Cash on the Effective Date. With respect to the post-Confirmation period, the Liquidation Trust shall pay all fees and amounts payable pursuant to the foregoing statutes with respect to the consolidated Chapter 11 Cases until the earlier of the date of entry of an order dismissing, converting to Chapter 7 of the Bankruptcy Code, or decreeing as final the Chapter 11 Cases, as applicable.

9. **Withdrawal of Plan**. The Proponents reserve the right, in the exercise of their discretion, to revoke and withdraw or to modify the Plan at any time prior to the Confirmation

Date or, if the Proponents are for any reason unable to consummate the Plan after the Confirmation Date, at any time up to the Effective Date. If the Proponents revoke or withdraw the Plan, (a) nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against any of the Estates or to prejudice in any manner the rights of any of the Estates or any Entity or Person in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, the Plan was not filed and the Effective Date did not occur.

10. **Notices**. Any notice, request or demand given or made under the Plan or under the Bankruptcy Code or the Bankruptcy Rules shall be in writing and shall be hand delivered or sent by a reputable overnight courier service, and shall be deemed given when received at the following addresses whether hand delivered or sent by overnight courier service:

>> If to the Proponents

>> Gerard A. McHale, Jr., as Trustee
>> 1601 Jackson Street
>> Suite 200
>> Fort Myers, FL 33901
>> Telephone: (239) 337-0808
>> Fax: (239) 337-1178

>> and


>> Golenbock Eiseman Assor Bell & Peskoe LLP
>> 437 Madison Avenue
>> New York, New York 10022
>> Attn: Jonathan L. Flaxer, Esq.
>> Telephone: (212) 907-7300
>> Fax: (212) 907-754-0330
>> jflaxer@golenbock.com

11. **Cancellation of Documents**. On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, debentures, certificates and other documents evidencing Claims and Interests in a Debtor or the Debtors shall be canceled and deemed rejected and terminated.

12. **Termination of Official Creditors' Committee and Chapter 11 Trustee**. The appointments of the Official Creditors' Committee and the Chapter 11 Trustee shall terminate on the Effective Date, and the members of the Official Creditors' Committee and the Chapter 11 Trustee thereafter shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases.

13. **Post-Confirmation Reporting.** The Liquidation Trustee and the Liquidation Trust shall file reports of their respective activities and financial affairs with the Bankruptcy Court on a quarterly basis, within thirty (30) days after the conclusion of each such quarterly

calendar period. Any such reports shall be prepared substantially consistent with (both in terms of content and format) currently applicable Bankruptcy Court and United States Trustee guidelines for such matters, or as the Liquidation Trustee and the United States Trustee may otherwise mutually agree. The Liquidation Trustee shall also maintain and continue to update the website of the Chapter 11 Trustee through the closing of the case or until the Liquidation Trustee and the Liquidation Trust Oversight Board jointly determine that the cost of maintaining the website outweighs the benefit.

## X.

## CERTAIN RISK FACTORS

HOLDERS OF IMPAIRED CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE) PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THE RISK FACTORS ENUMERATED BELOW ASSUME CONFIRMATION AND THE CONSUMMATION OF THE PLAN AND ALL TRANSACTIONS CONTEMPLATED THEREIN, AND DO NOT INCLUDE MATTERS THAT COULD PREVENT OR DELAY CONFIRMATION. THE FOLLOWING RISK FACTORS MAY AFFECT OVERALL RECOVERIES TO IMPAIRED CLASSES BUT SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.** **Risk of Decreased Distributions to Holders of Allowed Class 3 Claims.**

**1.** **Higher Actual Amounts of Other Kinds of Allowed Claims.**

If the total amount of Allowed Administrative Claims, Allowed Fee Claims and Allowed Priority Claims exceeds the amount thereof estimated by the Proponents, the amount of Cash available for distribution to holders of Allowed Class 3 Claims would decrease.

**2.** **Material Disputed Claims.**

Disputed Claims may prove to be material. Depending on the resolution of such Disputed Claims, the actual total amount of all Allowed Class 3 Claims may exceed the total amount of such Claims estimated by the Proponents. Accordingly, the distribution that will ultimately be received by any particular holder of an Allowed Class 3 Claim may be adversely affected by the aggregate amount of all such Disputed Claims that become Allowed Claims.

**3.** **Uncertainty of Potential Recoveries by Liquidation Trust.**

The Cash that may be distributed by the Liquidation Trust will consist almost entirely of proceeds actually obtained in connection with the Estate Causes of Action and Mineral Servitude Revenues. The ability of the Liquidation Trust to collect significant proceeds from Estate Causes of Action and the Mineral Servitude Revenues is speculative. The potential for any

recovery for holders of Allowed Class 3 Claims would decline in the event that, for any reason, the Liquidation Trust was not able to collect significant proceeds from the Estate Causes of Action or the Mineral Servitude Revenues. The latter are expected to vary and to be contingent on a variety of factors, including the amount of natural gas royalties and related payments generated by and/or the proceeds received upon a sale of the Mineral Servitude, the productivity and longevity of future natural gas wells subject to the Mineral Servitude, market conditions and general economic conditions. There can be no assurance that Mineral Servitude Revenues actually available to the Liquidation Trust will, in fact, fall within the range presented herein.

## B.     <u>Uncertainty of Liquidation Analysis.</u>

The Proponents have prepared this Disclosure Statement in connection with the development of the Plan to present the anticipated effects of the Plan. It assumes the Plan and the transactions contemplated thereby will be implemented in accordance with their terms. The assumptions and estimates herein are inherently uncertain and are subject to significant business and economic risks and uncertainties that could cause actual results to differ materially from those projected. Such uncertainties and other factors include approval by the Bankruptcy Court of the Plan, objections of third parties, as well as the Liquidation Trustee's ability to settle outstanding claims and litigation on terms that generate a recovery for the Liquidation Trust and variations in the Mineral Servitude Revenues. Consequently, this Disclosure Statement should not be regarded as a representation by the Proponents, the Proponents' advisors, or any other person that the recoveries referred to in this Disclosure Statement will be achieved.

## C.     <u>Certain Risks of Non-Confirmation</u>.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of Claims or Interests might challenge the adequacy of the Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code and/or Bankruptcy Rules. Even if the Bankruptcy Court were to determine that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting holders of Claims and Interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude that these requirements have been met.

The confirmation and consummation of the Plan are also subject to certain conditions. If the Plan, were not to be confirmed, it is unclear what distribution holders of Claims ultimately would receive with respect to their Claims.

While the Proponents believe that the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there can be no guaranty that the Bankruptcy Court will agree.

**D.**   **Potential Liabilities Could Arise from Ownership of the Mineral Servitude.**

Operating hazards and/or natural disasters could result in potential liabilities to Reorganized IPofA Shreveport (and/or the Liquidation Trust), which may not be fully protected by indemnity or covered by insurance.

Natural gas exploitation activities that are expected to be conducted in respect of the Mineral Servitude involve certain operating hazards such as explosions, uncontrollable flows, fires, pollution and releases of toxic gas. In addition, Louisiana is especially susceptible to damage from natural disasters such as hurricanes and floods, all of which involve increased risks of personal injury and property damage. The occurrence of one or more of these operating hazards and/or natural disasters may result in injury, loss of life, suspension of operations, environmental damage and remediation and/or governmental investigations and penalties, which could subject Reorganized IPofA Shreveport (and/or the Liquidation Trust) to liability.

Reorganized IPofA Shreveport intends to negotiate and enter into one or more leases or other MS Contracts with parties developing and extracting the gas deposits from the Mineral Servitude.  Although the Proponents anticipate that any such MS Contracts will contain customary indemnification provisions in favor of Reorganized IPofA Shreveport, Reorganized IPofA Shreveport may not be able to obtain satisfactory indemnification from such lessees or other parties for any number of reasons, including the inability of any such lessee or other party to make its required indemnification payment due to bankruptcy or other lack of financial resources, or the finding of a court that such indemnification provisions are invalid or otherwise not enforceable.  Furthermore, any insurance policies owned by any lessee may provide only limited coverage for losses or liabilities and may be inadequate in the event of a catastrophic loss.  If Reorganized IPofA Shreveport (and/or the Liquidation Trust) incurs substantial liability, and the damages are not covered by indemnity or insurance, then the financial condition of Reorganized IPofA Shreveport (and/or the Liquidation Trust, as applicable), and the Liquidation Trust's ability to make distributions to holders of Allowed Claims in accordance with the Plan, may be adversely affected.

The activities to be conducted by Reorganized IPofA Shreveport with respect to the Mineral Servitude could be regarded by the IRS as the conduct of a trade or business.  If such activities are regarded as a trade or business and if such activities are attributed to the Liquidation Trust, such activities may be inconsistent with the intended federal income tax treatment of the Liquidation Trust as a grantor trust.  Although the Proponents believe such activities are not inconsistent with the intended federal income tax treatment of the Liquidation Trust, it is possible the IRS may take a different position.  See "Certain Federal Income Tax Consequences of the Plan--Consequences to Holders of Allowed Class 3 Claims--Tax Treatment of the Liquidation Trust and Holders of Beneficial Interests--Classification of the Liquidation Trust."

## XI.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

*IRS Circular 230 Notice*: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT ARE NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS IN THE DEBTORS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR INTERESTS IN THE DEBTORS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following discussion summarizes certain matters as to potential U.S. federal income tax consequences of the implementation of the Plan to holders of Allowed Unsecured Claims in Class 3. The following summary does not address the federal income tax consequences to (i) holders whose Claims are entitled to satisfaction in full (e.g., holders of Allowed Secured Claims and Allowed Priority Non-Tax Claims) or (ii) holders of Interests in the Debtors; nor does it address federal income tax consequences as to any of the Debtors or the Estates.

The holders of Allowed Claims to which the following discussion is addressed should be aware that the tax consequences described below are unclear under existing law and, as a result, alternative tax results are possible.

The following summary is based on the Tax Code, Treasury regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof. These rules are subject to change, possibly on a retroactive basis, and any such change could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary addresses neither state, local, or foreign income taxes, alternative minimum tax, or other tax consequences of the Plan, nor the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding a general unsecured claim as part of a hedging, integrated constructive sale or straddle, and investors in pass-through entities).

Accordingly, the following summary is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.

## A.    Consequences to Holders of Allowed Class 3 Claims

As discussed below, the Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes. The discussion as to certain potential federal income tax consequences contained herein assumes that the Liquidation Trust will be so treated for federal income tax purposes. However, to date no ruling has been requested from the IRS, (although the Liquidation Trustee has the power to request such a ruling, and may do so after the Plan is confirmed) and no opinion of counsel has been requested concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS to successfully challenge such classification, the federal income tax consequences of the Liquidation Trust and to the holders of Allowed Class 3 Claims could vary from those discussed herein (including the potential for an entity level tax on any income of the Liquidation Trust). See "4. Tax Treatment of the Liquidation Trust and Holders of Beneficial Interests," below.

### 1.    Treatment of Transfers to the Liquidation Trust

Each holder of an Allowed Claim in Class 3 will be treated for federal income tax purposes as directly receiving, in a taxable exchange for such holder's Class 3 Claim, and as a direct owner of, its allocable percentage of the Liquidation Trust Assets as of the Effective Date.

Pursuant to the Plan and the Liquidation Trust Agreement, the Liquidation Trustee, in consultation with the Liquidation Trust Oversight Board, is to make a good faith valuation of the Liquidation Trust Assets as of the Effective Date, and all parties must consistently use such valuation for all federal income tax purposes.

### 2.    Gain or Loss – Generally

In general, a holder of an Allowed Class 3 Unsecured Claim as of the Effective Date should recognize gain or loss in an amount equal to the difference between (i) the aggregate fair market value of the holder's undivided interest in the Liquidation Trust Assets received in respect of its Claim, taking into account any liabilities assumed by the Liquidation Trust or to which the Liquidation Trust Assets are subject and determined without taking into account the portion of the Liquidation Trust Assets (and/or the proceeds thereof) allocable to, or retained on account of, Disputed Claims, and (ii) such holder's adjusted tax basis in such Claim.

Any amount such a holder receives following the Effective Date as a distribution from the Liquidation Trust (other than possibly as a deemed distribution resulting from the subsequent disallowance of a Disputed Claim held by another Person) should generally not be included for federal income tax purposes in the holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such holder's interest in the Liquidation Trust. See "4. Tax Treatment of the Liquidation Trust and Holders of Beneficial Interests," below.

As and when any Disputed Claims become disallowed, each holder of certain previously Allowed Class 3 Claims may, pursuant to the Plan and the Liquidation Trust Agreement, become entitled to an increased share of the proceeds of the Liquidation Trust Assets. For federal income tax purposes, the "receipt" of such increased share may be treated as a deemed distribution to each such holder, as additional consideration in satisfaction of its Allowed Class 3 Claim, in an amount equal to the fair market value of such increased share at such time (with the potential for the recognition of gain at such time). Under the Tax Code, a portion of such amounts may be treated as imputed interest. In addition, it is also possible that any loss and a portion of any gain realized by a holder in satisfaction of a Class 3 Unsecured Claim may be deferred until such time as such holder has received its final distribution, if any, from the Liquidation Trust. Holders of Class 3 Unsecured Claims are urged to consult their tax advisors regarding the possible applicability of such deferral provisions.

As and to the extent any Disputed Class 3 Claim becomes an Allowed Claim, the holder thereof may have taxable income or loss in the same manner as holders of Allowed Class 3 Claims as of the Effective Date had upon the initial funding of the Liquidation Trust, as described above.

Where gain or loss is recognized by a holder in respect of its Class 3 Unsecured Claim, the character of such gain or loss (as long-term or short-term gain or loss, or ordinary income or loss) will be determined by a number of factors, including the tax status of the holder, whether the Claim in respect of which any property was received constituted a capital asset in the hands of the holder or was incurred in connection with the conduct by such holder of a trade or business, and how long it had been held, whether such Claim was acquired at a market discount, and whether and to what extent the holder had previously claimed a loss or bad debt deduction in respect of such Claim. Holders should consult their tax advisors.

In general, a holder's initial aggregate tax basis in its interest in the Liquidation Trust Assets will equal the fair market value of such interest when received, and the holding period for such interest generally will begin the day following the receipt of such interest.

### 3.  Distributions in Discharge of Accrued but Unpaid Interest

To the extent applicable to a particular Claim, the Liquidation Trust intends to treat all distributions in respect of any Allowed Class 3 Claim as allocable first to the principal amount of such Allowed Claim, as determined for U.S. federal income tax purposes, and thereafter, to the remaining portion of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim), including, without limitation, any portion of the Claim representing accrued original issue discount ("OID") or accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

In general, to the extent that an amount received (whether equity, Cash, or other property) by a holder of debt is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally should recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. However, the law is unclear in this area and each holder is urged to consult its tax advisor regarding the allocation

of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

**4.      Tax Treatment of the Liquidation Trust and Holders of Beneficial Interests**

Upon the Effective Date, the Liquidation Trust is to be established for the benefit of holders of Allowed Class 3 Claims, whether such Claims are or become Allowed Claims on or after the Effective Date.

**(a)      Classification of the Liquidation Trust**

The Liquidation Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).

However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Estates, the Liquidation Trustee, and the holders of Allowed Class 3 Claims) are required to treat, for U.S. federal income tax purposes, the Liquidation Trust as a grantor trust of which the holders are the owners and grantors.

**(b)      General Tax Reporting by the Liquidation Trust and Beneficiaries**

For all U.S. federal income tax purposes, the Estates and the Liquidation Trustee will treat the transfer of assets to the Liquidation Trust, and any amounts subsequently transferred to the Liquidation Trust (but only at such time as actually transferred to the Liquidation Trust, in accordance with the terms of the Plan), as a transfer of such assets directly to the holders of Allowed Class 3 Claims, in exchange for their Allowed Class 3 Claims, followed by the transfer of such assets by such holders to the Liquidation Trust. Consistent therewith, the Estates and the Liquidation Trustee will treat the Liquidation Trust as a grantor trust of which such holders are the grantors and deemed owners. Thus, such holders (and any subsequent holders of interests in the Liquidation Trust) will be treated as the direct owners of an undivided interest in the assets of the Liquidation Trust for all U.S. federal income tax purposes. Pursuant to the Plan, the Liquidation Trustee, in consultation with the Liquidation Trust Oversight Board, is to make a good faith determination of the fair market value of the assets of the Liquidation Trust as of the Effective Date, and the Liquidation Trustee and all holders of Allowed Claims must consistently use such valuation for all federal income tax purposes.

Consistent with the treatment of the Liquidation Trust as a grantor trust, each holder of an Allowed Class 3 Claim should report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Liquidation Trust, in accordance with its pro rata share of the proceeds of the Liquidation Trust Assets. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a holder are not dependent upon the Liquidation Trust's distributing any Cash or other proceeds. Therefore, a holder may incur a federal income tax liability with respect to its allocable share of the income of the Liquidation Trust (including any income earned with respect to amounts allocated to the Disputed Claims Reserve) even if the Liquidation Trust has not made a concurrent distribution to the holder. In general, a distribution of Cash by the Liquidation Trust to a holder will not be taxable to the holder as such holder is regarded for U.S. federal income tax purposes as already owning the underlying assets or realizing the income. However, such distributions will generally cause a reduction in the holder's tax basis with respect to its share of the Trust Assets, and any distribution in excess of such tax basis will result in taxable income to the holder.

Under the Liquidation Trust Agreement, the Liquidation Trustee is required to file, or to cause to be filed, with the IRS returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Liquidation Trust is also required to send, or cause to be sent, to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and instructing the holder to report such items on its federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. Such items generally would be reported on the holder's state and/or local tax returns in a similar manner.

**(c)      Taxation of the Liquidation Trust's Interest
in Reorganized IPof A Shreveport**

As of the Effective Date, pursuant to the Plan, the entire membership interest in Reorganized IPofA Shreveport is to vest in the Liquidation Trust, and become a Liquidation Trust Asset, and the Liquidation Trust is to become the sole member of Reorganized IPofA Shreveport. Reorganized IPofA Shreveport is to hold title to a Mineral Servitude which will not be transferred to the Liquidation Trust. However, Mineral Servitude Revenues are to be transferred from time to time to the Liquidation Trust by Reorganized IPofA Shreveport and will thereupon become Trust Assets. Reorganized IPofA Shreveport should be treated as a disregarded entity for federal income tax purposes, and the Mineral Servitude Revenues should be treated as the income of the Liquidation Trust whether or not such Mineral Servitude Revenues are transferred to the Liquidation Trust.

**(d)      Tax Reporting for the Liquidation Trust Disputed Claims Reserve**

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Liquidation Trust will not treat any Liquidation Trust Assets allocable to, or retained on account of, the Disputed Claims Reserve as separate from other Trust Assets or as held by a separate or distinct fund, account or trust for federal income tax purposes. Trust Assets allocable to the Disputed Claims Reserve shall be so allocated solely for record keeping purposes. The Liquidation Trust, to the extent permitted by applicable law, is to report consistently for state and local income tax purposes. In addition, pursuant to the Liquidation Trust Agreement, all holders of Allowed Claims are required to report, for income tax purposes, consistently with such treatment.

**B.**     **Other Creditors or Interest Holders**

Each holder of an Allowed Claim (other than Class 3 Claims) will generally recognize taxable income or loss upon satisfaction of its Claim in an amount that is equal to the difference between (a) the amount of any Cash and the fair market of any property received in respect of its Claim, if any (excluding any Cash or property received in respect of a claim for accrued interest), and (b) the holder's tax basis in its Claim (other than any Claim for such accrued interest). Each holder of an Interest in the Debtors will generally recognize taxable loss upon termination of its Interest in an amount that is equal to the holder's tax basis in its Interest.

The determination of the character of such income or loss as long-term or short-term capital gain or loss or as ordinary income or loss will depend upon a number of factors, including, among other things, the tax status of the creditor or Interest holder, whether the Claim or Interest constitutes a capital asset in the hands of the Creditor or Interest holder, whether the Claim or Interest has been held for more than one year, and whether and to what extent the Creditor or Interest holder has previously claimed a loss or bad debt deduction (or charged a reserve for bad debts) with respect to the Claim or Interest.

**C.**     **Information Reporting and Withholding**

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%). Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated after January 1, 2003, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. These categories are very broad; however, there are numerous exceptions. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE FOREGOING SUMMARY AS TO CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE

FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX
CONSEQUENCES APPLICABLE UNDER THE PLAN.

# XII.

## LIQUIDATION ANALYSIS AND BEST INTERESTS TEST

Even if a plan is accepted by the holders of each class of Claims and Interests, the Bankruptcy Code requires that the court determine that the plan is in the best interests of all holders of Claims or Interests that are impaired by the plan and have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a Creditor who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover under a hypothetical chapter 7 liquidation. The "best interests" test does not apply to the holders of unimpaired Claims.

Based upon the Chapter 11 Trustee's investigation and the circumstances described below, the Proponents submit that the Plan is the most practical means of maximizing recoveries to Creditors in the Chapter 11 Cases in the most expeditious manner, and, therefore that the Plan is in the best interests of the Creditors. In this respect, the Chapter 11 Trustee has considered liquidation of the Debtors' remaining assets under chapter 7 of the Bankruptcy Code, but has concluded that the Plan provides a greater recovery to creditors on a more expeditious timetable.

If the Plan cannot be confirmed under Bankruptcy Code § 1129(a), the Chapter 11 Cases would likely be converted to cases under chapter 7 of the Bankruptcy Code ("Chapter 7"), in which event a trustee ("Chapter 7 Trustee") would be appointed or elected to liquidate the remaining assets of the Debtors for distribution to creditors pursuant to Chapter 7. In this event, Creditors holding Allowed Administrative Claims and Allowed Priority Claims (as well as holders of various other Claims) may receive lesser distributions on account of their Allowed Claims and likely would have to wait a longer period of time to receive such distributions than they would under the Plan. A Chapter 7 Trustee would lack the Chapter 11 Trustee's and his advisors' and professionals' knowledge of the Debtors' affairs, and would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Estates and the potential Causes of Action, thereby causing delay and additional expense.

Among other things, a Chapter 7 Trustee would require time to become familiar with the Debtors' Assets, including, the Estate Causes of Action and the Mineral Servitude that the Chapter 11 Trustee and his professionals have already been overseeing for well over a year, as well as other issues that have emerged over the course of the Chapter 11 Cases. Specifically, a Chapter 7 Trustee would likely not have the knowledge of the Debtors and the Causes of Action that has been developed by the Chapter 11 Trustee since his appointment. It is noted in this respect that the factual background regarding the Debtors is complex, involving numerous individuals and entities, and tens of thousand of financial transactions. In addition, the pending and contemplated litigations are multifaceted and complex, factually and legally. Therefore, the

Chapter 11 Trustee believes that a Chapter 7 Trustee may not be able to resolve the Estate Causes of Action, as well as the Disputed Claims, as effectively and efficiently as the Liquidation Trustee (who is already serving as the Chapter 11 Trustee) could in accordance with the Plan. A Chapter 7 Trustee who lacked a similar familiarity with the Debtors and the events that have occurred so far in the Chapter 11 Cases would require additional time, once appointed, to gain the requisite knowledge of the Debtors and the Causes of Action, the universe of Claims filed, and other significant items herein, thereby further delaying the administration of the Debtors' Estates.

In sum, the Chapter 11 Trustee believes that the Plan provides for the liquidation of the Debtors in a manner that would be more efficient and cost-effective than a liquidation under Chapter 7 of the Bankruptcy Code. Specifically, the Chapter 11 Trustee anticipates that a conversion to Chapter 7 would potentially result in (i) a delay in distributions to all Creditors who would have been entitled to receive a distribution under the Plan and (ii) diminished recoveries for holders of certain Claims in the Chapter 11 Cases.

Accordingly, the Proponents believe that the value of the assets to be received under the Plan by the holders of Claims entitled to distributions under the Plan would be equal to or greater than the value such holders would receive in a liquidation of the Debtors under Chapter 7.

## CONCLUSION

The Proponents believe that the Plan offers the Creditors the only means for a fair and meaningful distribution and strongly believe that the Plan should be confirmed.

Accordingly, the Proponents urge you to vote to accept the Plan by returning your ballot on or before September 25, 2009.

Dated: New York, New York
       August 11, 2009

Gerard A. McHale, Jr., as *Chapter 11 Trustee for The 1031 Tax Group, LLC, et al.*

     /s/ Gerard A. McHale, Jr.

IPofA Shreveport Industrial Park, LLC

By:   /s/ Gerard A. McHale, Jr.
    Gerard A. McHale, Jr., its Manager

GOLENBOCK EISEMAN ASSOR
  BELL & PESKOE LLP
*Attorneys for Gerard A. McHale, Jr., the Chapter 11 Trustee*
*for The 1031 Tax Group, LLC, et al. and IPofA Shreveport Industrial Park, LLC*
437 Madison Avenue
New York, New York 10022
(212) 907-7300

By:    /s/ Jonathan L. Flaxer
    Jonathan L. Flaxer, a Member of the Firm